## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANTHONY BAEZ, JONATHAN BERMUDEZ, JERMAINE GONSALVES, and DEDRICK LINDSEY on behalf of themselves and all others similarly situated; <br><br> Plaintiffs-Petitioners, <br><br> v. <br><br> JOSEPH D. MCDONALD, JR., SHERIFF OF PLYMOUTH COUNTY, in his official capacity, ANTONE MONIZ, SUPERINTENDENT OF THE PLYMOUTH COUNTY CORRECTIONAL FACILITY, in his official capacity, and JOHN and JANE DOES, in their individual and official capacities, <br><br> Defendants-Respondents. | CIVIL ACTION NO._____ <br><br> **CLASS ACTION PETITION SEEKING WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2241 AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs-Petitioners Anthony Baez, Jonathan Bermudez, Jermaine Gonsalves, and Dedrick Lindsey (collectively, "Petitioners"), on behalf of themselves and a class of similarly situated federally-detained individuals currently in the custody of the Defendants-Respondents (collectively, "Respondents") at the Plymouth County Correctional Facility ("PCCF") in Plymouth, Massachusetts, by and through their undersigned counsel, hereby allege as follows:

## PRELIMINARY STATEMENT

1. This case presents a request for immediate relief on behalf of a putative class of Petitioners—individuals currently being detained at PCCF in connection with criminal charges filed against them in the United States District Court for the District of Massachusetts and individuals. Because of the ongoing and unsafe conditions in which Petitioners are being held, Petitioners are at imminent risk of contracting COVID-19, the lethal virus that is sweeping the globe.

2. Over the course of the past month, Petitioners and the other class members have watched in panic as the COVID-19 epidemic has spread across the world, throughout the United States and in the Commonwealth of Massachusetts, wondering what, if anything, the Respondents would do to keep them safe.  Now that the COVID-19 virus has begun entering correctional facilities in Massachusetts, the answer is clear: far too little.

3. Like the rest of society, Petitioners and the other class members have read and viewed news reports in which the President of the United States and the Governor of the Commonwealth of Massachusetts have devoted hours to imploring –and in some instances requiring – all Americans to engage in "social distancing," to avoid congregating in groups, to wash their hands and to use hand sanitizer frequently, to disinfect frequently touched surfaces, and to seek prompt medical attention if COVID-19 symptoms develop.

4. But unlike the rest of society – people who are able to, and often must, heed the directives and guidance promoted by the government relating to COVID-19 – Petitioners and the other class members cannot do so. Although they are fully aware of the serious risks posed by COVID-19 and the precautions that must be taken to protect themselves from the virus, Petitioners and the other class members are being systematically denied the opportunity to take the basic steps that are being urged by federal and local officials to protect their safety.  That is because, despite knowledge of those directives—including specific and detailed guidance provided by the United States Centers for Disease Control and Prevention ("CDC") to correctional and detention facilities like the one operated by the Respondents—Respondents have failed to implement many of the basic procedures recommended by the CDC and other government officials, including steps as straightforward as requiring 6-foot social distancing among individuals within their facility, distributing sufficient hygienic products, engaging in

frequent and regular cleaning, and requiring the use of personal protective equipment (PPE). Most critically, Respondents have failed to take sufficient steps to reduce the populations of federal detainees at PCCF in order to ensure that the CDC guidance, including the 6-foot social distancing requirements, can be followed in order to adequately protect Petitioners' and other class members' health and safety.

5. Respondents' conduct, including but not limited to their failure to follow published CDC guidance and their ongoing deliberate indifference to the significant and serious health risks posed by the COVID-19 outbreak to the Plaintiffs has violated the Petitioners' and other class members' rights under the Fifth Amendment's Due Process Clause and the Eighth Amendment's protection against cruel and unusual punishment.

6. Respondents' ongoing failures to take reasonable precautions to prevent the spread of COVID-19 and to limit the severity of a potential COVID-19 outbreak at their facility gravely jeopardizes the safety of Petitioners and all of the other class members confined there.

7. Respondents are violating the due process rights of federal detainees when they "recklessly fail[] to act with reasonable care to mitigate the risk of a condition that Defendants "knew or should have known posed and excessive risk to health safety. *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017).

8. Respondents are violating the Eighth Amendment rights of class members through their conduct and by acting with "deliberate indifference" to an "unreasonable risk of serious damages" to members of the class. *See Helling v. McKinney*, 509 U.S. 25, 33-35 (1993).

9. Because of Respondents' ongoing and systematic violation of Petitioners' and other class members' constitutional rights, Petitioners seek class-wide relief requiring Respondents to take immediate action to reduce the population at PCCF and to implement other basic policies

and procedures that would mitigate the significant and serious risk posed by COVID-19 to

Petitioners' and other class members' health and safety.

## PARTIES

10. Petitioner Anthony Baez is an individual currently facing criminal charges in the

United States District Court for the District of Massachusetts. At all times relevant to this

Complaint, Mr. Baez has been detained at PCCF, where he is at risk of death or serious injury if

exposed to COVID-19. He is being held in pretrial custody and is presumed innocent.

11. Petitioner Jonathan Bermudez is an individual currently facing criminal charges in the

United States District Court for the District of Massachusetts. At all times relevant to this

Complaint, Mr. Bermudez has been detained at the Plymouth County Correctional Facility

("PCCF") in Plymouth, Massachusetts, where he is at risk of death or serious injury if exposed to

COVID-19. Mr. Bermudez is being held in pretrial custody and is presumed innocent.

12. Petitioner Jermaine Gonsalves is an individual currently facing criminal charges in

the United States District Court for the District of Massachusetts. At all times relevant to this

Complaint, Mr. Gonsalves has been detained at PCCF, where he is at risk of death or serious

injury if exposed to COVID-19. He is being held in pretrial custody and is presumed innocent.

13. Petitioner Dedrick Lindsey is an individual currently facing criminal charges in the

United States District Court for the District of Massachusetts. At all times relevant to this

Complaint, Mr. Lindsey has been detained at PCCF, where he is at risk of death or serious injury

if exposed to COVID-19. He is being held in pretrial custody and is presumed innocent.

14. Respondent Joseph D. McDonald, Jr. ("McDonald") is the Sheriff for Plymouth

County, Massachusetts.  He has failed to adopt and failed to enforce health and safety standards

at PCCF in response to the COVID-19 crisis, and those failures leave Petitioners and all those

similarly situated exposed to infection, severe illness, and death due to COVID-19. McDonald is the immediate physical custodian for the detention of Petitioners at PCCF. He is sued in his official capacity.

15. Respondent Antone Moniz ("Moniz") is the Superintendent of PCCF.  He has failed to adopt and failed to enforce health and safety standards at PCCF in response to the COVID-19 crisis, and those failures leave Petitioners and all those similarly situated exposed to infection, severe illness, and death due to COVID-19. McDonald is also the immediate physical custodian for the detention of Petitioners at PCCF. He is sued in his official capacity.

16. Respondents John and Jane Does (the "Doe Defendants") are parties responsible for the custody and care of Petitioners and other similarly situated individuals who have failed to enforce health and safety standards at PCCF in response to the COVID-19 crisis, which has left Petitioners and all those similarly situated exposed to infection, severe illness, and death due to COVID-19. The Doe Defendants are sued in their individual and, as appropriate, official capacities. The total number and identities of the Doe Defendants is currently unknown to the Petitioners, who therefore sue these individuals using fictitious names. Petitioners will seek leave to amend the Complaint to state the true names of the Doe Defendants when they ascertain their identities. Petitioners will serve each Doe Defendant with process at that time.

## JURISDICTION AND VENUE

17. Petitioners bring this action pursuant to 28 U.S.C. § 2241 for relief from Respondents' conduct in violation of the Fifth and Eighth Amendments to the U.S. Constitution.

