# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____
)
ANTHONY BAEZ, JONATHAN BERMUDEZ, )
JERMAINE GONSALVES, and DEDRICK )
LINDSEY on behalf of themselves and all others )
similarly situated; )
)     Case No. 1:20-cv-10753
)
Plaintiffs-Petitioners, )
)
    v. )
)
JOSEPH D. MCDONALD, JR., SHERIFF OF )
PLYMOUTH COUNTY, in his official capacity, )
ANTONE MONIZ, SUPERINTENDENT OF THE )
PLYMOUTH COUNTY CORRECTIONAL )
FACILITY, in his official capacity, and JOHN and )
JANE DOES, in their individual and official )
capacities; )
)
)
Defendants-Respondents. )
)
_____ )

## PETITIONERS AND PROPOSED CLASS MEMBERS' MEMORANDUM IN SUPPORT OF THEIR APPLICATION FOR AN EMERGENCY TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

FACTUAL BACKGROUND ......................................................................................4

**I.**    COVID-19 poses a grave risk of serious injury or death to anyone who is infected.......4

**II.**    Jails and prisons are particularly vulnerable to COVID-19 and pose a public health risk to the broader community. .................................................................................5

**III.**    Respondents have not implemented key measures at Plymouth that public health experts deem critical to mitigating the spread of COVID-19. .........................................9

**A.**    Petitioners are unable to take proper social distancing measures to protect themselves from infection. .........................................................................10

**B.**    Plymouth correctional officers do not utilize personal protective equipment ("PPE"), and Plymouth does not provide Petitioners with PPE either. ...................................11

**C.**    Respondents have maintained dangerous, unsanitary conditions. .............................13

**D.**    Petitioners in Respondents' custody are not properly quarantined after potential exposure to COVID-19. .........................................................................14

E.    Petitioners do not have immediate access to health care. .........................................15

ARGUMENT ...........................................................................................16

**A.**    Petitioners and the proposed class will likely succeed on their Fifth and Eighth Amendment claims because Respondents have failed to protect their health and safety. .................................................................................17

**B.**    Petitioners and proposed class members will suffer irreparable harm. ....................35

**C.**    An injunction furthers the public interest and the equities favor Petitioners and the proposed class. .........................................................................37

CONCLUSION .........................................................................................39

ActiveUS 179625565v.5

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Alderson v. Concordia Parish Correrctional Facility,*
    848 F.3d 415 (5th Cir. 2017) ............................................................30

*Austin v. Pennsylvania Department of Corrections,*
    No. 90-cv-7497 (JED), 1992 WL 277511 (E.D. Pa. Sept. 29, 1992) ...............................35

*Basank v. Decker,*
    No. 20-cv-2518 (AT), 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020).............25, 28, 33, 34

*Bell v. Wolfish,*
    441 U.S. 520 (1979)...............................................................17

*Boone v. Brown,*
    No. 05-cv-750 (AET), 2005 WL 2006997 (D.N.J. Aug. 22, 2005).................................35

*Boston Duck Tours, LP v. Super Duck Tours, LLC,*
    531 F.3d 1 (1st Cir. 2008)...........................................................16

*Burrell v. Hampshire County,*
    307 F.3d 1 (1st Cir. 2002)...........................................................17

*Castro v. County of Los Angeles,*
    833 F.3d 1060 (9th Cir. 2016) .......................................................30

*Charlesbank Equity Fund II v. Blinds To Go, Inc.,*
    370 F.3d 151 (1st Cir. 2004)....................................................16, 34

*City of Revere v. Massachusetts General Hospital,*
    463 U.S. 239 (1983)................................................................18

*Committee for Public Counsel Services v. Chief Justice of Trial Court,*
    No. SJC-12926, 2020 WL 1659939 (Mass. Apr. 3, 2020) ....................................... *passim*

*Couchon v. Cousins,*
    No. 17-cv-10965-RGS, 2018 WL 4189694 (D. Mass. Aug. 31, 2018)............................30

*Darnell v. Pineiro,*
    849 F.3d 17 (2d Cir. 2017).......................................................18, 30

*Davis v. Ayala,*
    576 U.S. 257, 135 S. Ct. 2187 (2015)................................................36

*Devitri v. Cronen,*
    289 F. Supp. 3d 287 (D. Mass. 2018) ..............................................16, 36

*Farmer v. Brennan,*
    511 U.S. 825 (1994)........................................................................................17, 18, 31

*Gonzalez-Droz v. Gonzalez-Colon,*
    573 F.3d 75 (1st Cir. 2009)...........................................................................................16

*Helling v. McKinney,*
    509 U.S. 25 (1993)...........................................................................................18, 24, 26

*Hernandez v. County of Monterey,*
    110 F. Supp. 3d 929 (N.D. Cal. 2015) ........................................................................33

*Jolly v. Coughlin,*
    76 F.3d 468 (2d Cir. 1996)...........................................................................................36

*Kingsley v. Hendrickson,*
    576 U.S. 389, 135 S. Ct. 2466 (2015)..............................................................18, 29, 30

*Kosilek v. Spencer,*
    774 F.3d 63 (1st Cir. 2014)...........................................................................................29

*Leite v. Bergeron,*
    911 F.3d 47 (1st Cir. 2018)...........................................................................................17

*Levesque v. Maine,*
    587 F.2d 78 (1st Cir. 1978)...........................................................................................16

*Miranda v. County of Lake,*
    900 F.3d 335 (7th Cir. 2018) .......................................................................................30

*Morales Feliciano v. Rossello Gonzalez,*
    13 F. Supp. 2d 151 (D.P.R. 1998)...........................................................................28, 32

*Nam Dang by & through Vina Dang v. Sheriff, Seminole County Florida,*
    871 F.3d 1272 (11th Cir. 2017) ...................................................................................30

*Nken v. Holder,*
    556 U.S. 418 (2009)...............................................................................................16, 36

*Palmigiano v. Garrahy,*
    639 F. Supp. 244 (D.R.I. 1986)....................................................................................29

*Pesce v. Coppinger,*
    355 F. Supp. 3d 35 (D. Mass. 2018) ......................................................................35, 38

*Philip Morris, Inc. v. Harshbarger,*
    159 F.3d 670 (1st Cir. 1998)........................................................................................16

*Philip Morris, Inc. v. Reilly*,
    312 F.3d 24 (1st Cir. 2002) (en banc) ..............................................36

*Preminger v. Principi*,
    422 F.3d 815 (9th Cir. 2005) ...........................................................36

*Reaves v. Department of Correction*,
    195 F. Supp. 3d 383 (D. Mass. 2016) ...............................................36

*Richmond v. Huq*,
    885 F.3d 928 (6th Cir. 2018) ...........................................................30

*Rio Grande Community Health Center, Inc. v. Rullan*,
    397 F.3d 56 (1st Cir. 2005) .............................................................34

*Ruiz-Rosa v. Rullan*,
    485 F.3d 150 (1st Cir. 2007) ......................................................18, 30

*Shimon v. Department of Correctional Services for New York*,
    No. 93-cv-3144 (DC), 1996 WL 15688 (S.D.N.Y. Jan. 17, 1996) ....................32

*United States v. Garlock*,
    No. 18-cr-418 (VC), 2020 WL 1439980 (N.D. Cal. Mar. 25, 2020) ................28

*United States v. Neto*,
    659 F.3d 194 (1st Cir. 2011) ...........................................................17

*United States v. Stephens*,
    No. 15-cr-95 (AJN), 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020) ...............28

*Watts v. Organogenesis, Inc.*,
    30 F. Supp. 2d 101 (D. Mass. 1998) .................................................35

*Whitney v. City of St. Louis*,
    887 F.3d 857 (8th Cir. 2018) ...........................................................30

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008)............................................................................16

*Youngberg v. Romeo*,
    457 U.S. 307 (1982)........................................................................18

## DOCKETED CASES

*Castillo v. Barr*, No. 20-cv-605 (TJH) (C.D. Cal.).........................................25

*Chunn v. Edge*, No. 20-cv-1590 (E.D.N.Y.).................................................9

*Committee for Public Counsel Services v. Chief Justice of Trial Court*, No. SJC-12926 (Mass.) ..............................................................................................7, 10

*Mays v. Dart*, No. 1:20-C-02134-MFK (N.D. Ill.) ......................................25, 26, 33

*Savino v. Souza*, Civ. A. No. 20-10617 (D. Mass.) ...................................................28

*Swain v. Junior*, No. 1:20-cv-21475-KMW (S.D. Fla.)..............................................33

*United States v. Anthony Baez*, Cr. No. 19-cr-40049 (D. Mass.)..............................21

*Xochihua-Jaimes v. Barr*, No. 18-71460 (9th Cir.) ..................................................25

## OTHER AUTHORITIES

*30 Days to Slow the Spread*, The President's Coronavirus Guidelines for America, https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf ...............................................................................19

*Advisory Regarding Face Coverings and Cloth Masks*, Massachusetts Department of Public Health (Apr. 10, 2020), https://www.mass.gov/news/advisory-regarding-face-coverings-and-cloth-masks..........................................................19

Chou-Han Lin et al., *Tuberculosis Mortality: Patient Characteristics and Causes*, 14 BMC INFECTIOUS DISEASES (2014) ..............................................................28

*Coronavirus Disease 2019 (COVID-19)*, *COVIDView*, CDC (last updated Apr. 10, 2020), https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html#hospitalizations.......................................27, 28, 32

*Coronavirus Disease 2019 (COVID-19)*, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, CDC (last reviewed: Apr. 9, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html .................21

*Coronavirus Disease 2019 (COVID-19), Resources for Correctional and Detention Facilities*, CDC (last reviewed: Apr. 9, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/index.html ................................................................................................19

*Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last updated Apr. 16, 2020, 3:41 PM)...............................................................7

*COVID-19 Dashboard*, Johns Hopkins Univ. (Apr. 14, 2020), https://www.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6................................................................................5

COVID-19 Order No. 13, Office of Governor, Commonwealth of Massachusetts
(Mar. 23, 2020), https://www.mass.gov/doc/march-23-2020-essential-
services-and-revised-gatherings-order/download ...........................................................18

D.R.I. General Order (Apr. 16, 2020) .........................................................................9

Executive Order No. 591, Commonwealth of Massachusetts (Mar. 10, 2020)...........................28

Faith Karimi, *One big coronavirus challenge is how to stop touching your face*, CNN
(Mar. 19, 2020), https://www.cnn.com/2020/03/08/health/coronavirus-touching-
your-face-trnd/index.html ....................................................................................22