18. The Court has subject matter jurisdiction over this Petition pursuant to Article I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause); the Fifth and the Eighth Amendments to the U.S. Constitution; 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1651 (All Writs Act); and 28

U.S.C. § 2241 (habeas corpus). In addition, this Court has jurisdiction to grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

19. Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to these claims occurred and continue to occur in this District.

## STATEMENT OF FACTS

### The COVID-19 Crisis

*Overview of COVID-19*

20. As of 11:45 a.m. EDT on April 16, 2020, the new strain of coronavirus, COVID-19, has infected over 2,090,110 people worldwide, leading to more than 139,000 deaths.[1]

21. On March 11, 2020 the World Health Organization officially classified COVID-19 as a pandemic.[2] Current projections by the Centers for Disease Control and Prevention ("CDC") indicate that over 200 million people in the United States could be infected with COVID-19 over the course of the epidemic without effective public health intervention, with as many as 1.5 million deaths in the most severe projections.[3]

22. The mortality rate for COVID-19 worldwide is 3.4%.[3]

23. People of any age who suffer from certain underlying medical conditions, including lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis

---

[1] Center for Systems Science and Engineering at Johns Hopkins University, Coronavirus COVID-19 Global Cases Dashboard at
https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6.

[2] WHO Characterizes COVID-19 as a Pandemic, World Health Organization (March 11, 2020) at
https://bit.ly/2W8dwpS.

[3] https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---3-march-2020

patients), diabetes, epilepsy, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke, developmental delay, and asthma, are at elevated risk from COVD-19.[4]

24. The WHO-China Joint Mission Report provides that the COVID-19 mortality rate for those with cardiovascular disease is 13.2%, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer.[5]

25. The need for care, including intensive care, and the likelihood of death, is much higher from COVID-19 infection than from influenza. According to recent estimates, the fatality rate of people infected with COVID-19 is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems.[6]

26. As of April 16, 2020, there are 32,181 positive reported cases in Massachusetts.[7] To date, there have been 1,245 COVID-19 related deaths in Massachusetts. *Id.*

*CDC and WHO recommendations regarding prevention and/or slowing the spread*

27. There is no vaccine available to prevent COVID-19, and there is no cure for COVID-19.[8]

---

[4] *Coronavirus disease (COVID-19) advice for the public: Myth buster*s, World Health Organization, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/advice-for-public/myth-busters ("Older people, and people with pre-existing medical conditions (such as asthma, diabetes, heart disease) appear to be more vulnerable to becoming severely ill with the virus.").

[5] *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, World Health Organization (Feb. 28, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf (finding fatality rates for patients with COVID-19 and co-morbid conditions to be: "13.2% for those with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer").

[6] Betsy McKay, *Coronavirus vs. Flu Which Virus is Deadlier*, WALL ST. J. (Mar. 10, 2020, 12:49 PM) https://www.wsj.com/articles/coronavirus-vs-flu-which-virus-is-deadlier-11583856879.

[7] *See* COVID-19 Cases, Quarantine and Monitoring (April 16, 2020) https://www.mass.gov/info-details/covid-19-cases-quarantine-and-monitoring.

28. The Centers for Disease Control and Prevention ("CDC") has advised that the virus passes between people who are in close contact with one another (approximately six feet), through respiratory droplets produced when an infected person coughs, sneezes or talks, and by contact with surfaces.[9]

29. New data published in the New England Journal of Medicine found that the highly contagious "virus can remain viable and infectious in aerosols for hours and on surfaces up to days." COVID-19 is thought to survive for three hours in the air in droplet form that can be inhaled or transferred to surfaces, up to twenty-four hours on cardboard, up to two days on plastic, and up to three days on steel.[10]

30. The current available evidence indicates that the virus may remain on surfaces for up to three days. *See* Neeljte van Doremalen, et. al., *Aerosol and Surface Stability of SARS-CoV2 as Compared with SARS-COV-1*, New England Journal of Medicine (Mar. 17, 2020) ("SARS-CoV-2 was more stable on plastic and stainless steel than on copper and cardboard, and viable virus was detected up to 72 hours after application to these surfaces (Figure 1A)…").[11]

31. To combat transmission, the CDC has issued guidance discouraging gatherings of more than 10 people in one place.[12]

---

[8] *See* Q&A on coronaviruses (COVID-19), World Health Organization (April 4, 2020) https://www.who.int/news-room/q-a-detail/q-a-coronaviruses

[9] *See* "How It Spreads," Center for Disease Control and Prevention, located at https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html.

[10] Neeltje van Doremalen, et. al, Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1, New England J. Med., (March 17, 2020), nejm.org/doi/10.1056/NEJMc2004973.

[11] Available at https://www.nejm.org/doi/10.1056/NEJMc2004973.

[12] Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission, Center for Disease Control and Prevention, 3 (Mar. 12, 2020) available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/community-mitigation-strategy.pdf.

32. The CDC also urges social distancing—every person should remain at a distance of at least six feet from every other person.[13]

33. Proper hygiene, including frequent cleaning of all surfaces and frequent, thorough hand washing is also recommended.[14]

### *The Government's Response to the COVID-19 Crisis*

34. On March 13, 2020, President Donald Trump declared a national emergency to address the pandemic.[15]

35. Massachusetts Governor Charlie Baker declared a state of emergency in the Commonwealth of Massachusetts on March 10, 2020.[16]

36. To date, the pandemic has caused the Governor to issue more than 21 emergency orders.[17]

37. Those orders range from closing all elementary and secondary schools to prohibiting on-site consumption of food and beverages to restricting visitor access to nursing homes to prohibiting public gatherings of more than 10 people. *Id.*

38. On March 23, 2020, Governor Baker ordered all non-essential businesses to close. *Id.*

---

[13] *See* supra note 7; see also Lisa Maragakis, "Coronavirus, Social Distancing, and Self-Quarantine," John Hopkins Univ. (last accessed March 21, 2020) https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-social-distancing-and-self-quarantine.

[14] https://www.cdc.gov/handwashing/when-how-handwashing.html

[15] Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Conference (March 13, 2020). https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-conference-3/.

[16] https://www.mass.gov/executive-orders/no-591-declaration-of-a-state-of-emergency-to-respond-to-covid-19

[17] https://www.mass.gov/info-details/covid-19-state-of-emergency.

39. Forty-two states have issued "stay at home" or "shelter in place" emergency orders prohibiting non-essential travel and assembly.[18] Three other states have "stay at home" and "shelter in place" orders in parts of the state. *Id.*

40. As of April 7, 2020, 95% of the American population is under instructions to stay at home. *Id.*

41. This Court has also issued a series of General Orders relative to coronavirus, including an Order continuing all jury trials that were scheduled to begin on or before May 29, 2020 (D. Mass. General Order 20-13) and an Order continuing all criminal hearings and deadlines for 60 days, unless there is a case-specific personal liberty or public safety interest at stake. (D. Mass. General Order 20-4).[19]  Other measures recently taken by this Court in response to the COVID-19 crisis include postponing grand juries, civil mediation sessions and naturalization ceremonies, and restricting courthouse visitors.

42. Virtually all of this Court's recent Orders and precautionary measures are designed to keep people out of crowded places and to require "social distancing" to lessen the spread of the virus because it is highly contagious.

### *Locations particularly vulnerable to the spread of COVID-19*

43. The recommended measures for mitigating the spread of COVID-19 are not readily available for incarcerated inmates or those who must interact with them.

44. Congregate settings such as jails and prisons allow for rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. In prison, individuals are confined in close proximity to one another and

---

[18]*See Which States and Cities Have Told Residents to Stay at Home* (April 10, 2020)
https://www.nytimes.com/interactive/2020/us/coronavirus-stay-at-home-order.html?auth=login-email&login=email
[19] http://www.mad.uscourts.gov/caseinfo/court-orders.htm

to the staff. When people must share sleeping areas, dining halls, bathrooms, showers and other common areas, the opportunities for transmission are greater.