General Order 20-7 (D. Mass. Mar. 23, 2020)............................................................27

General Order 20-13 (D. Mass. Mar. 30, 2020)...........................................................27

*Gov. Wolf: Department of Corrections to Establish Temporary Program to*
*Reprieve Sentences of Incarceration*, Commonwealth of Pennsylvania
(Apr. 10, 2020), https://www.governor.pa.gov/newsroom/gov-wolf-
department-of-corrections-to-establish-temporary-program-to-reprieve-
sentences-of-incarceration/ ....................................................................................8

Luke Baker, *Lock 'Em Up or Let 'Em Out? Coronavirus Prompts Wave of*
*Prisoner Releases*, Reuters, Mar. 25, 2020...............................................................8

Memo from Attorney General to Director of Bureau of Prisons, U.S. Dep't of Justice, Mar.
26, 2020...........................................................................................................8

Memo from Attorney General to Director of Bureau of Prisons, U.S. Dep't of Justice, Apr.
3, 2020........................................................................................................8, 32

Memo from Chief Justice Beatty to Magistrates, Municipal Judges, and Summary
Court Staff, S.C. Jud. Branch, Mar. 16, 2020,
https://www.sccourts.org/whatsnew/displaywhatsnew.cfm?indexID=2461 ......................9

Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus
Disease (COVID-19) Outbreak, White House (Mar. 13, 2020),
https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-
emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/...........................28

Sarah Betancourt, *Coronavirus Infection in State Prisons More than Two Times Statewide*
*Rate*, Commonwealth Magazine (Apr. 10, 2020),
https://commonwealthmagazine.org/criminal-justice/coronavirus-infection-in-state-
prisons-more-than-two-times-statewide-rate/ .............................................................7

Timothy Williams & Danielle Ivory, *Chicago's Jail is Top U.S. Hot Spot as Virus Spreads Behind Bars* (Apr. 8, 2020), N.Y. Times, https://www.nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html (last updated Apr. 9, 2020, 8:47 A.M.) ........................................................25

*Tracking Covid-19 in Massachusetts Prison & Jails*, ACLU of Massachusetts (Apr. 16, 2020), https://data.aclum.org/sjc-12926-tracker/#tab-9488-2 ..............................7

World Health Org., Coronavirus Disease 2019 (COVID-19) Situation Report – 46 (Mar. 6, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200306-sitrep-46-covid-19.pdf?sfvrsn=96b04adf_4 ...............................................................................................5

## PRELIMINARY STATEMENT

COVID-19 has transformed this Commonwealth: In just a few short weeks, the deadly pandemic has stopped all but the most essential activities. Public behavior is now guided by the Centers for Disease Control and Prevention's ("CDC") and other public health experts' recommendations: no congregate activity; socially distance from those outside one's immediate household by maintaining a minimum distance of six feet from others at all times; wash one's hands with soap and hot water with great frequency throughout the day; wear face masks at all times outside one's home; wear disposable gloves to avoid contamination, and meticulously clean and sanitize high-touch surfaces and objects continually throughout the day.

But the Plymouth County Correctional Facility ("Plymouth") has not implemented these mitigation measures. Petitioners-Plaintiffs Anthony Baez ("Mr. Baez"), Jonathan Bermudez ("Mr. Bermudez"), Dedrick Lindsey ("Mr. Lindsey"), and Jermaine Gonsalves ("Mr. Gonsalves," and collectively with Mr. Baez, Mr. Bermudez, and Mr. Lindsey, "Petitioners") and the proposed class, composed of federal detainees housed at Plymouth, cannot socially distance themselves, wash or sanitize their hands frequently throughout the day, wear requisite personal protective equipment or ensure that guards and other staff with whom they interact do so consistently; effectively clean and disinfect their cells daily; or ensure that frequently-touched surfaces to which they are exposed, such as chairs, tables, telephones, and remote controls, are decontaminated with the requisite frequency and care.

Plymouth's failure to implement the CDC's critical recommendations for mitigating the spread of COVID-19 subjects its federal detainees to an undue risk of contracting this potentially fatal disease. COVID-19 often causes horrible pain, fevers, diarrhea, and difficulty breathing. Serious cases require hospitalization, and even more severe cases can cause death or permanent lung, heart, and liver conditions. Among adults with preexisting medical conditions like high

1

blood pressure, asthma, and diabetes — features that disproportionately characterize incarcerated people — the hospitalization and death rates are greatly elevated. Unless Respondents-Defendants Sheriff Joseph D. McDonald, Jr. ("McDonald") and Superintendent Antone Moniz ("Moniz," and collectively with McDonald, "Respondents") act now to effectively mitigate the risk of an imminent COVID-19 outbreak at Plymouth, if (and likely when) that risk materializes, the facility's residents and staff, as well as the broader outside community, will suffer immense harm.

The evidence in the record includes:

- Affidavits on behalf of five federal detainees who are currently housed at Plymouth, detailing the impossibility of socially distancing themselves at the facility; the limited and oftentimes short supply of personal and environmental cleaning products; the unsanitary conditions of detainees' confinement; detainees' inability to avail themselves properly of personal protective equipment; and the staff's failure to consistently use personal protective equipment (such as face masks); and

- Expert declarations from: Dr. Jonathan Giftos, a Clinical Assistant Professor in the Department of Medicine at Albert Einstein College of Medicine, who previously served as the Clinical Director of Substance Use Treatment for NYC Health & Hospitals, Division of Correctional Health Services at Rikers Island; Dr. Regina Celeste LaRocque, Associate Professor of Medicine at Harvard Medical School and a physician and researcher in the Division of Infectious Disease at Massachusetts General Hospital; and Dr. Josiah Rich, Professor of Medicine and Epidemiology at Brown University and a provider of clinical care in the Rhode Island Department of Corrections.

Drs. Giftos, LaRocque, and Rich each conclude that Plymouth is highly vulnerable to a COVID-19 outbreak, and that such an outbreak would have dire consequences for Plymouth's residents and staff as well as the public at-large. In their expert opinions, it is of paramount importance that Plymouth implement a strict social distancing regimen that includes the elimination of shared cells to avert the dire consequences of a COVID-19 outbreak at the facility. Unless Respondents bring Plymouth into compliance with the full spectrum of the CDC's recommendations for mitigating the spread of COVID-19, they deem the health and safety of the Petitioners and the proposed class members to be at grave risk.

These times call for immediate action to prevent and mitigate a COVID-19 outbreak in Respondents' facility. Respondents' failure to implement basic preventive measures around which there is widespread medical consensus to protect residents against this potentially deadly disease violates Petitioners' and proposed class members' rights under the Fifth and Eighth Amendments. State and federal court judges have responded to these ongoing constitutional violations by ordering jail and prison officials to reduce the number of residents of their facilities and implement proper hygiene, sanitation, and social distancing measures. Indeed, on April 3, 2020, this Commonwealth's Supreme Judicial Court charged a special master with facilitating hearings regarding the release of certain pretrial detainees from the Commonwealth's houses of corrections. *See Comm. for Pub. Counsel Servs. v. Chief Justice of Trial Ct.*, No. SJC-12926, 2020 WL 1659939, at *2 (Mass. Apr. 3, 2020). The Supreme Judicial Court also urged the Massachusetts Department of Correction ("DOC") and parole board "to work with the special master to expedite parole hearings, to expedite the issuance of parole permits to those who have been granted parole, to determine which individuals nearing completion of their sentences could be released on time served, and to identify other classes of inmates who might be able to be released by agreement of the parties, as well as expediting petitions for compassionate release." *Id.* at *3.

Petitioners and proposed class members are more than 150 residents in federal custody at Plymouth. Respondents are the County Sheriff and Superintendent of that facility, in which Petitioners and proposed class members reside.

Petitioners seek a temporary restraining order and preliminary injunction directing Respondents to immediately implement new procedures that will bring Plymouth into compliance with expert guidance and to appoint an independent monitor to ensure such compliance. Toward that end, Petitioners seek the release on conditions or the transfer to home confinement of a

sufficient number of Plymouth's federal detainees to enable Plymouth to implement the CDC's foundational social distancing recommendations to prevent the spread of COVID-19. The Court should enter such an injunction for the following reasons.

## FACTUAL BACKGROUND

I. **COVID-19 poses a grave risk of serious injury or death to anyone who is infected.**

COVID-19 is a worldwide pandemic. It has neither a vaccine, nor a cure. Aff. of Jonathan Giftos, M.D. at ¶¶ 4, 14 ("Giftos Aff."), ECF No. 1-5. It is a highly infectious, often debilitating, and sometimes fatal disease. The Johns Hopkins University reports that as of April 16, 2020, there are at least 2,090,110 confirmed COVID-19 cases worldwide, resulting in 139,000 confirmed deaths. Class Action Pet. ¶ 20, ECF No. 1. In the United States, as of April 14, 2020, there are at least 608,458 confirmed cases of COVID-19 in the U.S. and 25,992 confirmed deaths. Center for Systems Science and Engineering at Johns Hopkins University, Coronavirus COVID-19 Global Cases Dashboard at https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6. All 50 states, the District of Columbia, Guam, Puerto Rico, the Northern Marianas Islands, and the U.S. Virgin Islands have reported confirmed cases of COVID-19. *Id.* Due to the highly contagious nature of COVID-19, data and statistical modeling show that absent adherence to CDC recommendations, especially social distancing, COVID-19 will continue to grow exponentially. Aff. of Regina Celeste LaRocque, MD, MPH at ¶ 9 ("LaRocque Aff."), ECF No. 1-4.

People of all ages risk serious injury and death if they contract COVID-19. According to Dr. Regina Celeste LaRocque, an infectious disease specialist, Associate Professor at Harvard Medical School, physician and researcher at Massachusetts General Hospital, and public health expert, even the young can suffer "serious harm from the disease." LaRocque Aff. ¶ 2. Indeed,

nearly 40 percent of those requiring hospitalization due to COVID-19 between February 12 and March 16, 2020 in the U.S. were between the ages of 20 to 54. *Id.*

For people who contract COVID-19, the symptoms can be extreme and severe. Dr. LaRocque reports that "[a]pproximately 16% of COVID-19 cases result in serious illness or death." LaRocque Aff. ¶ 3. For those who survive bouts with COVID-19, the effects of the disease may be long-lasting: new research indicates that the respiratory disease may not only damage the lungs, but also the "heart, liver, kidney, brain, and endocrine and blood systems." LaRocque Aff. ¶ 6. Moreover, the novel coronavirus that causes COVID-19 may also result in long-term complications, just as chicken pox may cause shingles later in life. *See id.*

The Johns Hopkins University data show that , as of April 14, 2020, 4.27% of people in the United States with a confirmed COVID-19 diagnosis died from the virus. *See COVID-19 Dashboard*, Johns Hopkins Univ. (Apr. 14, 2020), https://www.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6. The World Health Organization ("WHO") similarly estimates the COVID-19 mortality rate to be between three and four percent. Class Action Pet. ¶ 22. By way of comparison, the mortality rate of seasonal influenza is well below 0.1 percent. *See* LaRocque Aff. ¶ 4.