45. Because people — staff, residents, contractors, community members, and others — constantly cycle in and out of correctional facilities, there is an ever-present risk that new carriers will bring the virus into the facility.

46. In addition, there are reduced opportunities in jails and prisons to apply necessary hygiene measures, as those facilities are often under resourced and ill-equipped.

47. Compounding these problems, many people who are incarcerated also have chronic underlying health conditions, like asthma, diabetes, hypertension, or HIV, that place them at elevated risk for contracting serious COVID-19. Incarcerated people have poorer health than the general population, and even at the best of times, medical care is limited in federal pretrial detention centers.[20]

48. With respect to COVID-19, a prison is no different than a cruise ship[21] or a nursing home[22] – places where the virus has run rampant.

49. A prison is an environment in which the COVID-19 virus can easily gain a foothold and, when it does, it can spread rapidly jeopardizing the life and safety of prisoners.

> "[B]ehind bars, some of the most basic disease prevention measures are against the rules or simply impossible. Separating sick people from well people to prevent the disease from spreading can be nearly impossible in prison, since prisoners are already

---

[20] Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, at https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

[21] Center for Disease Control & Prevention, COVID-19 and Cruise Ship Travel (last accessed March 21, 2020) https://wwwnc.cdc.gov/travel/notices/warning/coronavirus-cruise-ship.

[22] Los Angeles Times, Seattle-Area Nursing Home Deaths Jump to 13 with COVID-19 and 11 of Unknown Causes, https://www.latimes.com/world-nation/story/2020-03-07/nursing-home-coronavirus-deaths.

grouped according to security and other logistical considerations.
Even so-called social distancing can prove impossible. People in
prisons and jails live every minute of the day in close proximity to
each other."[23]

50. According to public health experts, incarcerated individuals "are at special risk of

infection, given their living situations," and "may also be less able to participate in proactive

measures to keep themselves safe;" "infection control is challenging in these settings."[24]

51. Medical professionals behind bars are sounding the alarm as well. Dr. Ross

McDonald, the chief medical officer for Correctional Health Services at Rikers Island, has

explained that "a storm is coming."[25]

52. In commenting on the limitations of an incarceration facility to protect individuals

from the threat of COVID-19, Dr. McDonald stated, "we cannot change the fundamental nature

of jail. We cannot socially distance dozens of elderly men living in a dorm, sharing a bathroom.

Think of a cruise ship recklessly boarding more passengers each day. . . Please let as many out as

you possibly can." *Id.*[26]

53. The "storm" that Dr. McDonald foresaw in American correctional institutions is

already here. As of April 8, 2020, the Cook County Jail in Chicago, Illinois was the "largest

---

[23] The Justice Collaborative, *Explainer: Prisons and Jails are Particularly Vulnerable to COVID-19 Outbreaks*,
(emphasis removed) https://thejusticecollaborative.com/ wp-
content/uploads/2020/03/TJCVulnerabilityofPrisonsandJailstoCOVID19 Explainer.pdf.

[24] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other
Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), at
https://bit.ly/2W9V6oS.

[25] *See* Craig McCarthy, *Top Rikers Doctor: Coronavirus 'Storm is Coming*,' N.Y. Post (Mar. 19, 2020)

[26] *See also* Jennifer Grannerman, *A Rikers Island Doctor Speaks Out to Save Her Elderly Patients from the
Cornoavirus*, The New Yorker (Mar. 20, 2020).

source" of COVID-19 infections in the United States. In that facility, 218 inmates and 115 staff members have already tested positive for COVID-19.[27]

54. In New York, statistics gathered by the Legal Aid Society demonstrate that "New York City jails have become the epicenter of COVID-19."[28]  Those statistics show that the COVID-19 infection rate in New York City jails is more than *seven times greater* than in New York City in general and more than *fifty times greater* than the infection rate across the United States as a whole.  *Id.*

## Coronavirus Infection Rates as of April 9, 2020

| Locations | Cases | Population | Infection Rate | Infections/ 1,000 people |
|---|---|---|---|---|
| NYC Jails (Rikers)** | 288 | 4,263 | 6.76% | 67.56 |
| New York City | 84,373 | 8,175,133 | 1.03% | 10.32 |
| New York State | 159,937 | 19,440,469 | 0.82% | 8.23 |
| United States | 462,391 | 331,002,651 | 0.14% | 1.4 |
| Hubei Province (Wuhan) | 67,803 | 59,020,000 | 0.12% | 1.15 |
| China | 81,865 | 1,439,323,776 | 0.01% | 0.06 |
| Lombardy, Italy | 54,802 | 10,040,000 | 0.55% | 5.46 |
| Italy | 143,626 | 60,461,826 | 0.24% | 2.38 |



55. In China, officials have confirmed that the coronavirus spread at a rapid pace in Chinese prisons.[29]

56. Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country.[30]

57. In the United States, steps are already being taken in some jurisdictions to facilitate the release of elderly and sick prisoners and to reduce jail populations by discouraging the admission of individuals arrested on non-violent misdemeanor charges. *See*, e.g., Zusha Elinson and Deanna Paul, *Jails Release Prisoners, Fearing Coronavirus Outbreak*, Wall Street Journal (Mar. 22, 2020). This is happening in Massachusetts as well.[31]

58. Realizing that a crisis is looming, voices in Congress have called upon the Department of Justice to "do all they can to release as many people as possible who are currently behind bars and at risk of getting sick." *See* March 19, 2020 Letter from U.S. Reps. Jerrold Nadler & Karen Bass to Attorney General William P Barr ("With large numbers of people living in close proximity to one another, many of them elderly or living with chronic diseases, DOJ must act now to save lives. Accordingly, we urge you to put in place measures to ensure that both the flow of prisoners into federal facilities is slowed significantly and that prisoners who can and should be released are released forthwith. We cannot wait any longer to take action.");[32]

---

[29] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider (Feb. 21, 2020) at https://www.businessinsider.com/500-coronavirus-cases-reported-in-jails-in-china-2020-2.

[30] *Coronavirus: Iran Temporarily frees 54,000 prisoners to combat spread,* BBC News, (Mar. 3, 2020) https://www.bbc.com/news/world-middle-east-51723398.

[31] *See Citing Risk of Coronavirus Spread, DA Rollins Seeks Release of Many Suspects From Custody*," WCVB Channel 5 (Mar. 20, 2020) available at https://www.wcvb.com/article/citing-risk-of-coronavirus-spread-da-rollins-seeks-release-of-many-suspects-from-custody/31781799#

[32] Available at https://judiciary.house.gov/uploadedfiles/2020-03-19_letter_to_ag_barr_re_covid19.pdf.

*see also* March 19, 2020 Letter from Senator Kamala Harris to Bureau of Prisons Director

Michael Carvajal (noting that "[e]merging research has demonstrated how dangerous

coronavirus is for the elderly and those with underlying conditions and compromised immune

systems" and urging BOP to "tak[e] reasonable steps to reduce the incarcerated population and

guard against potential exposure to coronavirus").[33]

59. Federal courts are also beginning to recognize the risk and follow suit. *See, e.g,,*

United *States v. Matthaei*, ECF No. 30, Case No. 1:19-cr-243-BLW (D. Idaho Mar. 16, 2020)

(extending self-surrender date by 90 days in light of COVID-19); *United States v. Barkman*,

2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) (suspending intermittent confinement

order because "we must take every necessary action to protect vulnerable populations and the

community at large"); *In re Manrigue*, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) ("The risk

that this vulnerable person will contract COVID-19 while in jail is a special circumstance that

warrants bail."); *United States v. Stephens*, 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020)

(granting release based on the "unprecedented and extraordinarily dangerous nature of the

COVID-19 pandemic" which places inmates, in particular, at "heightened risk"); *See als*o *United

States v. Jose Perez*, Amended Order, No. 19-cr-00297-PAE (S.D.N.Y. Mar. 19, 2020) (ECF No.