## II. Jails and prisons are particularly vulnerable to COVID-19 and pose a public health risk to the broader community.

Congregate settings are especially vulnerable to COVID-19. Aff. of Dr. Josiah Rich, MD, MPH at ¶ 7("Rich Aff."), ECF No. 1-3. In congregate settings, such as correctional facilities, there is frequent contact between people. Rich Aff. ¶¶ 6, 8. Because the novel coronavirus that causes COVID-19 is spread by droplets that people emit when they cough or sneeze and may be spread by tiny particles that people breathe out, "the opportunities for transmission [in congregate settings] are great." Rich Aff. ¶ 5; LaRocque Aff. ¶¶ 7-8. Dr. Josiah Rich, a specialist in infectious

diseases in prisons whose writings on COVID-19 have been published by the New England Journal of Medicine and the Washington Post, observes that, "[e]ven when facilities are locked down and use of common space is restricted, . . . there is inevitably frequent contact among prisoners, and especially between prisoners and staff." Rich Aff. ¶¶ 3-6.

COVID-19 can thus spread rapidly through a correctional facility. Dr. Rich, concludes that the nature of the virus "create[s] a perfect storm for correctional settings." Rich Aff. ¶ 5. Because people — staff, residents, contractors, attorneys, community members, and others — constantly cycle in and out of correctional facilities, there is an ever-present risk that new carriers will bring the virus into the facility. In the absence of widespread testing, common screening measures, such as temperature checks, may be "ineffective with SARS-CoV-2 due to high rates of asymptomatic or pre-symptomatic infection." Rich Aff. ¶ 9. Dr. LaRocque explains that the virus may actually be more infectious early on, before the carrier displays significant or any symptoms at all. LaRocque Aff. ¶ 7.

The documented spread of COVID-19 at correctional facilities to date lends credence to Drs. LaRocque and Rich's concerns. Detention facilities constitute three of the top five places in the United States where people have contracted COVID-19. *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last updated Apr. 17, 2020, 1:26 PM). Cook County Jail alone accounts for nearly 600 cases. *Id.* "[T]he COVID-19 infection rate in New York City jails is more than *seven times greater* than in New York City in general and more than *fifty times greater* than the infection rate across the United States as a whole. *See* Class Action Pet. ¶ 54. The Bureau of Prisons has reported 692 COVID-19 cases as of April 14, 2020; that number has grown 34,500% since the Bureau of Prisons system reported its first case. Rich Aff. ¶ 17. In contrast, COVID-19 cases

have grown 3,042% nationwide in the same time frame.  *Id.*  As of April 10, 2020, the rate of infection for COVID-19 in DOC facilities was more than double the statewide rate.  *See* Sarah Betancourt, *Coronavirus Infection in State Prisons More than Two Times Statewide Rate*, Commonwealth Magazine (Apr. 10, 2020), https://commonwealthmagazine.org/criminal-justice/coronavirus-infection-in-state-prisons-more-than-two-times-statewide-rate/.[1]

Respondents concede that, "for several reasons, correctional institutions face unique difficulties in keeping their populations safe during this pandemic."  *Comm. for Pub. Counsel Servs. v. Chief Justice of Trial Ct.*, No. SJC-12926, 2020 WL 1659939, at *3 (Mass. Apr. 3, 2020).  The SJC noted that these difficulties arise because "confined, enclosed environments increase transmissibility," and "[m]aintaining adequate physical distance, i.e., maintaining six feet of distance between oneself and others, may be nearly impossible in prisons and jails."  *Id.* Similarly, both Drs. LaRocque and Rich assert that, without social distancing and a reduction in population, attempts to prevent or mitigate an outbreak likely will not succeed.  LaRocque Aff. ¶ 9, 19; Rich Aff. ¶¶ 8-9, 21-22.

Recognizing the dire threat that COVID-19 presents to residents and staff of federal correctional facilities, Attorney General William Barr instructed the Director of the Bureau of Prisons "to prioritize the use of [his] statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic."  Memo from Att'y Gen. to Dir. of Bureau of Prisons, U.S. Dep't of Justice, at 1, Mar. 26, 2020, ECF No. 1-1.  Attorney General Barr acknowledged that "for some eligible inmates, home confinement might be more effective in protecting their health."  *Id.*  A week later, Attorney General Barr emphasized that,

---

[1] The ACLU of Massachusetts has posted on its website the information provided by county sheriffs and the Massachusetts Department of Correction ("DOC") in *Committee for Public Counsel Services v. Chief Justice of the Trial Court*, SJC-12926 (Mass.).  *See Tracking Covid-19 in Massachusetts Prison & Jails*, ACLU of Mass. (last updated Apr. 16, 2020), https://data.aclum.org/sjc-12926-tracker/#tab-9488-2.

"[g]iven the speed with which this disease has spread through the general public, it is clear that time is of the essence." Memo from Att'y Gen. to Dir. of Bureau of Prisons, U.S. Dep't of Justice, at 2, Apr. 3, 2020, ECF No. 1-2. Here in the Commonwealth, the SJC has appointed a special master to "allow the physical separation of individuals recommended by the CDC." *Comm. for Pub. Counsel Servs.*, 2020 WL 1659939, at *2-4.[2] In the past week, Pennsylvania began an aggressive program to reduce the population of incarcerated people in order to "protect them and to allow [Pennsylvania prisons] space to mitigate the impact of the virus in [the] system." *Gov. Wolf: Department of Corrections to Establish Temporary Program to Reprieve Sentences of Incarceration*, Commw. of Pa. (Apr. 10, 2020), https://www.governor.pa.gov/newsroom/gov-wolf-department-of-corrections-to-establish-temporary-program-to-reprieve-sentences-of-incarceration/. As early as March 16, 2020, the South Carolina Supreme Court recognized the danger of detaining new people amidst this pandemic: it thus ordered that those "charged with a non-capital crime" must be "released pending trial on his own recognizance without surety, unless an unreasonable danger to the community will result or the accused is an extreme flight risk." Memo from Chief Justice Beatty to Magistrates, Municipal Judges, and Summary Court Staff, S.C. Jud. Branch, Mar. 16, 2020, https://www.sccourts.org/whatsnew/displaywhatsnew.cfm?indexID=2461.

On April 16, 2020, the U.S. District Court for the District of Rhode Island recognized that it needed "current, consistent, and correct information to assess" federal detainees' "risk of contracting COVID-19" in the Donald W. Wyatt Detention Facility. D.R.I. General Order at 1

---

[2] Government officials around the world and the country have reduced the number of people in detention because of the risk of COVID-19 in detention facilities. Iranian courts have furloughed 85,000 convicted defendants; Germany released "1,000 prisoners who are close to the end of their sentences"; and Canada released "1,000 inmates in the state of Ontario." Luke Baker, *Lock 'Em Up or Let 'Em Out? Coronavirus Prompts Wave of Prisoner Releases*, Reuters, Mar. 25, 2020.

(Apr. 16, 2020). Accordingly, it *sua sponte* ordered that facility's warden to provide written updates, twice a week, about "the incidence of infection of COVID-19" and "the measures undertaken to mitigate the spread of COVID-19" there. *Id.* at 1-2. Similarly, on April 15, 2020, the U.S. District Court for the Eastern District of New York permitted petitioners challenging their conditions of confinement at the Metropolitan Detention Center in light of COVID-19 to have an expert inspect the facility. *See Chunn v. Edge*, No. 20-cv-1590, slip op. at 1 (E.D.N.Y. Apr. 15, 2020), ECF No. 45.

## III. Respondents have not implemented key measures at Plymouth that public health experts deem critical to mitigating the spread of COVID-19.

Affidavits on behalf of Petitioners and another federal detainee at Plymouth, Samuel Baptista ("Mr. Baptista"), and medical experts demonstrate that the conditions of confinement at the facility expose Petitioners to a grave and undue risk of contracting COVID-19. Instead of adopting aggressive measures prescribed by public health and medical experts, the most critical of which is consistent social distancing, Respondents continue to house Petitioners and proposed class members in shared cells or multi-person dormitories whose beds are separated by less than six feet, making social distancing impossible. In so doing, Respondents have rendered Plymouth a veritable tinderbox for COVID-19.

According to Drs. LaRocque and Rich, Plymouth's failure to implement social distancing is the facility's most glaring and dangerous deficiency in following the CDC's recommendations for mitigating the spread of COVID-19. LaRocque Aff. ¶¶ 9, 19; Rich Aff. ¶¶ 8-10. Because detainees are housed in shared cells or multi-person dormitories whose beds are less than six feet apart, social distancing, the cornerstone of the CDC's mitigation strategy, is currently impossible at Plymouth. LaRocque Aff. ¶¶ 9, 19; Rich Aff. ¶¶ 8-10. The other deficiencies these experts cite in Plymouth's implementation of the CDC's recommendations — infrequent cleaning and

disinfecting; poor access to hygiene products; lack of access to personal protective equipment; lack of instruction on the proper use of such equipment; and inconsistent and improper use of such equipment by guards and staff to whom it has been provided — further exacerbate the fundamental danger posed by the Petitioners' conditions of confinement. LaRocque Aff. ¶¶ 10-12; Rich Aff. ¶¶ 11-13. Until Respondents rectify these fundamental deficiencies at Plymouth, their facility will continue to pose a grave public health risk and jeopardize the safety and well-being of Plymouth's federal detainees.