62) (ordering defendant's temporary release from custody "based on the unique confluence of

---

[33] Available at https://www.harris.senate.gov/imo/media/doc/Harris%20Letter%20to%20Carvajal%20(3.19).pdf

*See also* March 9, 2020 letter from fifteen United States Senators to BOP Director Carvajal, available at
https://www.warren.senate.gov/imo/media/doc/2020-03-
09%20Senator%20Warren%20Letter%20to%20BOP%20re%20Coronavirus.pdf.

*See also* Mark Hallum, *Three New York Congress members tell feds to spring non-violent offenders from jail*,
AMNY (Mar. 22, 2020) available at
https://www.amny.com/coronavirus/three-new-york-congress-members-tell-feds-to-spring-non-violent-offenders-
from-jail/.

serious health issues and other risk factors facing this defendant, including but not limited to the defendant's serious progressive lung disease and other significant health issues, which place him at a substantially heightened risk of dangerous complications should be contract COVID-19 as compared to most other individuals."); *Xochihua-James v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (unpublished) (sua sponte releasing detainee from immigration detention "in light of the rapidly escalating public health crisis").

60. On March 26, 2020, Attorney General William Barr sent a memorandum to the Director of the Federal Bureau of Prisons directing the BOP to take steps to transfer inmates to home confinement where appropriate in order to decrease the risk to their health.   *See* Exhibit A – Memorandum of Attorney General William Barr, dated March 26, 2020.

61. Approximately one week later, on April 3, 2020, Attorney General Barr sent a second memorandum to the Director of the BOP noting that "we are experiencing significant levels of infection at several of our facilities."  The memorandum directed the BOP to "move with dispatch . . . to move vulnerable inmates out of these institutions."  *See* Exhibit B – Memorandum of Attorney General William Barr, dated April 3, 2020. In that letter, Attorney General Barr issued a finding that "emergency conditions are affecting the functioning of the Bureau of Prisons."  *Id.* He accordingly directed that BOP "immediately maximize appropriate transfers to home confinement of all appropriate inmates" at the affected facilities and at other similarly situated facilities. *Id.* The Attorney General explained that "[g]iven the speed with which the this disease has spread through the general public, it is clear that time is of the essence."  *Id.*

62. The Attorney General's April 3, 2020, memorandum directed the immediate release of convicted defendants in response to the COVID-19 crisis. The arguments advanced by the

Attorney General in that memorandum apply with even greater force to the Petitioners, many of whom are pretrial detainees and who are entitled to the presumption of innocence.

63. On April 1, 2020, the Massachusetts Supreme Judicial Court issued a ruling recognizing the serious threat posed by COVID-19 to incarcerated individuals in the Commonwealth. *See Christie v. Commonwealth,* Case No. SJC-12927 (Mass., April 1, 2020), slip op. at 2 (holding that "the health risks to a person in custody caused by the pandemic constitute changed circumstances" that require de novo review of a lower court's earlier denial of a motion to stay the execution of a sentence).  In that case, the SJC cited to the "unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff and visitors," *d.* at 5 (quoting Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (March 23, 2020), and noted that incarcerated individuals "cannot realistically maintain adequate social distancing." *Id.* at 5-6.

64. On April 3, 2020, the Massachusetts Supreme Judicial Court ("SJC") issued a broad Order addressing individuals who are detained in Massachusetts jails, houses of correction pending trial on state charges, as well as individuals who have been convicted of state offenses and are serving a sentence of incarceration in the Commonwealth.[34]

65. In its April 3, 2020, ruling, the SJC acknowledged that "correctional institutions face unique difficulties in keeping their populations safe during this pandemic."  *Id.* at 9. Among many other concerns, the SJC noted that "[maintaining adequate physical distance, i.e., maintaining six feet of distance between oneself and others, may be nearly impossible in prisons and jails."  *Id.* "Proper sanitation" is another problem, and SJC noted that "during recent routine

---

[34] *See Committee for Public Counsel Services v. Chief Justice of the Trial Court,* Massachusetts Supreme Judicial Court, Docket No. SJC-12926, Order dated April 3, 2020: https://assets.documentcloud.org/documents/6824900/12926.pdf.

inspections of Massachusetts correctional institutions (prior to the declaration of emergency),

DPH inspectors discovered a concerning number of repeat environmental health violations." *Id.*

at 10.

66. As of April 15, 2020, at least four incarcerated people in Massachusetts have died

from COVID-19 related complications.[35]

67. At least 281 incarcerated people and staff in the Massachusetts prison and jail system

have tested positive for coronavirus.[36] There has been a steady increase in confirmed positive

cases in Massachusetts correctional facilities over time. *Id.*



68. As of April 14, 2020, Massachusetts has the third highest number of reported

COVID-19 cases in the United States, after New York and New Jersey.[37]

---

[35] Coronavirus cases increase at Bridgewater prison (April 16, 2020)
https://www.enterprisenews.com/news/20200413/coronavirus-cases-increase-at-bridgewater-prison

[36] *See* https://data.aclum.org/sjc-12926-tracker/

[37] *See* Tracking Covid-19 cases in the US (April 14, 2020)
https://www.cnn.com/interactive/2020/health/coronavirus-us-maps-and-cases/

69. As of April 13, 2020, the Federal Bureau of Prisons ("BOP") has reported that at least 388 individuals in BOP custody have tested positive for COVID-19 and 201 BOP staff members have tested positive for COVID-19.

70. As of April 13, 2020, the BOP has reported that thirteen federal inmates have died from COVID-19.

## Medical Experts Have Recommend the Immediate Reduction of Population in Detention Facilities

71. Medical experts throughout the United States and in the Commonwealth of Massachusetts have recommended that, in order to address the serious threat posed by COVID-19 to incarcerated persons, immediate steps must be taken to reduce inmate populations and to allow social distancing inside correctional institutions.

72. On April 2, 2020, Dr. Matthew J. Akiyama from the Albert Einstein College of Medicine and Montefiore Medical Center, Dr. Anne C. Spaulding from the Rollins School of Public Health at Emory University, and Dr. Josiah D. Rich from Brown University and Miriam Hospital published an article in the New England Journal of Medicine explaining that, in order to mitigate the serious impact of the COVID-19 crisis, "we need to prepare now, by 'decarcerating,' or releasing, as many people as possible."[38] They stressed the need to "consider the impact of correctional facilities in the global context" and noted that the "boundaries between communities and correctional institutions are porous, as are the borders between countries in the age of mass human travel." *Id.* They noted that "[d]espite security at nearly every nation's border, Covid-19 has appeared in practically all countries . . . [and noted that society] can't

---

[38] *See* Akiyama, M., Spaulding, A., Rich, J., *Flattening the Curve for Incarcerated Populations — Covid-19 in Jails and Prisons*, N Engl J Med (April 2, 2020) https://www.nejm.org/doi/full/10.1056/NEJMp2005687.

expect to find sturdier barriers between correctional institutions and their surrounding communities in any affected country." *Id.*

73. Dr. Josiah Rich, a Professor of Medicine at Brown University and the co-founder of the Center for Prisoner Health and Human Rights at The Miriam Hospital, has explained that, in light of the significant and heightened threat posed by COVID-19 to individuals in incarcerated settings,  "it is imperative to scale up efforts to "decarcerate," or release, as many detainees as possible."  He opines that "public safety will be at even greater peril if we fail to mitigate risks associated with confining too many people in correctional facilities during a pandemic."  *See* Exhibit C – Affidavit of Josiah Rich, M.D., M.P.H.

74. Dr. Regina Celeste Larocque, an associate physician of infectious disease at Massachusetts General Hospital and an Instructor at Harvard Medical School has explained that correctional facilities like PCCF "face a very high risk of a COVID-19 outbreak."  She explains that "such an outbreak would have disastrous consequences for the facility's residents and staff, and the broader community," and it therefore "is urgent that [Respondents] institute a comprehensive social distancing regimen at [PCCF] that must include elimination of shared cells if it is to be successful."  *S*ee Exhibit D – Affidavit of Regina Celeste LaRocque, M.D., M.P.H.