### A. Petitioners are unable to take proper social distancing measures to protect themselves from infection.

Respondents admit that the conditions of confinement to which Petitioners and proposed class members are subject preclude them from maintaining the social distance the CDC and public health experts deem critical to mitigating the risk of individuals contracting and spreading COVID-19. *See* McDonald's Answers to Interrogatories, ECF No. 1-7. In an interrogatory response before the SJC, Sheriff McDonald stated that approximately 49.2% of Plymouth's inmates or detainees sleep within six feet of one another, approximately 56.72% eat their meals within six feet of one another, and approximately 47.35% are within six feet of one another during recreation. *Id.*

Affidavits from Plymouth federal detainees demonstrate that the conditions of their confinement make social distancing, the bedrock of COVID-19 prevention measures, impossible at the facility. Each of the Petitioners (and another detainee who provided an affidavit) live and sleep in shared cells or dormitories. They are always within six feet of their cellmates when in their cells or dormitories and sleep in bunkbeds whose beds are less than six feet apart. Aff. of Attorney Jane Peachy ¶ 4 ("Peachy Aff."), ECF No. 1-9; Aff .of Attorney Keith Halpern ¶ 4 ("Halpern Aff."), ECF No. 1-10; Aff. of Edward P. Ryan, Jr. ¶ 4 ("Ryan Aff."), ECF No. 1-8; Aff. of Jessica Thrall ¶ 4 ("Thrall Aff."), ECF No. 11; Aff. of Attorney Timothy Watkins ¶ 9 ("Watkins

Aff."), ECF No. 12.  Plymouth's detainees are also routinely within six feet of other detainees during their daily recreation periods.  Halpern Aff. ¶ 12; Ryan Aff. ¶ 5; Thrall Aff. ¶ 7.  Plymouth correctional officers, who enter and leave the facility daily, routinely disregard social distancing guidelines and regularly stand in close proximity to detainees when interacting with them.  Halpern Aff. ¶ 11; Watkins Aff. ¶ 9.

To enable critical social distancing at Plymouth, Respondents must reduce their inmate population.  Because social distancing is essential to any COVID-19 prevention and mitigation strategy, it is urgent that this measure be undertaken swiftly.  Giftos Aff. ¶ 27; Rich Aff. ¶ 16.  Drs. Rich and Giftos explain that social distancing is exceedingly difficult in correctional settings because they house many residents in close proximity.  Giftos Aff. ¶ 18; Rich Aff. ¶¶ 6, 21-22.  As a consequence, correctional facilities must reduce their pre-pandemic populations to provide enough space for the remaining residents to socially distance.  *Id.*  Respondents' failure to decarcerate thus exposes Petitioners and their fellow class members to the risk of a severe COVID-19 outbreak.

### B. Plymouth correctional officers do not utilize personal protective equipment ("PPE"), and Plymouth does not provide Petitioners with PPE either.

The hazards of Respondents' disregard for proper social distancing are compounded by their failure to ensure that face masks are available to and correctly and consistently used by staff and detainees alike.  Effective and consistent use of personal protective equipment is vital to prevent the spread of COVID-19.  Rich Aff. ¶¶ 13-14; LaRocque Aff. ¶¶ 10, 19.  The need for face masks is especially acute in correctional facilities, where conditions of confinement often give rise to more close physical contact during this state of emergency than may occur in the community at large.  Yet, some detainees report receiving face masks not having received a face mask since a state of emergency was declared in the Commonwealth on March 10, 2020.  *See generally* Peachy

Aff.; Halpern Aff. Others report receiving a single mask. There is no evidence that detainees were instructed on how to use face masks properly, nor do Respondents ensure their consistent use. Mr. Baez reports that he is "not required to wear [a mask] all times when he is outside of his cell." Meanwhile, Mr. Baptista reports that he was instructed to "wear the mask when he thinks he should wear it." Ryan Aff. ¶ 7; Watkins Aff. ¶ 5.

Plymouth staff also reportedly – and incorrectly – told Mr. Baptista that he could use his mask five times. That is dangerous misinformation. The mask he received should never be worn over a multi-day period or after it becomes damp, such as from a cough or sneeze. Watkins Aff. ¶ 5; LaRocque Aff. ¶ 10. Dr. Baker, Plymouth's Medical Director, touts signs that Plymouth has reportedly posted to inform detainees that they should notify the medical staff if they feel sick so they can receive a face mask. Decl. PCCF Medical Director Lawrence Baker, MD ¶ 17 ("Baker Decl."), *United States v. Pridgen*, Cr. No. 19-cr-10375-RGS (Apr. 16, 2020), ECF No. 51-2. This is too little, too late. Dr. Baker's statement implicitly concedes that Plymouth is not routinely providing face masks to its federal detainees, much less requiring their continuous use. Moreover, not only may detainees already have transmitted the virus to others by the time they become symptomatic, but they may never become symptomatic at all while still spreading the virus. LaRocque Aff. ¶ 19; Rich Aff. ¶ 9.

The use of personal protective equipment is no better among Plymouth staff. While they appear to have better quality face masks than are provided to select detainees, a mask's quality is of no import if it is not used properly and consistently. Watkins Aff. ¶¶ 5-6. Yet, Plymouth staff wear face masks only intermittently, if they wear them at all, even though they frequently interact with inmates at close proximity. Halpern Aff. ¶ 6; Ryan Aff. ¶ 7; Thrall Aff. ¶ 8; Watkins Aff. ¶ 5. Respondents' failure to provide detainees with a steady supply of face masks or ensure their

consistent use by staff and detainees alike, severely limits their efficacy in mitigating the risk of COVID-19 exposure at their facility.  LaRocque Aff. ¶¶ 10, 19.

### C.    Respondents have maintained dangerous, unsanitary conditions.

Hand washing is essential to protecting against the virus, which commonly spreads when individuals touch contaminated surfaces and then touch their mouth, eyes or nose.  Rich Aff. ¶¶ 11-12; LaRocque Aff. ¶¶ 11, 18-19.  Yet Petitioners are unable washing and disinfect their hands and surroundings with sufficient frequency to effectively mitigate their risk of infection.  Plymouth tightly rations the hand soap provided to inmates, limiting individual inmates to one small bar of soap per week.  Halpern Aff. ¶ 7; Peachy Aff. ¶ 7; Ryan Aff. ¶ 8; Watkins Aff. ¶ 8.  After having categorically barred Respondents Petitioners' access to hand sanitizer within the facility, Respondents finally appear to have made limited supplies of it available to at least some detainees.  Peachy Aff. ¶ 6; Halpern Aff. ¶ 7; Ryan Aff. ¶ 8; Watkins Aff. ¶ 8.  But more still needs to be done.

Because the coronavirus can persist on surfaces for up to three days, frequent daily cleaning of cells, common areas, and high-touch surfaces is crucial to preventing the spread of COVID-19 within Respondents' facility.  Rich Aff. ¶ 11; LaRocque Aff. ¶¶ 12-13.  Yet, overall sanitation at Plymouth has deteriorated since the pandemic.  Plymouth inmates used to receive two rolls of toilet paper per week; they now receive a single roll.  Halpern Aff. ¶ 8; Ryan Aff. ¶ 8.  Common areas and frequently touched surfaces at Plymouth remain contaminated for hours if not days on end.  Peachy Aff. ¶ 9; Halpern Aff. ¶ 9; Ryan Aff. ¶ 9; Thrall Aff. ¶ 9.  The showers in Mr. Bermudez's unit at Plymouth, which house 70-80 detainees, are cleaned only once every several days.  Peachy Aff. ¶ 9.

Respondents have neglected to supply inmates at Plymouth with gloves, which could help them protect themselves from contracting COVID-19 while they are cleaning contaminated objects

and surfaces. At Plymouth, staff placed Mr. Bermudez in direct contact with objects they were on notice had a dangerous likelihood of being contaminated. After Mr. Bermudez's cellmate went to medical for symptoms of coronavirus, staff reportedly directed Bermudez to pack up his cellmate's belongings without providing him gloves to protect himself. Peachy Aff. ¶ 12.

Respondents fail to persistently clean high-touch surfaces and objects. Peachy Aff. ¶¶ 5, 9; Halpern Aff. ¶ 9; Ryan Aff. ¶ 9; Watkins Aff. ¶ 11. This failure allows virus-containing droplets and particles to collect on those surfaces, where they can live for several days. Respondents' inaction thus turns ordinary objects into vectors of COVID-19. Sheriff McDonald asserts that he has improved sanitization conditions in certain units. Decl. of Sheriff Joseph D. McDonald, Jr. ¶¶ 9-12, *United States v. Pridgen*, Cr. No. 19-cr-10375-RGS (Apr. 16, 2020), ECF No. 51-1. But heightened sanitization standards must be maintained across the facility to prevent a COVID-19 outbreak from starting in one unit and then rampaging through the rest of the facility. *See* LaRocque Aff. ¶ 19. Plymouth's selective action plainly contravenes the CDC guidance and the medical consensus on preventing infection.

### D. Petitioners in Respondents' custody are not properly quarantined after potential exposure to COVID-19.

Successful management of COVID-19 exposure relies on infected individuals entering quarantine before spreading the disease to others during its early stages, when the virus is at its most infectious. Rich Aff. ¶ 20; LaRocque Aff. ¶¶ 14-16. At Plymouth, due to a poorly structured quarantine system or an utter lack of transparency around the procedures Respondents may have put in place, detainees avoid reporting symptoms, at all costs. Halpern Aff. ¶ 10. Detainees are loathe to report any symptoms they may have, fearful that doing so will prompt their being housed in close quarters with inmates who may, in fact, have contracted COVID-19, thereby ensuring that the newly quarantined inmate will become infected, even if he had not yet contracted the virus

before being quarantined.  *Id*.  Mr. Baptista's own recent experience in the medical unit, unrelated to COVID-19, did nothing to instill confidence in him.  There, Mr. Baptista was placed "in close proximity and less than six feet from other detainees in the unit," observed "correctional officers talking to each other within two feet of each other," and witnessed "other detainees cleaning the medical unit without masks or gloves."  Watkins Aff. ¶ 10.  And though his doctor wore a mask, his nurse did not.  *Id*.

E.     **Petitioners do not have immediate access to health care.**

Rapid access to medical treatment is vital to prevent death from COVID-19.  LaRocque Aff. ¶ 20.  This is all the more true for detainees, who are far more likely than the general population to have chronic underlying conditions that expose them to risk of severe complications from COVID-19.  Rich Aff. ¶ 15.  But medical care in jails is frequently insufficient to meet inmates' needs even when there is no pandemic.  Giftos Aff. ¶ 18; Rich Aff. ¶ 23.  According to Dr. Baker, only six staffers (a number that includes administrators and mental health aides) are currently working in the medical unit onsite.  Baker Decl. ¶ 6.  This limited medical care will surely crack under the strain of a COVID-19 outbreak, as sick inmates multiply, staff fall sick, and supplies are depleted.  Rich Aff. ¶¶ 23-24.