75. Dr. Jonathan Giftos, a current professor in the Department of Medicine at Albert Einstein College of Medicine and a former Clinical Director of Substance Use Treatment for NYC Health and Hospitals, Division of Correctional Health Services at Rikers Island has recommended that "given the proximity and high numbers of inmates correctional staff and healthcare workers at pretrial detention facilities . . . it is an urgent priority to reduce the number of people in detention facilities, including PCCF, during this national public health emergency." *See* Exhibit E – Affidavit of Jonathan Giftos, M.D.

**The CDC Interim Guidance on Management of COVID-19 in
Correctional and Detention Facilities**

76. On March 23, 2020, the United States Centers for Disease Control and Prevention

("CDC") issued Interim Guidance on Management of Coronavirus Disease 2019 (Covid-19) in

Correctional and Detention Facilities (the "Interim Guidance").[39]  The Interim Guidance states

that it is designed "to ensure continuation of essential public services and protection of the health

and safety of incarcerated and detained persons, staff and visitors."  A copy of that Interim

Guidance is attached hereto as Exhibit F.

77. The Interim Guidance acknowledges that "[i]ncarcerated/detained persons live, work,

eat, study, and recreate within congregate environments, heightening the potential for COVID-19

to spread once introduced."

78. The Interim Guidance explains that "there are many opportunities for COVID-19 to

be introduced into a correctional or detention facility, including daily staff ingress and egress;

transfer of incarcerated/detained persons between facilities and systems, to court appearances,

and to outside medical visits; and visits from family, legal representatives, and other  community

members."

79. The Interim Guidance sets forth various "Operational Preparedness" steps that it

describes as "essential actions" that correctional and detention facilities should take to plan and

prepare for COVID-19. Those "essential actions" include, but are not limited to:

---

[39] *See* Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention
Facilities (April 5, 2020) - https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-
correctional-detention.html

a.   the creation and testing of "communication plans to disseminate critical

information to incarcerated detained persons, staff, contractors, vendors, and

visitors as the pandemic progresses:"

b.   ensuring that physical locations (dedicated housing areas and bathrooms) have

been identified to isolate confirmed COVID-19 cases and individuals displaying

COVID-19 symptoms, and to quarantine known close contacts of cases;

c.   for facilities without onsite health care capacity, the creation of "a plan for how

they will ensure that suspected COVID-19 cases will be isolated, evaluated, tested

(if indicated) and provided necessary medical care;"

d.   the creation of a "list of possible social distancing strategies that could be

implemented as needed at different stages of transmission intensity;

e.   exploring "strategies to prevent over-crowding of correctional and detention

facilities during a community outbreak;" and

f.   the posting of signage throughout the facility, in all appropriate languages,

communicating the symptoms of COVID-19 and appropriate hand hygiene

instructions.

80. With respect to "Operations and Supplies," the Interim Guidance states that all

correctional and detention facilities should "ensure that sufficient stocks of hygiene supplies,

cleaning supplies, PPE and medical supplies . . . are on hand and available."  Such supplies

include, "standard medical supplies for daily clinic needs," "tissues," "liquid soap when

possible," "hand drying supplies," "[a]lcohol-based hand sanitizer containing at least 60%

alcohol (where permissible based on security restrictions)," "cleaning supplies,"

"[r]ecommended PPE (facemasks, N95 respirators, eye protection, disposable medical gloves,

22

and disposable gowns/one-piece coveralls)," and "sterile viral transport media and sterile swabs"
for COVID-19 testing.

81. The Interim Guidance also recommends that facilities "begin implementing
intensified cleaning and disinfecting procedures," including the recommendation that frequently-
touched surfaces and objects (including, doorknobs, light switches, sink handles, countertops,
toilets, toilet handles, recreation equipment, kiosks and telephones) be cleaned several times per
day.

82. With respect to "Prevention Practices for Incarcerated/Detained Persons," the Interim
Guidance recommends, inter alia, that facilities "[i]mplement social distancing strategies to
increase the physical space between incarcerated/detained persons (ideally 6 feet between all
individuals, regardless of the presence of symptoms."  The CDC recommends that these
strategies be adopted in all common areas, during recreation and meals, during group activities,
as well as in housing and medical areas.

83. With respect to sleeping areas, the CDC recommends that bunks for detainees be
reassigned "to provide more space between individuals, ideally 6 feet or more in all directions."

84. With respect to hygiene, the CDC recommends that facilities "[r]einforce healthy
hygiene practices, and provide and continually restock hygiene supplies throughout the facility,
including in bathrooms, food preparation and dining areas, intake areas, visitor entries and exits,
visitation rooms and waiting rooms, common areas, medical, and staff-restricted areas (e.g.,
break rooms)."

85. Under the current conditions at PCCF, Respondents have not and cannot reasonably
implement the recommendations of the CDC Interim Guidelines without taking steps to
dramatically reduce the populations at their facility. In these circumstances, release from custody

23

must be the primary step taken in order to protect Petitioners and the class they seek to represent from unconstitutional treatment.

## Plymouth County Correctional Facility

86. Plymouth County Correctional Facility ("PCCF") is located at 26 Long Pond Road in, Plymouth, Massachusetts. PCCF is in Plymouth County where, as of April 16, 2020, there have been 2,466 confirmed positive cases of COVID-19.

87. On information and belief, there are currently more than one hundred and fifty (150) federal detainees being held at PCCF. Many of these federal detainees are awaiting trial on their charges. Other similarly situated detainees being held at PCCF have plead or have been found guilty of certain criminal charges and are awaiting sentencing.

88. There are more than eight hundred and seventy-five (875) full-time and part-time staff members who work in the Sheriff's Department in Plymouth County.  On information and belief, the vast majority of these staff members work regularly on-site at PCCF.   On information and belief, the hundreds of staff members working regularly at PCCF work multiple shifts per week, rotating in and out of the facility according to their assigned work schedules.

89. In response to a recent Massachusetts Supreme Judicial Court's Order, Respondent McDonald answered interrogatories related to PCCF's social distancing practices. *See* Exhibit G– McDonald's Answers to Interrogatories.

90. Approximately 49.2% of PCCF detainees sleep within six feet of one another. *Id.*

91. Approximately 56.72% of PCCF detainees eat their meals within six feet of one another. *Id.* The facility claims that detainees have multiple seating options which provide an opportunity for social distancing. *Id.*

92. Approximately 47.36% of PCCF detainees are permitted to be within six feet of one another during recreation period. The facility claims that detainees have split recreation periods, which allows for social distancing, and that officers "enforce the importance of such social distancing." *Id.*

93. Respondent McDonald has also recently disclosed information relating to certain state detainees that are in his custody at PCCF.  It appears, however, that those recent disclosures do not address the conditions of confinement relating to the federal detainees at PCCF, including the Petitioners and other members of the class.

94. According to information collected in connection with the SJC litigation, as of April 16, 2020, Respondents had only conducted a total of four (4) COVID-19 tests of detainees in custody at PCCF and seventeen (17) COVID-19 tests of the hundreds of staff members who currently work at PCCF.[40]

95. Because PCCF is not regularly testing detainees or staff members for COVID-19, there is no reliable information available regarding the spread of the virus PCCF.