The provision of medical treatment at Plymouth lagged even before the current COVID-19 pandemic.  Mr. Bermudez recently submitted two medical requests at Plymouth after an ingrown toenail became infected, which he believes was caused by the communal showers.  Peachy Aff. ¶ 10.  He received no response.  *See id*.  Only after his lawyer pressed the facility to respond to his medical request did a nurse finally see him and prescribe an antibiotic.  *See id*.

Petitioners' lives and well-being may well depend on their ready access to medical care during this public health emergency.  Plymouth's dilatory response to simple medical requests in the recent past does not bode well for its timely care of detainees in the midst of this pandemic.

And there is every reason to expect that such will be need. Because Plymouth has not already implemented the CDC's critical recommendations for preventing the spread of COVID-19, Drs. LaRocque and Rich conclude that it faces a "high risk of a COVID-19 outbreak," which could spread rapidly through the facility and "have disastrous consequences for the facility's residents and staff, and the surrounding broader community." LaRocque Aff. ¶¶ 17, 21; Rich Aff. ¶¶ 5, 9.

## ARGUMENT

The Court may grant a preliminary injunction or temporary restraining order if Petitioners establish (1) that they are "likely to succeed on the merits," (2) that they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in [their] favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The standards for issuing a temporary restraining order and a preliminary injunction are "the same," and therefore both remedies can be analyzed together. *Levesque v. Maine*, 587 F.2d 78, 80 (1st Cir. 1978)

"The first two factors are the most important and, in most cases, 'irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief.'" *Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75, 79 (1st Cir. 2009) (quoting *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004)). Nevertheless, Petitioners' "likelihood of success, is 'the touchstone of the preliminary injunction inquiry.'" *Bos. Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 11 (1st Cir. 2008) (quoting *Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 674 (1st Cir. 1998)). Here, Petitioners are likely to succeed on the merits of their claims. Those claims relate to a risk that could not be more dire: that of contracting a deadly infectious disease. The public interest – which is the only relevant interest in a motion for a preliminary injunction against the government – also favors relief. *See Devitri v. Cronen*, 289 F. Supp. 3d 287, 297 (D. Mass. 2018) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

**A.** **Petitioners and the proposed class will likely succeed on their Fifth and Eighth Amendment claims because Respondents have failed to protect their health and safety.**

Petitioners will likely prevail on their Fifth and Eighth Amendment claims because Respondents are not adequately protecting the health and safety of Petitioners and proposed class members. Instead, Respondents have maintained conditions of confinement that contravene critical CDC recommendations designed to protect individuals from the COVID-19 pandemic. In so doing, Respondents have violated Petitioners' Fifth Amendment (for pretrial detainees) and Eighth Amendment rights (for post-conviction detainees). *See Bell v. Wolfish*, 441 U.S. 520, 536-37 & n.16 (1979).

The Eighth Amendment requires corrections officials to "provide humane conditions of confinement," such as "adequate food, clothing, shelter, and medical care," and reasonable safety precautions. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal citations omitted). Corrections officials violate the Eighth Amendment when (1) the facility's conditions manifest "a substantial risk of serious harm" to detainees and (2) the officials subjectively know of that risk and fail to address it. *See Leite v. Bergeron*, 911 F.3d 47, 52 (1st Cir. 2018).

While the Due Process Clause protects pretrial detainees from dangerous conditions of confinement, the First Circuit has previously analyzed such claims using the Eighth Amendment's framework. *See Burrell v. Hampshire Cty.*, 307 F.3d 1, 7 (1st Cir. 2002) (citing *Bell*, 441 U.S. at 545); *see also United States v. Neto*, 659 F.3d 194, 201 n.7 (1st Cir. 2011) ("[D]ue process cases decided under the Fourteenth Amendment provide guidance in due process cases arising under the Fifth Amendment."). However, as detailed below, subsequent Supreme Court rulings suggest that

pretrial detainees' Fifth Amendment claims are subject to a less stringent standard of review.[3] *See Kingsley v. Hendrickson,* 576 U.S. 389, 135 S. Ct. 2466, 2473-74 (2015); *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017). Even if Petitioners' Fifth Amendment claims are evaluated through the prism of the Eighth Amendment, Petitioners are likely to prevail because, notwithstanding Respondents' acute awareness that COVID-19 poses a substantial risk of serious harm to the detainees in their custody, they have failed to implement critical CDC recommendations, including social distancing, that are essential to protect detainees from COVID-19 and mitigate its spread.

### 1. Plymouth is unduly vulnerable to a COVID-19 outbreak.

Petitioners will likely prevail on the first prong of the analysis because their "conditions pos[e] a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Petitioners meet their burden on this prong if they show that "the risk of which [they] complain[] is not one that today's society chooses to tolerate." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). That is plainly so here. "Today's society" has banned congregate gatherings; repeatedly and urgently stressed the importance of social distancing; recommended the use of cloth face masks outside the privacy of one's home; underscored the critical importance of repeated hand washing and disinfection of all high-touch surfaces; closed nonessential businesses; and stopped nonessential travel because of the mortal threat that they pose during the COVID-19 pandemic. *See* COVID-19 Order No. 13, Office of Gov., Commw. of Mass. (Mar. 23, 2020), https://www.mass.gov/doc/march-23-2020-essential-services-and-revised-gatherings-order/download (temporarily closing nonessential businesses and organization, allowing essential services to stay open if they follow social

---

[3] Under the Fifth Amendment, pre-trial detainees enjoy "at least as much protection" as convicted defendants do under the Eighth Amendment. *See Youngberg v. Romeo*, 457 U.S. 307, 322 (1982); s*ee also Ruiz-Rosa v. Rullan*, 485 F.3d 150, 155 (1st Cir. 2007) (applying the Fourteenth Amendment due process clause) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). Accordingly, plaintiffs in pretrial detention may be "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg*, 457 U.S. at 322

distancing protocols, and banning gatherings of more than 10 people indoors); *Advisory Regarding Face Coverings and Cloth Masks*, Mass. Dep't of Pub. Health (Apr. 10, 2020), https://www.mass.gov/news/advisory-regarding-face-coverings-and-cloth-masks; *Coronavirus Disease 2019 (COVID-19), Resources for Correctional and Detention Facilities*, CDC (last reviewed: Apr. 9, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/index.html (advising corrections facilities to "[u]se multiple social distancing strategies"); *30 Days to Slow the Spread*, The President's Coronavirus Guidelines for America, https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf (recommending avoiding gatherings of more than 10 people).

a.   **Plymouth's conditions of confinement expose Petitioners to an unduly substantial risk of contracting COVID-19.**

Petitioners and proposed class members face an unduly substantial risk of contracting COVID-19. In facilities holding federal detainees nationwide, the growth rate of COVID-19 infections has dramatically outpaced the rate in the country at large.



Rich Aff. ¶ 17.

Drs. Giftos and Rich observe that correctional facilities are especially susceptible to COVID-19. In his affidavit, Dr. Giftos explains that residents at facilities like Respondents' face an increased risk of contracting COVID-19 because of "the high numbers of people with chronic, often untreated, illnesses housed in a setting with minimal levels of sanitation, limited access to personal hygiene, limited access to medical care, and no possibility of staying at a distance from others." Giftos Aff. ¶ 18. Dr. Rich observes that COVID-19 can spread quickly in correctional settings because people in such facilities are often housed in close proximity to one another, frequently congregate without face coverings, and are not always able to wash or sanitize hands their hands frequently. Rich Aff. ¶¶ 6, 11. Dr. Rich emphasizes that without social distancing,

which is both essential but difficult to achieve in correctional facilities, people must be especially rigorous in practicing proper hand hygiene and frequently cleaning and disinfection of high-touch surfaces. Rich Aff. ¶ 11. Yet "[c]orrectional facilities do not provide adequate opportunities to exercise necessary hygiene measures, such as frequent handwashing or use of alcohol-based sanitizers when handwashing is unavailable." *Id.*

Multiple conditions at Plymouth expose detainees there to a heightened risk of contracting COVID-19 and will make an outbreak at the facility all the more difficult to contain. Respondents admit that the conditions of confinement at Plymouth do not conform with the CDC's social distancing guidelines. *See* McDonald's Answers to Interrogatories (admitting that approximately half of all people living in the facility sleep, eat, and/or recreate within six feet of another). But the CDC states that social distancing "is a cornerstone of reducing the transmission of respiratory diseases such as COVID-19."[4] Respondents' failure to implement consistent social distancing at Plymouth, by eliminating shared cells and communal meals in particular, therefore subjects detainees to a substantial risk of serious harm. LaRocque Aff. ¶¶ 9, 19; Rich Aff. ¶¶ 5, 21-22. Respondents also do not enforce their purported policy requiring staff to maintain social distance when possible in their interactions with detainees. Peachy Aff. ¶ 12; Halpern Aff. ¶ 11; Watkins Aff. ¶ 9.

Respondents further exacerbate this risk by failing both to equip detainees with adequate supplies of personal protective equipment, such as cloth masks, and to require Plymouth correctional officers to consistently use the face masks with which they are provided. Halpern Aff. ¶ 6; Ryan Aff. ¶ 7; Thrall Aff. ¶ 8; Watkins Aff. ¶ 6. Consistent and correct use of cloth masks

---

[4] *Coronavirus Disease 2019 (COVID-19)*, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, CDC (last reviewed: Apr. 9, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

reduces the risk of spreading COVID-19.  Rich Aff. ¶ 13; LaRocque Aff. ¶¶ 10, 19.  Not all

detainees report receiving masks, s*ee generally* Peachy Aff.; Halpern Aff., and those who did say

they received only one, Ryan Aff. ¶ 7; Watkins Aff. ¶ 5; Thrall Aff. ¶ 8.  Moreover, Plymouth staff

incorrectly told Mr. Baptista that he could wear his mask "five times."  Watkins Aff. ¶ 5.  Not so.

Once the mask becomes damp, as it would from a sneeze or cough, the mask becomes ineffective

and must be thrown out.  LaRocque Aff. ¶ 10.  In any event, a mask should not be worn over the

course of multiple days.  LaRocque Aff. ¶ 10, 19.  Plymouth staff also do not require detainees to

always wear their mask outside of their cell.