96. Petitioner Baez, a federal detainee being detained at PCCF, shares a cell with four other detainees. *See* Exhibit H – Affidavit of Edward P. Ryan, Jr. ¶ 4.  There is one toilet in the cell that is shared by all five men. *Id.* Given the size of the cell, it is impossible for the men to maintain six feet of separation from each other during the periods when they are in the cell, including while they sleep. *Id.*

97. There are a total of approximately seventy (70) detainees in the "block" where Mr. Baez and his cellmates are being detained at Plymouth HOC. Mr. Baez and his cellmates are released from their cell for only four hours per day, during which they can go to the common

---

[40] *See* https://data.aclum.org/sjc-12926/tracker/ (accessed April 16, 2020).

areas of the Plymouth HOC. *Id.* ¶ 5.  During those periods, approximately thirty-five (35) detainees on his "block" at the Plymouth HOC can mingle generally amongst each other. The other approximately thirty-five (35) detainees are allowed out of their cells for a different four-hour period each day. When the detainees are out of their cells, there is no effort to maintain separation of at least six feet from other detainees and staff. No "social distancing" protocols are enforced by Plymouth HOC staff in those common areas. *Id.*

98. There are two tables in the "block" that are shared by the detainees in the section of Plymouth HOC where Mr. Baez is detained. Each table has approximately eight (8) seats, and detainees regularly sit at those tables shoulder-to-shoulder. *Id. ¶* 6.

99. Mr. Baez stated that he was recently provided with a face mask, but that he is not required to wear it at all times when he is outside of his cell. Mr. Baez has seen some Plymouth HOC staff recently wearing face masks, but the masks are not worn by all staff. Plymouth HOC staff routinely are within six feet of detainees when they interact with the detainees at the facility. *Id. ¶* 8.

100. Petitioner Bermudez, a federal detainee being held at PCCF, is housed in the H-3 unit at PCCF. *See* Exhibit I – Affidavit of Attorney Jane Peachy, ¶ 3.

101. Petitioner Bermudez is assigned to a cell with one other person and shares a bunk bed, one toilet and one sink with his cellmate. *Id.* ¶ 4.

102. Petitioner Bermudez and other detainees in his unit are responsible for cleaning their own cells. *Id.* ¶ 5.

103. Petitioner Bermudez has had limited access to hand sanitizer; detainees are only given one bar of soap per week. *Id.* ¶¶ 6-7.

104. Petitioner Bermudez resides among 70-80 other detainees in the unit, where the detainees eat their meals at four inmates per table. *Id.* ¶ 8.

105. Petitioner Bermudez and other similarly situated PCCF detainees share nine showers among 70-80 detainees, which are cleaned a few times per week by an inmate worker. *Id.* ¶ 9.

106. Petitioner Bermudez recently suffered a medical issue that was likely the result of poor hygiene in the showers. *Id.* ¶ 10.

107. Petitioner Bermudez's cellmate recently went to the medical unit with symptoms of coronavirus. PCCF staff required Petitioner Bermudez to pack up his cellmate's property and did not give Petitioner Bermudez gloves despite the fact that his cellmate's property was likely to transmit coronavirus to Petitioner Bermudez. *Id.* ¶¶ 11-12.

108. Petitioner Bermudez and other similarly situated PCCF detainees have not been given information regarding the spread of the virus at PCCF. *Id.* ¶ 10.

109. Petitioner Gonsalves, a federal detainee being held at PCCF, is housed in a cell at PCCF with one other individual. *See* Exhibit J – Affidavit of Keith Halpern, Esq., ¶ 1-2. There is one bunk unit in the cell. The bunk has two beds, one stacked on top of the other. The beds are less than six feet apart. It is not possible for Petitioner Gonsalves and his cellmate to maintain a distance of six feet between themselves while they are in their cell together. *Id.* ¶4.

110. There has been no change in meal conditions for Petitioner Gonsalves and other similarly situated federal detainees at PCCF in response to the COVID-19 pandemic. The number of inmates eating together has not changed. Inmates eat at rectangular tables that seats six, in a room with a number of similar tables. There is no effort to maintain a distance of six feet between inmates. Rather, inmates are seated immediately next to one another at the tables, with other inmates seated across the table, all within a distance of six feet. *Id.* ¶ 5.

27

111. Petitioner Gonsalves has observed less than half of the correctional officers wearing masks. There has been no change in the manner in which correctional officers interact with Petitioner Gonsalves and other similarly situated federal detainees at PCCF, and no effort to maintain greater physical distance between correctional officers and inmates. Correctional officers are routinely within six feet of inmates. *Id.* ¶ 6.

112. Petitioner Gonsalves and other similarly situated federal detainees have no access to liquid soap or hand sanitizer. Inmates are provided with one small bar of soap each week. There has been no change in soap access due to the pandemic. *Id.* ¶ 7.

113. Prior to the pandemic, PCCF inmates received two rolls of toilet paper each week. Since the pandemic began, Petitioner Gonsalves and other similarly situated federal detainees at PCCF are receiving one roll of toilet paper per week. *Id.* ¶ 8.

114. Petitioner Gonsalves has observed PCCF to be a dirty environment, and there have been no visible efforts to improve cleanliness as a result of the pandemic. PCCF is as dirty as it was before the pandemic. *Id.* ¶ 9.

115. Petitioner Gonsalves has learned that a special unit, C-1, had been set up for the quarantine of inmates with symptoms suggesting COVID-19. Petitioner Gonsalves stated that inmates were reluctant to report feeling unwell because they feared being moved into the quarantine unit and being surrounded by sick inmates. *Id.* ¶ 10.

116. Petitioner Gonsalves has not observed any efforts being made at PCCF keep inmates at least 6' apart, or to keep inmates and correctional officers at least six feet apart. *Id.* ¶ 11.

117. Petitioner Gonsalves has not observed any changes to inmates' recreation at PCCF. Inmates have four hours of recreation per day. At recreation, inmates are able to work out, play

basketball, and engage in other activities without regard to how far apart they are from one another, and that inmates are routinely within six feet of one another. *Id.* ¶ 12.

118. Petitioner Dedrick Lindsey, who is a federal detainee being held at PCCF, currently being held in a dorm unit. *See* Exhibit K – Affidavit of Attorney Jessica Thrall. This is a setting where 6-8 individuals share a living quarters. *Id.* ¶ 4. Their beds are next to one another. *Id.* Mr. Lindsey is currently sleeping on the bottom bunk. *Id.* There is no one above him at this time, but there is someone next to him on the same level. *Id.* The beds are not 6 feet apart. *Id.*

119. Mr. Lindsey stated that the individuals living in this dorm also share meals together. *Id.* ¶ 5. There are several tables for the men to eat at, but they cannot eat at a table alone as there are not enough tables for everyone. *Id.* In order to sit at these tables and eat, they must be closer than 6 feet apart. *Id.* At any given time, additional people could be added to the dorm setting. *Id.* at ¶6.

120. Mr. Lindsey is permitted to go outdoors for recreation time. *Id.* However, this "rec time" is shared with people from other dorms or units. *Id.* Mr. Lindsey chooses not to go outdoors at "rec time" as he will then have to interact with more people than the individuals in his dorm. *Id.*

121. Mr. Lindsey reports that the detainees were recently given masks. *Id.* ¶ 8. The guards use masks and gloves with variable frequency depending on who is working that shift. *Id.*

122. Within the dorm unit, there is a spray bottle of sanitizer that the people on the dorm are allowed to utilize. *Id.* ¶ 9. As of April 16, 2020, a hand sanitizer bottle was put in the dorm unit. Previously there had been no hand sanitizer. *Id.* ¶10.

123. Mr. Lindsey is fearful for his health and is concerned because he cannot control who he shares space with. *Id.* ¶ 11.

124. Samuel Baptista, a federal detainee being held at PCCF, is currently being housed in a segregated unit at PCCF. *See* Exhibit L – Affidavit of Attorney Timothy Watkins. Mr. Baptista explained that he and other detainees were previously housed in an open-cell dormitory-style unit, where detainees sleep three feet from each other. *Id.* Mr. Baptista has not observed any changes made within that unit regarding increased social distancing or hygiene after the COVID-19 pandemic began.