What's more, Respondents have impeded Petitioners' ability to practice recommended

hand hygiene.  Plymouth limits inmates to one small bar of soap per week, and has barred use of

hand sanitizer all together until the day before this filing.[5]  Halpern Aff. ¶ 7; Peachy Aff. ¶¶ 6-7;

Ryan Aff. ¶ 8; Thrall Aff. ¶ 10; Watkins Aff. ¶ 8.  Yet experts explain that the virus is often spread

by people touching their face after touching a contaminated surface.  Rich Aff. ¶ 11; LaRocque

Aff. ¶¶ 7-8, 11, 18-20; *see also* Faith Karimi, *One Big Coronavirus Challenge is How to Stop*

*Touching Your Face*, CNN (Mar. 19, 2020), https://www.cnn.com/2020/03/08/health/coronavirus-

touching-your-face-trnd/index.html (individuals touch their face an average of 23 times per hour).

Perpetual hand washing and sanitizing is thus a crucial component of preventing the spread of

COVID-19.

Respondents have also failed to enact basic environmental hygiene practices at Plymouth

that would help protect detainees from the risk of contracting COVID-19.  The cleaning products

Respondents make available to detainees are in such short supply that detainees cannot clean and

---

[5] Shortly before this filing was made, undersigned counsel learned that one detainee had been provided with hand sanitizer the day before.

disinfect their cells on a daily basis. Peachy Aff. ¶ 5; Ryan Aff. ¶ 9; Thrall Aff. ¶ 9; Watkins Aff. ¶ 11. Detainees must go without gloves when they do clean or otherwise have physical contact with known potential sources of contamination. Peachy Aff. ¶¶ 5, 12; Watkins Aff. ¶ 7. Respondents also fail to disinfect high-touch areas and objects within Plymouth, such as communal tables, telephones, and remote controls, with sufficient frequency to make them anything other than a perpetual source of potential contamination. Peachy Aff. ¶ 5; Halpern Aff. ¶ 9; Ryan Aff. ¶ 9; Thrall Aff. ¶ 9. Mr. Baptista, Mr. Bermudez and Mr. Gonsalves also report that medical treatment at Plymouth is unreliable and that patients are afraid to ask for help because they believe that Plymouth lacks areas to isolate potential COVID-19 patients. Peachy Aff. ¶ 11; Halpern Aff. ¶ 10; Watkins Aff. ¶¶ 9-10.

Based on their review of Petitioners' and Mr. Baptista's affidavits, Drs. LaRocque and Rich warn that the conditions of confinement at Plymouth amount to a perfect storm for a mass outbreak of COVID-19 at the facility, one that they doubt Plymouth is poised to respond to effectively. *See* LaRocque Aff. ¶¶ 20-21; Rich Aff. ¶¶ 22-24.

Specifically, Drs. Rich and LaRocque find that Respondents have placed Plymouth detainees at grave risk because Plymouth lacks:

- sufficient space for detainees to practice social distancing (the "best initial strategy" to combat infection), since they "must share cells, toilets, showers," tables at meals, telephones, and other "common areas" and objects";

- sufficient supplies of hand soap for inmates to wash their hands with needed frequency;

- hand sanitizer and sufficient personal protective equipment for inmates' use;

- sufficient supplies of cleaning products and cleaning protocols to ensure continual sanitization of high-touch surfaces and cells;

- adequate ventilation to prevent or mitigate the spread of COVID-19 through respiratory droplet or aerosolized particles; and

- adequate (1) personal protective equipment for on-site medical personnel, (2) cloth face masks to mitigate risks for residents and staff that do not provide medical assistance, (3) contingency plans for a COVID-19 outbreak, (4) onsite units to isolate a person with a COVID-19 infection, and (5) other medical equipment needed to treat severe cases of COVID-19.

LaRocque Aff. ¶ 19; Rich Aff. ¶¶ 5, 12-13.

After reviewing the evidence in the record, including the Respondents' own representations and affidavits from detainees in Respondents' custody, Dr. LaRocque concluded that "Defendants are not taking vital steps to prevent and mitigate a COVID-19 outbreak at the facility. Such an outbreak would have disastrous consequences for the facility's residents and staff, and the broader surrounding community." LaRocque Aff. ¶ 21. Dr. Rich agrees and suggests that decarceration may be necessary to prevent the pandemic from devasting the correctional facility. Rich Aff. ¶¶ 21-22.

Petitioners and the proposed class are currently at risk even though there is not yet a confirmed COVID-19 case among detainees at Plymouth. Asymptomatic individuals infected with COVID-19 may still transmit the disease to others through respiratory droplets or physical contamination of surfaces, such as cell bars, telephone receivers, or even shared hand soap. LaRocque Aff. ¶ 7; Rich Aff. ¶ 9. Although none of the Plymouth detainees has tested positive yet for COVID-19, testing at the facility is quite limited. Not long ago, many elected officials cited that very same data point to endorse the continuation of society's daily routines, notwithstanding the ravages of COVID-19 in other parts of the globe or the United States.

The Supreme Court has made clear that detainees need not show that they are currently infected or suffering "serious health problems" to show that they face a "substantial risk" of serious harm. *Helling*, 509 U.S. at 34. Corrections officials may not "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." *Id.* at 33. Nor may corrections officials expose detainees "to a serious, communicable

disease on the ground that the complaining inmate shows no serious current symptoms." *Id.* Absent strict adherence to the CDC's recommendations, an intolerably high risk persists that when (not if) a proposed class member contracts COVID-19, it will run rampant throughout the facility.

Other district courts have issued temporary restraining orders in advance of a confirmed COVID-19 case among detainees, citing the speed with which the virus would spread within the correctional facilities at issue and the dire consequences of that eventuality. *See, e.gs. Basank v. Decker*, No. 20-cv-2518 (AT), 2020 WL 1481503, at *5 (S.D.N.Y. Mar. 26, 2020); *Xochihua-Jaimes v. Barr*, No. 18-71460, slip op. (9th Cir. Mar. 23, 2020), ECF No. 53 (unpublished); Temporary Restraining Order & Order to Show Cause at 10, *Castillo v. Barr*, No. 20-cv-605 (TJH) (C.D. Cal. Mar. 27, 2020), ECF No. 32. For example, the U.S. District Court for the Southern District of New York ordered the immediate release of ten people because "[t]he spread of COVID-19 is measured in a matter of a single day — not weeks, months, or years." *Basank*, 2020 WL 1481503, at *5. Courts agree that there is a "rapidly escalating public health crisis," and the "number of cases in the United States has yet to peak." *Xochihua-Jaimes*, No. 18-71460, slip op.; Temporary Restraining Order & Order to Show Cause at 10, *Castillo*, No. 20-cv-605 (TJH).

Cook County Jail serves as a cautionary tale. As of April 8, 2020, 251 detainees and 150 employees at the Jail had tested positive for coronavirus, and one detainee had died of apparent complications from it. *See Mays v. Dart*, No. 1:20-C-02134-MFK, slip op. at 4 (N.D. Ill. Apr. 9, 2020), ECF No. 47 (citing COVID-19 Cases at CCDOC, Cook Cty. Sheriff's Office, https://www.cookcountysheriff.org/covid-19-cases-at-ccdoc/ (as updated on Apr. 8, 2020, 5:00 P.M.)). For a time, that facility had the unfortunate distinction of being "the largest single known source of infections in the nation." *Id.* (citing Timothy Williams & Danielle Ivory, *Chicago's Jail is Top U.S. Hot Spot as Virus Spreads Behind Bars* (Apr. 8, 2020), N.Y. Times,

https://www.nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html (as updated on Apr. 9, 2020, 8:47 A.M.)). As a result, the U.S. District Court for the Northern District of Illinois ordered the jail to (1) provide pretrial detainees "soap and/or hand sanitizer to all detainees in quantities sufficient to permit them to frequently clean their hands"; (2) "adequate sanitation supplies to enable all staff and detainees to regularly sanitize surfaces and objects on which the virus could be present, including in all areas occupied or frequented by more than one person," (3) and create a sanitization policy for "frequently touched surfaces and objects," among other things. *Id.* at 35.

Dr. Giftos avers that because "there are more people who are susceptible to getting infected all congregated together" in corrections settings "in which fighting the spread of an infection is nearly impossible," individuals such as those in Respondents' custody live in a "context in which fighting the spread of an infection is nearly impossible." Giftos Aff. ¶ 18. In effect, he warns that what happened in Cook County could also happen in Plymouth as well.

These conditions thus subject Petitioners and members of the proposed class to a "substantial risk" of contracting COVID-19.

### b. COVID-19 Is a Serious Harm

Contracting COVID-19 constitutes a "serious harm." To demonstrate a "serious harm," Petitioners must show that "society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling*, 509 U.S. at 36.

Society does not tolerate exposing anyone unwillingly to COVID-19. The Commonwealth, joining many other states, has shut down all but its "critical infrastructure." Even those critical infrastructure operations must abide by the CDC's social distancing recommendations. People have been directed not to leave their homes, except for essential

activities such as grocery shopping and medical necessities. Society has chosen this course – despite its serious economic costs – because were these extraordinary steps not taken, the human toll would be unacceptable.

This Court itself has recognized that business as usual in the face of the COVID-19 pandemic is untenable. Chief Judge Saylor has acknowledged "the public emergency arising out of the coronavirus epidemic," and ordered measures to curtail mass gatherings so as "to protect public health." General Order 20-13 (D. Mass. Mar. 30, 2020). Indeed, this Court went so far as to close the Springfield courthouse after one employee "reported symptoms consistent with COVID-19." General Order 20-7 (D. Mass. Mar. 23, 2020). The Court did not wait for a confirmed diagnosis and did not simply quarantine the stricken employee: it acted immediately and shut down the entire building. *Id.*

The expert affidavits and epidemiological data demonstrate the deadly risk of COVID-19. Dr. LaRocque points out that this risk extends not only to the elderly, but also to the young: "from February 12 to March 16, nearly 40% of American COVID-19 patients who were hospitalized were between the ages of 20 and 54" LaRocque Aff. ¶ 3. According to the CDC, in total, 12.3 percent of people who tested positive for COVID-19 require hospitalization and, according to data compiled by Johns Hopkins University, 4.27% of those with a confirmed COVID-19 diagnosis die. *See Coronavirus Disease 2019 (COVID-19)*, *COVIDView*, CDC (last updated Apr. 10, 2020), https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html#hospitalizations; *COVID-19 Dashboard*, Johns Hopkins Univ. (Apr. 14, 2020), https://www.arcgis.com/apps/opsd ashboard/index.html#/bda7594740fd40299423467b48e9ecf6. Physicians and epidemiologists agree: COVID-19 risks serious harm to those suffering from it.