125. Mr. Baptista has explained that the correctional officers at PCCF do not maintain six feet of distance from him or between themselves. *Id.* ¶ 4. He has explained that he was recently provided with a paper mask and told to wear it "when he thinks he should wear it." *Id.* ¶ 5. The correctional officers at PCCF do not consistently wear masks or gloves in the facility. *Id.* ¶ 7.

126. Mr. Baptista has explained that PCCF is "extremely dirty." *Id.* ¶ 11. He has not observed any effort to clean the facility or to enforce social distancing at the facility in response to the COVID-19 pandemic. *Id.*

127. Mr. Baptista and other PCCF detainees are not given hand sanitizer and are only given one bar of soap per week. *Id.* ¶ 8.

## LEGAL ALLEGATIONS

128. Section 2241(c)(3) of Title 28 of the United States Code authorizes courts to grant habeas corpus relief where a person is "in custody in violation of the Constitution or other laws or treaties of the United States."

129. Respondents are violating Petitioners' Fifth and Eighth Amendment rights by continuing to incarcerate them in conditions where it is virtually impossible to take steps to prevent transmission of an infectious disease that will prove deadly because of the nature of the infectious disease.

130. Pretrial detainees are presumed innocent and must not be punished with likely exposure to COVID-19 due to their incarcerated status. *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) ("Due process requires that a pretrial detainee not be punished.")

131. All federal detainees being held at the facility operated by Respondents are entitled to be protected from condition of confinement that create a serious risk to health or safety, including through release from custody when necessary. *Brown v. Plata*, 563 U.S. 493, 531-32 (2011) (upholding lower court's order releasing people from state prison even though release was based on prospect of future harm caused by prison overcrowding); *see also Farmer v. Brennan*, 511 U.S. 825, 834 (correctional official violates Eighth Amendment by consciously failing to prevent "a substantial risk of serious harm"); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) ("deliberate indifference" to serious medical needs violate the Eighth Amendment). The risk of exposure to a deadly infectious disease such as COVID-19 constitutes a serious risk to health. *Helling v. McKinney*, 509 U.S. 25, 34 (1993) (noting with approval Eighth Amendment claims based on exposure to serious contagious diseases). Under the current conditions at PCCF, Respondents have not and cannot protect Petitioners and the class from this risk of serious harm. In these circumstances, release is the only means of protecting Petitioners and the class they seek to represent from unconstitutional treatment.

132. Government officials act with deliberate indifference when they "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," even when "the complaining inmate shows no serious current symptoms." *Helling*, 509 U.S. at 33. This Court need not "await a tragic event" to find that Respondents are maintaining unconstitutional conditions of confinement. *Id.*

31

133. The reach of the Fifth and Eighth Amendments includes "exposure of inmates to a serious, communicable disease." *Helling*, 509 U.S. at 33.

134. In this case, as established by the facts above, Petitioners and the other class members face a significant risk of exposure to coronavirus, with the attendant risk of death that follows given the current conditions of confinement at PCCF. Respondents are well aware of this risk, having been alerted to it by the CDC, the Attorney General, the Massachusetts Supreme Judicial Court, and advocates such as the Federal Defender Office for the District of Massachusetts.

135. Additionally, in recent weeks, courts in other jurisdictions such as the Second Circuit Court of Appeals, unprompted, acknowledged the "grave and enduring" risk posed by COVID-19 in the correctional context. *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, No. 19-1778, __ F.3d __, 2020 WL 1320886, at *12 (2d Cir. Mar. 20, 2020); see also *Jovel v. Decker*, No. 20 Civ. 308, 2020 WL 1467397, at *1 (S.D.N.Y. Mar. 26, 2020) (finding "extraordinary circumstances" of COVID-19 pandemic justified release of immigration detainee from federal detention); *United States v. Little*, No. 20 Cr. 57, 2020 WL 1439979, at *4 (S.D.N.Y. Mar. 24, 2020) ("As additional people are arrested who have been out in the community as the coronavirus spreads, if they are not symptomatic, they will be brought into the MCC and MDC, and held with the existing population, potentially bringing COVID-19 into this population held in large numbers, close quarters, and low sanitary conditions.").

136. Finally, as established above, Respondents have not taken steps sufficient to protect Petitioners and the other members of the class from the grave risks that are present every moment they are in detention at PCCF. Respondents are not capable of managing the risk to Petitioners and the other members of the class in the current environments at PCCF. Whether

judged under the Fifth or Eighth Amendment, Respondents are holding Petitioners in violation of the Constitution by detaining them in the face of significant threats to their health and safety without taking sufficient steps to prevent that harm.

## CLASS ACTION ALLEGATIONS

137. Petitioners bring this representative habeas action pursuant to 28 U.S.C. § 2241 and, alternatively, as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on their own behalf and on behalf of all persons similarly situated.

138. Petitioners seek to represent a class consisting of all current and future federal detainees being held at PCCF during the course of the COVID-19 pandemic, including detainees being held prior to trial and detainees who have plead or been found guilty of certain offenses, but have not yet been sentenced (the "Class").

139. The members of the Class are too numerous to be joined in one action, and their joinder is impracticable. Upon information and belief, the Class exceeds one hundred and fifty (150) individuals.

140. Common questions of law and fact exist as to all Class members and predominate over questions that affect only the individual members. These common questions of fact and law include but are not limited to: (1) whether the conditions of confinement described in this Petition amounts to Constitutional violations; (2) what measures Respondents took in response to the COVID-19 Crisis; (3) whether Respondents implemented an adequate emergency plan during the COVID-19 Crisis; (4) whether Respondents' practices during the COVID-19 Crisis exposed federal detainees in PCCF to a substantial risk of serious harm; (5) whether the Respondents knew of and disregarded a substantial risk of serious harm to the safety and health

of the Class; and (7) what relief should be awarded to redress the harms threatened to members of the Class as a result of the conditions.

141. Absent class certification, federal detainees in Respondents' custody during the COVID-19 pandemic would face a series of barriers in accessing the relief sought. Under the current circumstances, federal detainees have limited access to communication with the outside world, impeding their ability to obtain legal representation and pursue litigation. A large portion of the Class has limited educational backgrounds. And a significant percentage of the Class members suffer from physical or mental impairments.

142. Respondents' practices and the claims alleged in this Petition are common to all members of the Class.

143. The claims of Petitioners are typical of those of the Class. Petitioners are threatened with imminent inhumane conditions of confinement at the facility operated by Respondents.

144. The legal theories on which Petitioners rely are the same or similar to those on which all Class members would rely, and the harms suffered by them are typical of those suffered by all the other Class members.

145. Petitioners will fairly and adequately protect the interests of the Class. The interests of the Class representatives are consistent with those of the Class members. In addition, counsel for Petitioners are experienced in class action litigation.

146. Counsel for Petitioners know of no conflicts of interest among Class members or between the attorneys and Class members that would affect this litigation.

147. Use of the class action mechanism here is superior to other available methods for the fair and efficient adjudication of the claims and will prevent the imposition of undue financial,

administrative, and procedural burdens on the parties and on this Court, which individual litigation of these claims would impose.

148. This class action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all Class members is impracticable.

149. There will be no extraordinary difficulty in the management of this class action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION – VIOLATION OF FIFTH AMENDMENT
(Declaratory and Injunctive Relief)

150. Petitioners incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

151. Petitioners bring this claim on their own behalf and on behalf of the Class.

152. The Due Process Clauses guarantees pretrial detainees the right to be detained in a safe situation, free from punitive conditions of confinement. *See* U.S. Const. Amend V. The government violates that guarantee where a widespread outbreak of a contagious disease subjects detainees to inhumane conditions without adequate protection.

153. Respondents are violating Plaintiffs' and proposed class members' Fifth Amendment rights because "the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 2466, 2473–74 (2015).

154. Because of the conditions at PCCF, Petitioners and all others similarly situated are not able to take steps to protect themselves—such as social distancing, employing routine hygienic practices, using hand sanitizer, or washing their hands regularly—and Respondents have not provided adequate protections. If COVID-19 rapidly spreads at the PCCF, the already

deplorable conditions there will be exacerbated, and the ability to protect oneself will become even more impossible.