It is not just medical experts that draw that conclusion: elected officials consider COVID-19 a grave risk.  On March 13, 2020, President Trump declared a national emergency and noted that "[t]he spread of COVID-19 within our Nation's communities threatens to strain our Nation's healthcare systems."  Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, White House (Mar. 13, 2020), https://www.whiteho use.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.  Governor Baker's Declaration of a State of Emergency states that "the worldwide outbreak of COVID-19 and the effects of its extreme risk of person-to-person transmission throughout the United States and the Commonwealth significantly affect the life and health of our people, as well as the economy, and is a disaster that impacts the health, security, and safety of the public."  Exec. Order No. 591, Commw. of Mass. (Mar. 10, 2020).

As a consequence, courts concur that COVID-19 risks serious harm to people in jails and prisons.  In this very district, Judge Young relied on the CDC's data to conclude that COVID-19 "is gravely dangerous to all of us."  *Savino v. Souza*, Civ. A. No. 20-10617, slip op. at 21 (D. Mass. Apr. 8, 2020), ECF No. 64.  Moreover, the Supreme Judicial Court cited "the severity of the COVID-19 pandemic" in ordering the release of certain pretrial detainees.  *Comm. for Pub. Counsel Servs. v. Chief Justice of Trial Ct.*, No. SJC-12926, 2020 WL 1659939, at *10 (Mass. Apr. 3, 2020).  Other federal and state courts have agreed.  *See Basank*, 2020 WL 1481503, at *3 (citing *United States v. Stephens*, No. 15-cr-95 (AJN), 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020); *United States v. Garlock*, No. 18-cr-418 (VC), 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020)).

Additionally, courts in the First Circuit have recognized that tuberculosis – a disease with a less severe mortality rate[6] – constitutes a "serious harm" for Eighth Amendment purposes.  *See, e.gs.*, *Morales Feliciano v. Rossello Gonzalez*, 13 F. Supp. 2d 151, 208 (D.P.R. 1998) (ruling that failure to "properly isolate cases of active tuberculosis inflicts cruel and unusual punishment on particular individuals at present, endangers their health in the future and threatens the health of all the members of the class"); *Palmigiano v. Garrahy*, 639 F. Supp. 244, 258 (D.R.I. 1986) (observing that "tuberculosis is a very serious concern in prisons").

Therefore, Petitioners and the proposed class will likely prevail on their Fifth Amendment claim because the evidence demonstrates that (1) they are at "substantial risk" of contracting COVID-19; and (2) contracting COVID-19 would cause them "serious harm."

### 2. Respondents have acted with deliberate indifference to the risk of COVID-19 infection.

To prevail on their Eighth Amendment claim, Petitioners must show that Respondents were subjectively deliberately indifferent to the conditions at Plymouth that exposed Petitioners and proposed class members to a substantial risk of serious harm from COVID-19.  *See Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014).  However, an objective standard arguably applies to the deliberate indifference element of Petitioners' Fifth Amendment claim.  In *Kingsley v. Hendrickson,* 576 U.S. 389, 135 S. Ct. 2466, 2473 (2015), in which a pretrial detainee brought an excessive force claim against several jail officers under the Due Process Clause, the Supreme Court held that an objective standard applied to the deliberate indifference prong of plaintiff's due process claim.  Because the Due Process Clause protects pretrial detainees from actions that are not "rationally related to a legitimate nonpunitive governmental objective" or are "excessive in

---

[6] A study of tuberculosis in the United States suggested that its mortality rate is 2.1%.  *See* Chou-Han Lin et al., *Tuberculosis Mortality:  Patient Characteristics and Causes*, 14 BMC INFECTIOUS DISEASES (2014).

relation to that purpose," the Supreme Court determined that a pretrial detainee need not show subjective intent to prevail. *Id.* The Court held that whether defendants' use of force was "cruel or unusual," – the standard formulation for an Eight Amendment claim – was irrelevant to the plaintiff's claim because a pretrial detainee cannot be punished at all. *Id.* at 2475. That analytical approach applies to all due process claims lodged by pretrial detainees, not just claims of excessive force.

In the wake of Kingsley, several circuit courts have applied this objective standard to the deliberate indifference prong of pretrial detainees' due process claims for unlawful conditions of confinement. *See Miranda v. Cty. of Lake*, 900 F.3d 335, 351 (7th Cir. 2018) (medical-care claims brought by pretrial detainees are subject to objective unreasonableness inquiry); *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017) (applying the objective standard to complaints about conditions of confinement); *Castro v. Cty. of L.A.*, 833 F.3d 1060, 1070-71 (9th Cir. 2016) (applying objective inquiry to detainees' failure-to-protect claims); *see also Richmond v. Huq*, 885 F.3d 928, 938 n.3 (6th Cir. 2018) (recognizing the "shift in Fourteenth Amendment deliberate indifference jurisprudence [that] calls into serious doubt whether [the plaintiff] need even show that the individual defendant-officials were subjectively aware of her serious medical conditions and nonetheless wantonly disregarded them").[7] *Kingsley* prompted the Second Circuit to overrule its precedent and to adopt an objective standard of proof with respect to deliberate indifference in Fifth Amendment due process claims. *See Darnell*, 849 F.3d at 36 ("*Kingsley*'s broad reasoning extends beyond the excessive force context in which it arose."). While the First Circuit has not

---

[7] The Eighth and Eleventh circuits have confined *Kingsley* to its facts without analysis. *See Whitney v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018); *Nam Dang by & through Vina Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017). Citing the "rule of orderliness," the Fourth Circuit declined to address *Kingsley*'s application to conditions of confinement claims. *See Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 420 n.4 (5th Cir. 2017) (declining to reconsider standard of intent post-*Kingsley*).

had the opportunity to address the deliberate indifference standard for Fifth Amendment condition of confinement claims since *Kingsley* and *Darnell* were decided, *Kingsley*'s reasoning fatally undermines the application of a subjective standard to deliberate indifference in Fifth Amendment due process claims. *Compare Kingsley*, 135 S. Ct. at 2475 (reasoning that requiring objective knowledge was appropriate for pretrial detainee's due process claims) *with Ruiz-Rosa v. Rullan*, 485 F.3d 150, 154 (1st Cir. 2007) (defining deliberate indifference to medical care subjectively).[8]

Petitioners are likely to prevail under the subjective standard of their Eighth Amendment claim. Therefore, even were this Court to require subjective knowledge for pretrial detainees' due process claims, Petitioners would also succeed under their Fifth Amendment claim because they are likely to establish that Respondents acted knowingly. Under the subjective test, Petitioners must show both that (1) the defendant "knows of" the identified risk, and (2) the defendant "disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Respondents' failure to protect Petitioners from a dire risk of infection with COVID-19, despite clear guidance from the CDC and widespread recognition of the deadly consequences of flouting needed protective measures, amounts to deliberate indifference, whether evaluated under an objective or subjective standard.

There is overwhelming evidence that Respondents "knew of a substantial risk" posed by COVID-19. Dr. Baker's own words reveal as much: He concedes "it is clear that a prison setting poses particular challenges from an infectious disease standpoint"; Plymouth's staff is "acutely aware of the risks posed by the pandemic; and "this pandemic presents unique challenges." Baker

---

[8] *But see Couchon v. Cousins*, No. 17-cv-10965-RGS, 2018 WL 4189694, at *6 (D. Mass. Aug. 31, 2018) (commending reasoning of Second and Ninth Circuits, but concluding district court lacks authority to follow suit given First Circuit's pre-*Kingsley* precedent).

Decl. ¶¶ 21, 24. These concessions doom any argument that Respondents did not know of the substantial risk of COVID-19.

Even without these fatal admissions, the evidence shows that Respondents knew of this risk. Governor Baker declared a state of emergency in the Commonwealth of Massachusetts on March 10, 2016, which has been followed by more than 21 emergency orders, ranging from school and business closures to prohibition of public gatherings. Class Action Pet. ¶¶ 35-37. The Massachusetts Supreme Judicial Court drew attention to correctional institutions' inability to keep adequate physical distance between inmates and maintain proper sanitation. *See Comm. for Pub. Counsel Servs.*, 2020 WL 1659939, at *3. Noting that individuals in prisons and jails have an increased prevalence of underlying conditions that can make COVID-19 fatal, the SJC warned that an outbreak in correctional institutions could have severe ramifications outside of them, as inmates in need of specialized medical interventions are transferred to overburdened outside hospitals and correctional and medical staff bring the virus home. *See id.* at *3-4. On April 3, the SJC ordered Massachusetts sheriffs –one of whom is also a Respondent in this case – to report daily to a special master on the number of COVID-19 tests and positive results. *Id*. at *15. In the federal system, Attorney General Barr has found that COVID-19 constitutes an emergency condition in the federal corrections system and "time is of the essence" in responding to it. Memo from Att'y Gen. to Dir. of Bureau of Prisons, U.S. Dep't of Justice, at 2, Apr. 3, 2020.

Petitioners and proposed class members are also likely to prevail in showing that Respondents have disregarded and continue to disregard the excessive risk to their health or safety. Dr. LaRocque notes that, although there is still uncertainty about how COVID-19 spreads, recent data shows that it can spread easily even when the person transmitting the virus has light or no symptoms. The latest data from Johns Hopkins University indicates that the mortality rate for

COVID-19 in the United States is 4.27%. *See COVID-19 Dashboard*, Johns Hopkins Univ. (Apr. 14, 2020), https://www.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b 48e9ecf6. Given that corrections facilities tend to house more people with chronic medical conditions that make the virus more severe, the mortality rate could be even higher at Plymouth. Giftos Aff. ¶ 16; Rich Aff. ¶ 23.

The very failures of Respondents in this case have been found to constitute deliberate indifference in like cases. For instance, in *Morales Feliciano v. Rossello Gonzales*, 13 F. Supp. 2d 151 (D.P.R. 1998), the Court found that the defendant's "inability . . . to properly isolate cases of active tuberculosis," the "insufficient medical dormitory beds," the failure to "fully screen incoming inmates," and the failure to "provide for a sick call system that ensures access to care and that is capable of effectively handling emergencies" constituted deliberate indifference. *Id.* at 208-09. In another case, the defendant's inability to "adequately quarantine or remove inmates and support personnel known to have active tuberculosis" was found to constitute deliberate indifference. *Shimon v. Dep't of Corr. Servs. for N.Y.*, No. 93-cv-3144 (DC), 1996 WL 15688, at *1 (S.D.N.Y. Jan. 17, 1996). Here, Respondents at the very least have not informed Petitioners or the public as to the steps they plan to take to effectively isolate a resident who shows any COVID-19 symptoms. This uncertainty has caused residents to assume the worst and thus keep their medical issues to themselves. Halpern Aff. ¶ 10. After all, less than half of the staff wear masks and many come within six feet of each other and of residents. Halpern Aff. ¶¶ 6, 11.