155. Respondents' failure to adequately protect Petitioners from these punitive conditions, or release them from the conditions altogether, constitutes an egregious violation of Petitioners' due process rights and deliberate indifference to the serious medical needs of Petitioners, and all members of the Class.

156. Respondents are aware or should have been aware of these conditions, which are open and obvious throughout the facility.

157. Upon information and belief, Respondents have received the CDC's Interim Guidance on Management of Coronavirus Disease 2019.

158. Respondents know of and have disregarded excessive risks to the health and safety of Petitioners and the other members of the Class.

159. Respondents have failed to act with reasonable care to mitigate these risks.

160. Respondents have acted with deliberate indifference towards Petitioners and all others similarly situated by failing to safeguard their health and safety adequately.

161. Because Respondents have failed to act to remedy Petitioners' and the Class's degrading and inhuman conditions of confinement in violation of their Fifth Amendment rights, Petitioners seek relief under this Writ of Habeas Corpus.

162. Because of the unlawful conduct of Respondent, Petitioners and the Class are threatened with imminent physical injury, pain and suffering, emotional distress, humiliation, and death.

**SECOND CAUSE OF ACTION – VIOLATION OF EIGHTH AMENDMENT**
(Declaratory and Injunctive Relief)

163. Petitioners incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

164. Petitioners bring this claim on their own behalf and on behalf of the Class.

165. The Eighth Amendment to the United States Constitution protects Petitioners and proposed class members from cruel and unusual punishment.

166. To amount to the infliction of cruel and unusual punishment (1) jail or prison conditions must pose "an unreasonable risk of serious damage" to a prisoner's health (an objective test) and (2) prison officials must have acted with deliberate indifference to the risk posed (a subjective test). *Helling*, 509 U.S. at 33–35.

167. Petitioners and proposed class members are subject to a risk of harm that today's society does not tolerate.

168. Society does not tolerate the risk of exposure to COVID-19 to which Respondents' policies and procedures (or lack thereof) have subjected Petitioners and proposed class members.

169. Indeed, the CDC, the World Health Organization and several government officials have warned against the dangers of the very behaviors in which Petitioners and proposed class members are required daily to engage as a direct result of Respondents' policies and procedures (or lack thereof). Because of the conditions at the facility operated by Respondents, Petitioners and all others similarly situated are not able to take steps to protect themselves—such as social distancing, using hand sanitizer, or washing their hands regularly—and Respondents have not provided adequate protections. If COVID-19 rapidly spreads at the facility operated by

Respondents, as experts predict, the already deplorable conditions at that facility will be exacerbated, and the ability to protect oneself will become even more impossible.

170. Petitioners and proposed class members suffer a substantial risk of serious harm to their health and safety due to the presence of, and spread of, COVID-19.

171. Respondents' failure to adequately protect Petitioners from these punitive conditions, or release them from the conditions altogether, constitutes an egregious violation of Petitioners' due process rights and deliberate indifference to the serious medical needs of Petitioners, and all members of the Class, thereby establishing a violation of the Eighth Amendment of the United States Constitution.

172. Respondents are aware or should have been aware of these conditions, which are open and obvious throughout the entire jail.

173. Upon information and belief, Respondents have received the CDC's Interim Guidance on Management of Coronavirus Disease 2019.

174. Respondents know of and have disregarded an excessive risk to health and safety.

175. Respondents have failed to act with reasonable care to mitigate these risks.

176. Respondents have acted with deliberate indifference towards Petitioners and all others similarly situated by failing to safeguard their health and safety adequately.

177. Because Respondents have failed to act to remedy Petitioners' and the Class's degrading and inhuman conditions of confinement in violation of their Eighth Amendment rights, Petitioners seek relief under this Writ of Habeas Corpus.

178. Because of the unlawful conduct of Respondent, Petitioners and the Class are threatened with imminent physical injury, pain and suffering, emotional distress, humiliation, and death.

**PRAYER FOR RELIEF**

WHEREFORE, Petitioners and the Class members respectfully request that the Court enter a

class-wide judgment:

A.  Certify the proposed Class;

B.  Enter a temporary restraining order, preliminary injunction, and permanent injunction

and/or writs of habeas corpus requiring the following:

1.  Require Respondents to immediately take all actions to reduce the federal detainee

population at PCCF by releasing a sufficient number of federal detainees from the facility

in order to ensure the health and safety of all members of the Class;

2.  Appoint an expert under Federal Rule of Evidence 706 to make recommendations to the

Court regarding how many and which class members to order released so as to ensure

that the number of prisoners remaining at PCCF can be housed consistently with CDC

guidance on best practices to prevent the spread of COVID-19, including the requirement

that prisoners be able to maintain six feet of space between them and further order that

such recommendations take into account CDC guidance concerning health factors that

put individuals at elevated risk of death from COVID-19;

3.  Allow that expert to enter PCCF unannounced in order to assess the facility's compliance

with the guidance noted in Paragraph 2 and bring with them cameras, cell phones, writing

implements, and any other equipment required to conduct their site visits. Once in the

facility, permit the expert to inspect areas of the facility without limitation and speak with

staff and residents in confidence and outside of the presence of the facility's supervisors

and staff;

4. Ensure that each member of the Class receives an individual supply of hand soap, sufficient to allow frequent hand washing; paper towels; toilet paper; running water; and facial tissue;

5. Ensure that all members of the Class, when not in cells with access to hand soap and running water, have access to hand sanitizer containing at least 60% alcohol;

6. Require that all staff at PCCF wear personal protective equipment, including masks and gloves when interacting with visitors and residents and members of the Class or when touching surfaces in common areas;

7. Direct Respondents to clean and disinfect all frequently touched surfaces at PCCF with disinfectant products effective against the virus that causes COVID-19 (at the manufacturer's recommended concentration), as well as surfaces in common areas, every two hours during waking hours, and at least once during the night;

8. Order Respondents to provide a status report to this Court, twice weekly in writing, concerning the incidence of infection of COVID-19 at PCCF and the measures undertaken to mitigate the spread of COVID-19 at PCCF. The status report shall include the following information:

> A. The total number of federal detainees at PCCF that day (divided by United States Marshals Service and Immigration and Customs Enforcement detainees);
>
> B. The number of detainees, including federal detainees, tested for COVID-19 and the number testing positive (numbers should be cumulative);

    C.   The number of staff tested for COVID-19 and the number testing positive (numbers should be cumulative);

    D.   All efforts undertaken to mitigate the spread of COVID-19 both generally, and in response to any symptomatic inmate(s) and staff member(s) and/or positive test(s);

    E.   Protocols for screening and testing all detainees, staff, and others entering or leaving the facility.

9.   Appoint an independent monitor with medical expertise to ensure compliance with these conditions, and provide the monitor with unfettered access to medical units, confidential communication with detained individuals in and out of quarantine, and surveillance video of public areas of the facility; and

10.  Award such further relief as this Court deems appropriate.

Respectfully submitted,

ANTHONY BAEZ, JONATHAN BERMUDEZ,
JERMAINE GONSALVES, and DEDRICK LINDSEY
on behalf of themselves and all others similarly situated,

By their attorneys,

/s/ Daniel J. Cloherty
Daniel J. Cloherty (BBO #565772)
Saraa Basaria (BBO #685705)
TODD & WELD LLP
One Federal Street, Floor 27
Boston, MA  02110
(617) 720-2626
dcloherty@toddweld.com
sbasaria@toddweld.com

/s/Emily Schulman
Emily Schulman (BBO #566374)
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6077
emily.schulman@wilmerhale.com

David E. Rudin (*pro hac vice* pending)
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
(212) 936-7249
david.rudin@wilmerhale.com

Dated: April 17, 2020