Respondents' deliberate indifference can also be shown by their failure to follow accepted medical standards. The court in *Hernandez v. County of Monterey*, 110 F. Supp. 3d 929 (N.D. Cal. 2015) explained that "known noncompliance with generally accepted guidelines for inmate health strongly indicates deliberate indifference to a substantial risk of serious harm." *Id.* at 943.

Dr. LaRocque notes that Respondents' decision not to institute any social distancing measures does not adhere to the CDC's guidance. She also explains that the situation is worsened by the fact that the staff does not universally wear masks and does not provide them to residents. Further, she points out that Respondents do not appear to sanitize risky areas, such as showers and bathrooms, in accordance with the CDC's guidance. LaRocque Aff.¶ 19 ; Peachy Aff. ¶ 9; Halpern Aff. ¶ 9.

In the context of COVID-19, courts have found deliberate indifference on similar records. In *Mays v. Dart*, No. 1:20-cv-02134-MFK (N.D. Ill. Apr. 9, 2020), ECF No. 47, the court found that numerous aspects of defendants' measures to protect inmates from infection were not objectively reasonable, and ordered immediate remediation of each deficiency. Among other measures, the court required increased testing, provision of soap and/or hand sanitizer, sanitation between all uses of frequently touched surfaces and objects, and provision of facemasks to all quarantined detainees. *See id.* at 34-36. In *Swain v. Junior*, No. 1:20-cv-21475-KMW (S.D. Fla. Apr. 7, 2020), ECF No. 25, the court ordered defendants to provide adequate sanitation and disinfecting supplies, require all jail staff and inmate workers to wear personal protective equipment, and ensure access to testing for anyone displaying symptoms of COVID-19. In *Basank v. Decker*, No. 20-cv-2518 (AT), 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020), the court rejected the measures taken by the jail in that case, including "screening detainees upon intake for risk factors, isolating detainees who report symptoms, . . . providing soap and hand sanitizer to inmates, and increasing the frequency and intensity of cleaning jail facilities." *Id.* at *5. Regarding those policies, the Court held that they "are patently insufficient to protect Petitioners," because the jail "could not represent that the detention facilities were in a position to allow inmates to remain six feet apart from one another, as recommended by the [CDC]." *Id.*

The record evidence thus shows that Respondents failed to act with reasonable care to mitigate the risk of COVID-19 even though Respondents knew, or should have known, of that risk. At Plymouth, Respondents themselves admit that approximately half of their detainees sleep and/or eat within six feet of one another. Inmates reportedly receive one small bar of soap and one roll of toilet paper per week. Most correctional officers do not wear masks and the facility remains as visibly dirty as before the pandemic. Residents of Plymouth report being afraid to state that they are feeling unwell because they fear being moved into a quarantine unit populated by residents with COVID-19 symptoms. *See* Halpern Aff. ¶ 10.

**B.**     **Petitioners and proposed class members will suffer irreparable harm.**

Immediate injunctive relief is necessary to avert the rapid spread of a disease that can cause serious injury or death. Infection with a potentially fatal disease is irreparable, as it "cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). This is far from a case based on "conjecture, surmise, or . . . unsubstantiated fears." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) (there must be a "realistic prospect" of irreparable harm). Without immediate release of Petitioners or adherence to CDC guidelines, it is only a matter of time before the virus ravages detention facilities in Massachusetts. Given the contagious nature of the disease and the conditions at Respondents' facility, absent a temporary restraining order, Petitioners and proposed class members face serious illness, long-term health issues, and possible death from a virus with no known cure and no vaccine.

COVID-19 has already entered the state's correctional facilities. At least 64 inmates in Massachusetts correctional facilities have tested positive for COVID-19. *See* Betancourt, *supra*. As the world now knows from watching the same scene unfold time and again, the growth of

positive cases will be exponential.  At Cook County jail in Chicago, the number of positive cases among inmates and staff at the facility skyrocketed from 38 to 450 in less than a week.  Without adequate testing, low numbers of positive cases are a mirage.

A "serious, *daily* risk" to Petitioners' health qualifies as an irreparable harm.  *Watts v. Organogenesis, Inc.*, 30 F. Supp. 2d 101, 111 (D. Mass. 1998) (finding irreparable harm where plaintiff risked "stroke, heart attack, or death if" she did not receive proper nursing services).  The Court must not wait until each individual is infected with COVID-19 — by then it will be too late to prevent the irreparable harm Petitioners and proposed class members face.  *See Pesce v. Coppinger,* 355 F. Supp. 3d 35, 48 (D. Mass. 2018) (reasoning that pretrial detainee that facility refused to treat with methadone faced irreparable harm because he presented a "high risk of overdose and death upon his release if not treated" in pretrial detention) (internal quotation marks omitted).  Courts in other districts have found that even the failure to test for a disease suffices.  *See Boone v. Brown*, No. 05-cv-750 (AET), 2005 WL 2006997, at *14 (D.N.J. Aug. 22, 2005) (allegation of refusal to provide adequate testing for highly contagious infectious disease sufficient to demonstrate irreparable harm); *Austin v. Pa. Dep't of Corr.*, No. 90-cv-7497 (JED), 1992 WL 277511, at *7 (E.D. Pa. Sept. 29, 1992) (granting preliminary injunction for prison to develop testing and protocol for tuberculosis); *see also Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (correctional officers have an affirmative obligation to protect prisoners from infectious disease).  The only known way to prevent the spread of the virus is by adherence to rigorous sanitation, testing, and social distancing.  Respondents' failure to adhere to these measures presents a dire risk of irreparable harm to Petitioners.  Delay is a death sentence.

## C. An injunction furthers the public interest and the equities favor Petitioners and the proposed class.

When the government opposes a preliminary injunction, the public interest and balancing of the equities inquires merge. *See Devitri v. Cronen*, 289 F. Supp. 3d 287, 297 (D. Mass. 2018) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). And because Petitioners show that Respondents violated their constitutional rights, enjoining their unconstitutional behavior serves the public interest "because all citizens have a stake in upholding the Constitution." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005). Since one can judge a society by entering its prisons, "[t]he public has an especially strong interest in ensuring that its prisons are operated in a safe, constitutional, and non-discriminatory manner." *Reaves v. Dep't of Corr.*, 195 F. Supp. 3d 383, 426-27 (D. Mass. 2016) (quoting *Davis v. Ayala*, 576 U.S. 257, 135 S. Ct. 2187, 2210 (2015) (Kennedy, J., concurring)). This "especially strong interest" independently justifies an injunction here.

But the public interest in this case extends beyond the walls of Plymouth: a COVID-19 outbreak there could have devastating effects outside them. Advancing the "public health" qualifies as "a significant, perhaps compelling, state interest." *Philip Morris, Inc. v. Reilly*, 312 F.3d 24, 44 (1st Cir. 2002) (en banc).

Public health officials and medical professionals have concluded that the crucial step to minimize the spread of COVID-19 is to downsize jail populations. In Dr. Rich's expert opinion, reducing the number of residents at Plymouth will "flatten the curve of Covid-19 cases among incarcerated populations and … limit the impact of transmission both inside correctional facilities and in the community." Rich Aff. ¶ 22. That is because, given the churn of residents and staff through Plymouth, the outbreak of COVID-19 in the jail will not be confined to it. Dr. Rich explains that residents of detention facilities "are at heightened risk for severe illness" caused by

COVID-19 and "[t]he abrupt onset of severe COVID-19 infections among incarcerated individuals will require mass transfers to local hospitals" for intensive medical and ventilator care, which are "highly expensive interventions that are already in very short supply." Rich Aff. ¶¶ 15, 23-24. He thus concludes that "[e]ach severely ill patient coming from Plymouth who occupies an ICU bed may mean others may die for inability to obtain care." Rich Aff. ¶ 24 . The Supreme Judicial Court has agreed that a COVID-19 outbreak in the Commonwealth's detention facilities threatens the public health and thus imposed strict reporting requirements on prison administrators. *See Comm. for Pub. Counsel Servs.*, 2020 WL 1659939, at *15.

Here, denying relief would not further any public interest. Any additional administrative complexity that relief might cause – and Petitioners do not concede that it would cause any at all – would be outweighed by the lives it would save. What's more, that burden does not justify refusing to take steps necessary to protect the health and safety of Petitioners under the Fifth and Eighth Amendments. *See Pesce*, 355 F. Supp. 3d at 49. That potential burden pales in comparison to what is at stake to Petitioners, the class, and the public if preliminary relief is not issued.

## CONCLUSION

For all these reasons, the Court should certify a conditional class and grant a preliminary injunction, or, alternatively, a temporary restraining order providing the relief that Petitioners request in their accompanying motion.

/s/ Daniel Cloherty
Daniel J. Cloherty (BBO # 565772)
Saraa Basaria (BBO # 685705)
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626
dcloherty@toddweld.com
sbasaria@toddweld.com

/s/ Emily Schulman
Emily R. Schulman (BBO #566374)
Adam W. McCall (*pro hac vice pending*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6077
emily.schulman@wilmerhale.com
adam.mccall@wilmerhale.com

David E. Rudin (*pro hac vice pending*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 937-7249
david.rudin@wilmerhale.com

*Attorneys for Anthony Baez, Jonathan Bermudez, Jermaine Gonsalves, and Dedrick Lindsey and the proposed class*

## **CERTIFICATE OF SERVICE**

I, Emily R. Schulman, counsel for Petitioners, hereby certify that this document has been filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF); this document is being sent by first class mail to the Respondents c/o Patrick Lee, Director of Legal/Civil Process, Plymouth County Sheriff's Department, 24 Long Pond Road, Plymouth, MA  02360 and by email at plee@pscdma.org and to Rayford Farquhar, AUSA, United States Attorney's Office, One Courthouse Way, Boston, MA 02210 and by email at Rayford.Farquhar@usdoj.gov.

*/s/ Emily Schulman*
Emily R. Schulman