UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ANTHONY BAEZ, JONATHAN BERMUDEZ JERMAINE GONSALVES, and DEDRICK LINDSEY on behalf of themselves and all others similarly situated, | ) ) ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) | Civil Action No. 20-10753-LTS |
| ANTONE MONIZ, | ) ) | **Leave To File Granted** **On April 21, 2020** |
| Respondent. | ) | |

**RESPONDENT ANTONE MONIZ'S MEMORANDUM OF LAW IN OPPOSITION TO PETITIONERS' APPLICATION FOR AN EMERGENCY TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION**

ANDREW E. LELLING
United States Attorney

JASON C. WEIDA
Assistant U.S. Attorney

United States Attorney's Office
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, Massachusetts  02210
(617) 748-3180
jason.weida@usdoj.gov

Dated: April 21, 2020          *Attorneys for the Government*

Respondent Antone Moniz, Superintendent of the Plymouth County Correctional Facility ("Respondent"), respectfully submits this memorandum of law in opposition to Petitioner Anthony Baez's ("Baez"), Petitioner Jonathan Bermudez's ("Bermudez"), Petitioner Jermaine Gonsalves's ("Gonsalves"), and Petitioner Dedrick Lindsey's ("Lindsey," and collectively, "Petitioners") application for an emergency temporary restraining order and motion for preliminary injunction ("Petitioners' motion").  Doc. # 9.

## INTRODUCTION

Petitioners are federal pretrial criminal detainees charged with serious drug and gun crimes. They challenge the conditions of their confinement at the Plymouth County Correctional Facility as inadequate to address the threat to health and safety posed by COVID-19.  Rather than availing themselves of (or exhausting) the opportunities for seeking release in their respective criminal cases under the Bail Reform Act, Petitioners filed this civil action on behalf of themselves and a putative class seeking a highly extraordinary injunction that would require Respondent immediately to release some number of detainees, that would appoint an expert to recommend who and how many more detainees to release, and that would require this Court to function as a judicial monitor regarding the conditions of a state prison.

Petitioners' motion and the highly extraordinary injunctive relief it seeks must be denied for the following multiple independent reasons.  *First*, Petitioner's motion for injunctive relief must be denied for the reasons described in Respondent's motion to deny the Petition, filed earlier today.  Those reasons include: (1) this Court lacks subject matter jurisdiction under the Prison Litigation Reform Act; (2) Petitioners lack standing; and (3) Petitioners failed to exhaust administrative remedies, contrary to the Prison Litigation Reform Act's mandatory exhaustion requirements.  *Second*, Petitioners have an adequate remedy at law because are free *at any time* to

seek release due to the threat to health and safety posed by COVID-19 by moving before the judge assigned to their criminal cases under the traditional remedies afforded to criminal defendant in the Bail Reform Act. 18 U.S.C. § 3142. *Third*, the requested relief offends principles of comity because, at bottom, Petitioners are asking this Court to interfere with the operations of other sessions of this district court where Petitioners' criminal cases are pending. *Finally,* Petitioners have not satisfied the necessary elements of the injunctive relief they seek. They have not shown that they are likely to succeed on the merits of their Fifth Amendment or Eighth Amendment claims, or that the highly extraordinary injunctive relief they seek has any basis in law. Nor have they shown that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, or that the injunction they seek is in the public interest.

For these and other reasons discussed below, the Court should deny Petitioners' motion.

## BACKGROUND

**A.     COVID-19 In Massachusetts.**

On March 10, 2020, Governor Charlie Baker declared a state of emergency in Massachusetts based on the 2019 novel Coronavirus ("COVID-19") that originated in Wuhan, China.[1] As of April 20, 2020, there are 38,077 cases of COVID-19.[2] Of those 38,077 cases of COVID-19 in Massachusetts, 2,832 cases are in Plymouth County.[3] The population of Plymouth County is around 521,202.[4] Based on those figures, about half of one percent of the population in

---

[1] *See* https://www.mass.gov/executive-orders/no-591-declaration-of-a-state-of-emergency -to-respond-to-covid-19 (last visited Apr. 20, 2020).

[2] *See* https://www.mass.gov/doc/covid-19-cases-in-massachusetts-as-of-april-19-2020/ download (last visited Apr. 20, 2020).

[3] *See id.*

[4] *See* https://www.census.gov/quickfacts/plymouthcountymassachusetts (last visited Apr. 20, 2020) (estimate dated July 1, 2019).

Plymouth County has COVID-19 (2,832 out of 521,202).  The Town of Plymouth, where the Plymouth County Correctional Facility ("PCCF") is located, has 108 cases of COVID-19.[5]  With a population of 60,803,[6] less than 2/10th of one percent of the population of the Town of Plymouth has COVID-19 (108 out of 60,803).

**B.     Efforts To Prevent Exposure To COVID-19**
**At The Plymouth County Correctional Facility.**

PCCF is a correctional facility that houses inmates and detainees, including federal pretrial criminal detainees like Petitioners here.   The Plymouth County Sheriff's Department ("Department") operates the PCCF.  *See* Decl. of Joseph D. McDonald, Jr., attached as <u>Exhibit A</u> hereto, ¶ 2.  The Department has a contract with the Correctional Psychiatric Services ("CPS") to provide comprehensive medical services to inmates and detainees at the PCCF.  *See* Decl. of Lawrence Baker, M.D., attached as <u>Exhibit B</u> hereto, ¶ 1.  The Department and CPS provide services to Petitioners pursuant to an Inter-Governmental Service Agreement ("IGSA") with the U.S. Marshals Service ("USMS").  *See* Decl. of John Sheehan, attached as <u>Exhibit C</u> hereto.  As described below, all three entities—the Department, CPS, and USMS—have endeavored and, indeed, succeeded through the present time to prevent exposure to inmates and detainees at PCCF.

**1.     The Plymouth County Sheriff's Department Has Instituted Protocols At The**
**Plymouth County Correctional Facility To Prevent Exposure to COVID-19.**

Since the onset of COVID-19, the Department has instituted strict protocols at PCCF to prevent exposure to inmates and detainees.  Ex. A ¶ 6.  Those protocols include the following:

- Beginning in February, the Department enhanced its inmate intake procedure to obtain additional information about travel and exposure to illness.  *Id.*

---

[5]     *See*    https://www.mass.gov/info-details/covid-19-cases-quarantine-and-monitoring# covid-19-cases-in-massachusetts (last visited Apr. 20, 2020) (link to Word document on webpage).

[6]     *See*    https://www.census.gov/quickfacts/plymouthtownplymouthcountymassachusetts (last visited Apr. 20, 2020) (estimate dated July 1, 2018).

- The Department has adopted treatment and detection practices consistent with guidelines from the CDC and DPH. The Department's health services administrator is in frequent contact with DPH and consults them on the challenges facing the Department. *Id.*

- The Department suspended visits by friends, families, and volunteers. To assist with the transition, the Department arranged with its telephone vendors to provide two free calls per week. *Id.*

- The Department restricted attorney visits to non-contact. The Department disabled monitoring and recording functions for visit phones. *Id.*

- The Department has kept non-essential staff from entering PCCF, consistent with the governor's order for executive staff. *Id.*

- The Department has ceased inmate assignments to the farm operation, community work crew, and other work details outside PCCF. *Id.*

- The Department has eliminated unnecessary movement within PCCF. *Id.*

- The Department established a housing unit for newly admitted inmates and inmates who leave and return to PCCF, to monitor for signs and symptoms of the virus. Inmates remain in the unit until they clear the incubation period. *Id.*

- The Department has worked with Trial Court officials to limit travel outside PCCF by conducting hearings by videoconference and telephone. This greatly has reduced travel to and from PCCF and resulting potential exposure. *Id.*

- The Department has changed recreation and meal schedules to provide more space in the dayrooms. Inmates and detainees in standard large and small housing units have split recreation schedules so that approximately half are permitted access to the day room at one time. The inmates and detainees have split meal periods, as well. *Id.*

- The Department maintains an aggressive cleaning schedule for the housing units and conducts daily sanitation of transportation vans. *Id.*

- The Department has educated staff and inmates on sanitation practices and proper social distancing. The Department provides soap to the inmates and detainees weekly and as needed. The Department also provides cleaning supplies. *Id.*

- The Department conducts temperature screenings for all employees, contractors, and visitors to PCCF. *Id.*

- The Department has provided surgical masks for all PCCF staff and inmates. The Department encourages all staff to wear masks while on duty. The Department encourages inmates to wear masks while out of their cells and requires them to wear masks while working or when leaving the housing unit. *Id.*

- The Department has installed hand sanitizer dispensers in every housing unit. *Id.*

**2.     Correctional Psychiatric Services Deployed Clinical Guidelines To Prevent Exposure to COVID-19 At The Plymouth County Correctional Facility.**

In addition to the Department's protocols described above, CPS deployed a set of clinical guidelines, titled CPS Clinical Guideline for COVID-19/CORONAVIRUS ("CPS Clinical Guideline"), to educate and guide CPS staff, including the seven fulltime staff members at PCCF.[7] Ex. B ¶¶ 6, 8. "The CPS Clinical Guideline follows the most recent guidance pertaining to correctional and detention facilities from the Centers for Disease Control and U.S. Immigration and Customs Enforcement, as well as recommendations from the Massachusetts Department of Public Health and the World Health Organization." *Id.* ¶ 8.

Among other things, the CPS Clinical Guideline provides as follows:

- The CPS Clinical Guideline lists the possible symptoms of a COVID-19 infection and states that upon identification of any of those symptoms (*i.e.*, fever, cough, shortness of breath, loss of smell or taste, sore throat, tiredness, or diarrhea) the patient should immediately be masked. *Id.* ¶ 9.

---

[7] Note that these seven fulltime CPS staff members at PCCF are *in addition to* "[t]he Department's nursing staff," which "consists of 21 full-time employees plus a nursing supervising lieutenant." Ex. A ¶ 3.

- The CPS Clinical Guideline provides that if a patient presents with fever and any other symptoms then the medical staff is to perform a rapid test for Influenza A and B. If the influenza test is negative, then medical staff is to test for COVID-19. If a COVID-19 test is positive, then staff are instructed to monitor vital signs, especially temperature and oxygen saturation twice a day; offer acetaminophen 650 mg. twice per day or as needed for coronavirus symptoms for one week; monitor the patient's respiratory status to include oxygen saturation, trouble breathing, persistent chest pain or pressure, new onset of confusion or inability to arouse and any signs of cyanosis, and nurses are to notify the on-call doctor immediately if any symptoms are present and discuss possible transport to the local emergency room; and restrict patient movement unless emergent for anyone in isolation. Any movement while in isolation requires that staff wear a mask with shield, gloves and gown. *Id.* ¶ 10.

- The CPS Clinical Guideline also provides for the medical isolation of a patient with suspected COVID-19 infection be maintained until all the following criteria have been met:

    a. For individuals who will be tested to determine if they are still contagious: the individual has been free from fever for at least 72 hours without the use of fever-reducing medications AND the individual's other symptoms have improved (e.g., cough, shortness of breath) AND the individual has tested negative in at least two consecutive respiratory specimens collected at least 24 hours apart.

    b. For individuals who will NOT be tested to determine if they are still contagious: the individual has been free from fever for at least 72 hours without the use of fever-reducing medications AND the individual's other symptoms have improved (e.g., cough, shortness of breath) AND at least 7 days have passed since the first symptoms appeared.

    c. For individuals who had a confirmed positive COVID-19 test but never showed symptoms: At least 7 days have passed since the date of the individual's first positive COVID-19 test AND the individual has had no subsequent illness.

    *Id.* ¶ 11.

- The CPS Clinical Guideline provides for restriction of patients from leaving the facility while under medical isolation precautions, unless released from custody or if a transfer is necessary for medical care,

infection control, lack of medical isolation space, or extenuating security concerns.  *Id.* ¶ 12.

In addition to the CPS Clinical Guideline, CPS has taken the following steps:

- ***New Detainee Screening***.  Upon receiving a new detainee/inmate, medical staff screen the individuals for signs and symptoms of infection.  This includes event travel history, temperature checks, taking a recent medical history and observing the individual for any signs of sickness.  If an individual appears symptomatic on admission a mask is applied immediately, the individual is placed in isolation and clinical care guidelines are followed (as outlined above) thereafter.  *Id.* ¶ 18.

- ***Detainee Education and Monitoring***.  Nursing staff have also been instructed to use any detainee/inmate interaction as a time to educate the detainee/inmate regarding COVID-19, including that all inmates need to wash their hands frequently, avoid crowds and stay apart at least six feet whenever possible, and to report any shortness of breath or concerns of fever immediately to either nursing or security.  Additionally, signs have been posted in all units in English, Spanish, Portuguese and Chinese, indicating that if a detainee/inmate feels sick, they should notify medical staff and have a mask applied immediately.  Detainees and inmates are also being educated during medical encounters on the signs and symptoms of a COVID-19 infection.  *Id.* ¶¶ 16-17.

- ***Monitoring of Vulnerable Detainees***.  CPS staff are monitoring and reviewing all detainees and inmates who are known to have chronic disease or other co-morbidities which would make them more susceptible to a COVID-19 infection.  *Id.* ¶ 20.

- ***Staff Training and Supplies***.  COVID-19 health information has been posted in all units and visiting areas.  Staff have access to CDC materials, including posting the link/url for the CDC website on all medical area computer equipment.  A training website for CPS medical staff has been developed as well as a COVID-19 power point.  Staff have access to masks, disinfectant/sanitizer and other personal protective equipment.  *Id.* ¶ 15.

- ***Staff Precautions***.  CPS also is taking steps to ensure that staff do not inadvertently introduce COVID-19 into the facility by educating staff and screening them for raised temperatures or other signs of illness.  Staff have been instructed not to work if they feel ill and to report any symptoms for follow up.  Staff have also been educated

regarding both their own protection as well as CDC guidelines for eliminating virus transmission.  *Id.* ¶ 19.

**3.     USMS Works Closely With The Plymouth County Correctional Facility To Attend To The Medical Needs Of Pretrial Detainees In USMS Custody.**

In addition to the above steps taken by the Department and CPS, USMS itself provides monitoring and guidance to the medical staff at PCCF.  Specifically, USMS employs U.S. Public Health Service ("PHS") personnel—including physicians, physician assistants, and nurses—to oversee and manage its prisoner medical program.  Ex. C. ¶ 7.  The PHS staff work closely with medical personnel at the IGA facilities, like PCCF, to attend to the medical needs of USMS prisoners, like Petitioners.  *Id.* ¶ 7.

**C.     The Lack of Any COVID-19 Case Among Inmates And Detainees At The Plymouth County Correctional Facility.**

There is not currently, and has never been, a case of COVID-19 in the inmate and detainee population at PCCF.  Ex. A ¶ 7; Ex. B. ¶ 24; Ex. C ¶ 11.  There has been one case of COVID-19 of a PCCF staff member.  Ex. A ¶ 8; Ex. B. ¶ 25.  That individual's last day at PCCF was March 19, 2020.  The individual did not have close contact with any inmates or detainees.  Ex. A ¶ 8; Ex. B. ¶ 25.  The staff members that had close contact with that individual were sent home and were not permitted to return to PCCF for at least 14 days.  Ex. A ¶ 8; Ex. B. ¶ 25.  To date, that is the only case of COVID-19 at PCCF.  Ex. A ¶¶ 7-8; Ex. B. ¶¶ 24-25.

**D.     Pending Criminal Cases Against Petitioners.**

**1.     Anthony Baez.**

In November 2019, Baez was indicted for an array for serious drug crimes, including conspiracy to distribute large amounts of fentanyl.  *See* Doc. # 1, *United States v. Baez*, No. 4:19-cr-40049 (D. Mass.) (Hillman, J.) (charging conspiracy to distribute and possess with intent to distribute 500 grams or more of cocaine, 400 grams or more of fentanyl, 100 grams or more of

heroin, and 28 grams or more of cocaine base; distribution of 40 grams or more of fentanyl and heroin, and aiding and abetting; distribution of 100 grams or more of heroin and 40 grams or more of fentanyl, and aiding and abetting; and distribution of 400 grams or more of fentanyl and 100 grams or more of heroin, and cocaine, and aiding and abetting)

On April 6, 2020, Baez moved for release based on the conditions of his confinement at PCCF and the threat to health and safety posed by COVID-19.  *See* Doc. # 93, *Baez*, No. 4:19-cr-40049.  On April 10, 2020, based on an individualized inquiry, Magistrate Judge Kelley denied his motion and entered an order of detention.  *See* Doc. # 93, *Baez*, No. 4:19-cr-40049 ("The court is aware of the covid-19 pandemic and the problems it poses for the safety of those who are incarcerated.  In addition, Mr. Baez's four children are in the care of his mother who is reportedly overwhelmed and could use his help caring for the children.  The court is very sympathetic to these concerns but is also obligated to take into consideration the risks posed to public safety of those who make a living by selling illegal drugs that endanger others' lives, and who seem not to be deterred by being arrested and punished for it.").

**2.      Jonathan Bermudez.**

In April 2019, Bermudez, who has a prior conviction for assaulting a pregnant woman, also was indicted for serious drug crimes, including conspiracy to distribute large amounts of fentanyl. *See* Doc. # 1, *United States v. Bermudez*, No. 1:19-cr-10180 (D. Mass.) (Sorokin, J.) (charging conspiracy to distribute and possess with intent to distribute 400 grams or more of fentanyl and distribution of 40 grams or more of fentanyl).

On April 2, 2020, Bermudez moved, on an emergency basis, for release based on the conditions of his confinement at PCCF and the threat to health and safety posed by COVID-19. *See* Doc. # 109, *Bermudez*, No. 1:19-cr-10180.  On April 8, 2020, after the government responded,

this Court referred the motion to Magistrate Judge Dein. *See* Doc. # 113, *Bermudez*, No. 1:19-cr-10180. As of April 21, 2020, at the time of filing, Bermudez's emergency motion remains pending.

### 3.     Jermaine Gonsalves.

In October 2018, Gonsalves, a career offender with multiple state and federal convictions, also was indicted for, among other things, conspiracy to distribute large amounts of fentanyl. *See* Doc. # 1, *United States v. Gonsalves*, No. 1:18-cr-10468 (D. Mass.) (Gorton, J.) (charging conspiracy to distribute and possess with intent to distribute 400 grams or more of fentanyl and 100 or more grams of heroin).

On March 31, 2020, Gonsalves moved for release based on the conditions of his confinement at PCCF and the threat to health and safety posed by COVID-19. *See* Doc. # 381, *Gonsalves*, No. 1:18-cr-10468. On April 16, 2020, following a hearing and based on an individualized inquiry, Magistrate Judge Bowler denied his motion and reaffirmed her earlier finding that detention was warranted, but did so "without prejudice to renew if there is a change in circumstances." *See* Doc. # 396, *Gonsalves*, No. 1:18-cr-10468 ("As to the defendants new arguments for release based on the Covid-19 outbreak, this court finds the defendant did not present any special or extraordinary circumstances. Defendant's motion raises systematic and not particularized concerns regarding the institution where he is being held. He does not set forth any specific medical conditions that would make him more vulnerable or more at risk than other detainees at the institution. Therefore, this court finds that release is not warranted at this time. The motion is DENIED without prejudice to renew if there is a change in circumstances.").

### 4.     Dedrick Lindsey.

In March 2019, Lindsey, who has a long criminal history with multiple state convictions for serious drug and gun crimes (many of which serve as Armed Career Criminal predicates that

subject him to a fifteen-year mandatory minimum sentence), was indicted for being a felon in possession. *See* Doc. # 1, *United States v. Lindsey*, No. 1:19-cr-10091 (D. Mass.) (Wolf, J.).

Unlike the other Petitioners, on April 3, 2019, Lindsey waived his detention hearing and requested a voluntary order of detention. *See* Doc. # 13, *Lindsey*, No. 1:19-cr-10091. On April 4, 2019, based on Lindsey's waiver and request, Magistrate Judge Dein entered an order of detention. *See* Doc. # 15, *Lindsey*, No. 1:19-cr-10091. Also unlike the other Petitioners, Lindsey has not sought his release on the conditions of his confinement at PCCF or the threat to health and safety posed by COVID-19. *See generally Lindsey*, No. 1:19-cr-10091.

**E.     Petitioners' Detention at Plymouth County Correctional Facility.**

Each of the Petitioners is detained at PCCF. "Baez is assigned to Unit DS1, a small housing unit with a capacity of 62. As of April 20, the population of the unit was 34. The inmate roster reflects that Baez was assigned to a five-man cell with two other inmates on that date." Ex. A ¶ 9. "Bermudez is assigned to Unit H3, a large unit with a capacity of 139. As of April 20, the population of the unit was 74. The inmate roster reflects that Bermudez was in a cell by himself on that date." *Id.* ¶ 10. "Gonsalves is assigned to Unit H1, a large unit with a capacity of 139. As of April 20, the population of the unit was 68. The inmate roster reflects that Gonsalves was in a cell by himself on that date." *Id.* ¶ 11. "Lindsey is assigned to Unit BS1, a dormitory unit with a capacity of 60. As of April 20, the population of the unit was 10." *Id.* ¶ 12.

When Petitioners are in the common areas of their respective units, such as during recreation and meals, the Department takes a variety of precautions. For example:

- *Social Distancing in Common Areas*. To permit and encourage social distancing, the security staff spread out the day room chairs in the units. The Department conducts split recreation in the standard large and small units, with each side (in the large units) or each tier (in the small units) of the unit entering the day room at different times. The split recreation periods provide much more

space in the day room and offer significant opportunity for social distancing. The Department similarly provides meals for each portion of the large and small units at different times. This provides detainees multiple seating options which provide significant opportunity for social distancing. The inmates in the dormitory units continue to recreate and eat together. *Id.* ¶ 10.

- *Sanitation*. Multiple times each day, unit workers sanitize the units. Workers clean all tables, phones, day room chairs, showers, and cell door handles with 100 product multi-use disinfectant 256. Laundry workers clean all mop heads and cleaning rags every morning. Maintenance officers regularly use Virex spray to disinfect showers, day room chairs, tables, phones, all door handles, and railings in the morning before recreation periods begin. A cleaning crew cleans all visit rooms and sally ports with Virex fogging spray. *Id.* ¶ 11.

- *Sanitary Supplies*. The Department provides the detainees antibacterial soap weekly and as needed and provides the detainees the cleaning supplies they need. The Department provides toilet paper weekly and as needed. The detainees have access to the 100 product disinfectant to clean their cells. Unit workers have access to nitrex gloves for their assignments, and all inmates have access to plastic gloves at the officer panel for cleaning. The Department runs a laundry unit to keep clothing clean. *Id.*

## F.    The Petition In This Case.

In the Petition, Petitioners, on behalf of themselves and a putative class of all federal pretrial criminal detainee at PCCF (which they estimate to be about 150 detainees), challenge the conditions of their confinement at PCCF as inadequate to address the threat to health and safety posed by COVID-19. Doc. # 1 ¶ 1. According to Petitioners, those conditions violate the Fifth Amendment, *id.* ¶¶ 150-62 (First Cause of Action), and the Eighth Amendment, *id.* ¶¶ 163-78 (Second Cause of Action), and require the following relief:

- an injunction that would "[r]equire Respondents to immediately take all actions to reduce the federal detainee population at PCCF by releasing a sufficient number of federal detainees from the facility in order to ensure the health and safety of all members of the Class," *id.* at 39 (section B.1 of the prayer for relief);

12

- the appointment of "an expert under Federal Rule of Evidence 706 to make recommendations to the Court regarding how many and which class members to order released," *id.* at 39 (section B.2 of the prayer for relief); and

- judicial monitoring of PCCF to ensure that the conditions of Petitioners' confinement comply with the recommendations of their experts, *id.* at 40 (section B.4-7 of the prayer for relief).

The same day they filed the Petition, Petitioners filed their motion seeking the above injunction.

Doc. # 9.  This timely opposition followed.

## ARGUMENT

### I.   PETITIONERS' MOTION MUST BE DENIED FOR THE REASONS DESCRIBED IN RESPONDENT'S MOTION TO DENY THE PETITION.

As an initial matter, Petitioner's motion for injunctive relief must be denied for the reasons

described in Respondent's motion to deny the Petition, filed earlier today.  Those reasons include:

- *First*, this Court lacks subject matter jurisdiction under the Prison Litigation Reform Act, which places strict limits on a district court's ability to order the release of inmates and expressly precludes a single district judge from doing so.  18 U.S.C. § 3626(a)(3); *Money v. Pritzker*, No. 20-cv-2093, 2020 WL 1820660, at *1, 13 (N.D. Ill. April 10, 2020) (recognizing that, although "the issue of inmate health and safety is deserving of the highest degree of attention," an "order imposing a court-ordered and court-managed 'process' for determining who should be released" from a state prison in response to the COVID-19 pandemic falls "squarely within Section 3626(a)(3)—which forbids this Court from granting it").

- *Second*, Petitioners lack standing because they cannot establish either injury in fact or redressability.  Specifically, the site-specific circumstances in this case—(1) that there are *zero* cases of COVID-19 in the detainee population, (2) that a staff member tested positive for in mid-March and yet there are *still* no cases of COVID-19 in the detainee population as of April 20, (3) that units housing Petitioners are well under capacity and, indeed, two of the Petitioners have their own cells, (4) that Respondent takes a variety of precautions that reasonably provide for adequate social distancing when Petitioners are in common areas, and (5) that Petitioners do not have any medical conditions that present a higher risk for COVID-19—demonstrate that Petitioners' alleged injury is speculative and will not be redressed by ordering their release.

- *Third*, Petitioners failed to exhaust administrative remedies—and, indeed, did not even attempt to file an emergency grievance—before filing this case, contrary to the Prison Litigation Reform Act's mandatory exhaustion requirements.  42 U.S.C. § 1997e(a).

For all of the above reasons, or any one of them, this Court must deny the highly extraordinary injunctive relief Petitioners request here.

## II.   PETITIONERS' MOTION SHOULD BE DENIED BECAUSE PLAINTIFF HAS AN ADEQUATE REMEDY AT LAW, FORECLOSING INJUNCTIVE RELIEF.

Independently, Petitioners' motion should be denied because he have an adequate remedy at law.  *See Porto Rico Tel. Co. v. Puerto Rico Commc'ns Auth.*, 189 F.2d 39, 41 (1st Cir. 1951) (applying the rule to injunctions); *El Dia, Inc. v. Hernandez Colon*, 963 F.2d 488, 493, 497 (1st Cir. 1992) (applying "traditional principles of equity jurisprudence," including availability of adequate remedy at law, to declaratory judgment action where relief sought was "equitable in nature").  The Bail Reform Act ("BRA") expressly allows district courts to consider an individual defendant's health when deciding whether to detain him or her pending trial.  In addition to the standard motions for release by pretrial defendants, 18 U.S.C. § 3142(b), or for post-conviction release, 18 U.S.C. § 3143, or bail pending appeal, 18 U.S.C. § 3143(b)(1), a defendant may seek release under 18 U.S.C. § 3142(i), which provides that a "judicial officer may, by subsequent order, permit the temporary release of [a] person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."

Moreover, the Attorney General recently has issued guidance to federal prosecutors concerning "Litigating Pre-Trial Detention Issues During the COVID-19 Pandemic."  *See* Attorney General Barr Mem., dated Apr. 6, 2020, attached as Exhibit D hereto.  The Attorney General's April 6 Memorandum makes clear that "the current COVID-19 pandemic requires that [prosecutors] ensure [they] are giving appropriate weight to the potential risks facing certain

individual from being remanded to . . . custody." *Id.* Thus, although the Department's "paramount obligation" is to "[p]rotect[ ] the public," prosecutors must also "consider the medical risks associated with individuals being remanded into . . . custody during the COVID-19 pandemic." *Id.* at 1-2. Prosecutors "should consider not seeking detention to the same degree [they] would under normal circumstances," and must weigh "the risk of flight and seriousness of the offense . . . .against the defendant's vulnerability to COVID-19." *Id.* at 2. Likewise, "these same considerations should govern [prosecutors'] litigation of motions filed by detained defendants seeking release in light of the pandemic." *Id.* Such a defendant's "risk from COVID-19 should be a significant factor in [each prosecutor's] analysis[.]" *Id.*

Here, Petitioners are free to seek release due to the threat to health and safety posed by COVID-19 at any time by moving before the judge who is assigned to the detainee's criminal case. Indeed, various applications of this type have already been made in this district. *E.g.*, Doc. # 568, *United States v. Nia-Bush Moore*, No. 18-CR-30001 (D. Mass.) (Young, J.) (denying pretrial detainee's motion for release due to COVID-19 because her particular medical conditions were likely more safely managed by prison medical staff than in community given her history of noncompliance). Because Petitioners have multiple opportunities to seek release based on the BRA's robust statutory scheme, the highly extraordinary injunctive relief they seek here is foreclosed. *E.g.*, *El Dia, Inc.*, 963 F.2d at 497; *Porto Rico Tel. Co.*, 189 F.2d at 41.

## III.   PETITIONERS' MOTION SHOULD BE DENIED BECAUSE THE RELIEF THEY SEEK OFFENDS PRINCIPLES OF COMITY BY INTERFERRING WITH THE OPERATIONS OF OTHER SESSIONS OF THIS COURT.

Similarly, the Court should decline to allow the highly extraordinary equitable relief Petitioners seek here based on principles of comity. *See Coors Brewing Co. v. Mendez-Torres*, 678 F.3d 15, 28 (1st Cir. 2012) ("Comity is a doctrine of equitable restraint[.]"). "When an injunction sought in one federal proceeding would interfere with another federal proceeding,

considerations of comity require more than the usual measure of restraint, and such injunctions should be granted only in the most unusual cases." *Bergh v. State of Wash.*, 535 F.2d 505, 507 (9th Cir. 1976); *see CitiFinancial Corp. v. Harrison*, 453 F.3d 245, 251 (5th Cir. 2006) ("[O]ne district court judge, whether as a matter of respect and institutional orderliness, if not jurisdiction, should shy from involvement in a case proceeding before another Article III judge."). Exercising restraint in cases involving courts of coordinate jurisdiction "keeps to a minimum the conflicts between courts administering the same law, conserves judicial time and expense, and has a salutary effect upon the prompt and efficient administration of justice." *Brittingham v. U.S. Comm'r of Int. Rev.*, 451 F.2d 315, 318 (5th Cir. 1971).

At bottom, Petitioners are asking this Court to take the extraordinary step of interfering with the operations of other sessions of this district court where Petitioners' criminal cases are pending.[8] Abiding by Congress's statutory scheme in the BRA avoids the comity problems that Petitioners' motion raises. Because courts should avoid comity problems when possible, this Court should deny Plaintiff's motion. *E.g.*, *Coors Brewing Co.*, 678 F.3d at 28.

## IV. PETITIONERS' MOTION SHOULD BE DENIED BECAUSE THEY HAVE NOT SATISFIED THE ELEMENTS NECESSARY TO OBTAIN THE INJUNCTIVE RELIEF THEY SEEK.

If Petitioners were able to overcome all three of the above barriers to injunctive relief (and they cannot), their motion still should be denied for failure to satisfy the necessary elements of the injunctive relief they seek. "The same four-factor test for preliminary injunctions also has been

---

[8] With the possible exception of Bermudez, whose bail application currently is pending before Magistrate Judge Dein following this Court's referral of the motion. *See* Doc. # 113, *Bermudez*, No. 1:19-cr-10180. But even with Bermudez, he has not yet exhausted the relief available to him under the BRA. Indeed, given the multiple opportunities for seeking bail and reconsideration of bail determinations under the BRA, none of the Petitioners has yet exhausted those traditional remedies afforded to criminal defendants.

extended to temporary restraining orders." *Asadoorian v. Travis*, No. 11-10963, 2011 WL 2224984, at *1 (D. Mass. June 7, 2011). "A preliminary injunction is an 'extraordinary and drastic remedy,'" *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 2948, at 129 (2d ed. 1995), that "is never awarded as of right." *Id.* at 690. "A plaintiff seeking a preliminary injunction must establish that [1] he is likely to succeed on the merits, that [2] he is likely to suffer irreparable harm in the absence of preliminary relief, that [3] the balance of equities tips in his favor, and that [4] an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). To warrant the more extraordinary relief of a temporary restraining order, however, Petitioners must demonstrate that their injury is "immediate and irreparable." Fed. R. Civ. P. 65(b). Plaintiff cannot satisfy any of these dispositive elements.

### A.   Petitioners Have Not Shown That They Are Likely To Succeed On The Merits Of Their Claims Against Respondent.

"The sine qua non of this four-part inquiry is likelihood of success on the merits." *Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006) (*quoting New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)). "[I]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *Id.*; *see also Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 173 (1st Cir. 2015) (same); *Perez-Kudzma v. United States*, No. 17-11877, 2017 WL 6209190, at *1 (D. Mass. Dec. 8, 2017) (same). Here, Petitioners cannot show that they is likely to succeed on the merits of their claims against Respondent.

### 1.   Petitioners Have Not Shown A Fifth Amendment Violation.

Petitioners allege that the conditions of their confinement at PCCF violate the Fifth Amendment. *See* Doc. # 1 ¶¶ 150-62 (First Cause of Action). To evaluate the constitutionality of

a pretrial detention condition under the Fifth Amendment, a district court must determine whether those conditions "amount to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Punishment may be shown through an express intent to punish or a restriction or condition that "is not reasonably related to a legitimate governmental objective." *Id.* at 539; *see also Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473-74 (2015) (clarifying that "a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose"). In addition, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989).

Petitioners do not allege an express intent to punish them. *See generally* Doc. # 1. Nor do they challenge the general propositions that the government "may permissibly detain a person suspected of committing a crime prior to a formal adjudication of guilt," *Bell*, 441 U.S. at 534, and that the government "has a substantial interest in ensuring that persons accused of crimes are available for trials and, ultimately, for service of their sentences, or that confinement of such persons pending trial is a legitimate means of furthering that interest," *id.* Thus, Petitioners may succeed on their Fifth Amendment claim only if their confinement is not reasonably related to a legitimate governmental objective or is excessive in relation to the legitimate governmental objective, *see Kingsley*, 135 S. Ct. at 2473-74, or if Respondent fails to provide for his reasonable safety, *see DeShaney*, 489 U.S. at 200.

Here, Petitioners have not made that showing and cannot do so as circumstances currently stand at PCCF. As described in the attached declarations, PCCF is taking active and substantial

measures to respond to a challenging public health crisis.  Ex. A; Ex. B.  Indeed, CAPT Steven S. Wolf, MD, a PHS physician and the Medical Director for the USMS Prisoner Operations Division, reviewed those measures and opines that "PCCF is providing appropriate precautions to protect their prisoner population during the current COVID-19 pandemic."  Ex. C. ¶ 10.

Those measures create conditions that are reasonably related and not excessive in relation to the government's interests in ensuring that Petitioners are available for their trials and, ultimately, for service of their sentences, and are legitimate means of furthering those interests— especially when:

- All of the Petitioners are charged with serious drug or gun crimes. Three (Baez, Bermudez, and Goncalves) are charged with conspiracy to distribute large amounts of fentanyl.  Some, like Lindsey, have lengthy criminal histories (*e.g.*, drug and gun convictions).  One of them (Bermudez) assaulted a pregnant woman.

- Based on the gravity of those charges and criminal histories, all of the Petitioners are subject to valid orders of detention issued by federal magistrate judges.

- Two of those magistrate judges recently denied release requests filed by two of the Petitioners (Baez and Goncalves) based on individualized, case-specific facts and determined that those Petitioners should remain in detention despite the threat to health and safety posed by COVID-19.[9]

Moreover, PCCF's measures generally track the recommendations of public health authorities, including the CDC.  Ex. A; Ex. B; Ex. C.

Of course, the risk of contracting COVID-19, either in PCCF or elsewhere, cannot be entirely eliminated.  But Respondent is not required to eliminate any risk to Petitioners.  Rather, Respondent is required to provide for their reasonable safety.  *See DeSahney*, 489 U.S. at 200. Because PCCF's measures meet that standard, Petitioners' claim under the Fifth Amendment fails

---

[9] Bermudez's release request currently is pending and Lindsey has not sought release.

and, at a minimum, is unlikely to succeed on the merits. *E.g.*, *Kingsley*, 135 S. Ct. at 2473; *DeShaney*, 489 U.S. at 199; *Bell*, 441 U.S. at 535.

## 2.      Petitioners Have Not Shown An Eighth Amendment Violation.

Petitioners also allege that the conditions of their confinement at PCCF violate the Eighth Amendment. *See* Doc. # 1 ¶¶ 163-78 (Second Cause of Action). The Eighth Amendment protects against the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. "A prison official violates the Eighth Amendment only when two requirements are met." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "First, the deprivation alleged must be, objectively, 'sufficiently serious.'" *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). A deprivation is sufficiently serious if "a prison official's act or omission" causing such a deprivation "result[s] in the denial of 'the minimal civilized measure of life's necessities.'" *Id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Second, "a prison official must have a 'sufficiently culpable state of mind.'" *Id.* (quoting *Wilson*, 501 U.S. at 297). "[T]hat state of mind is one of 'deliberate indifference' to inmate health or safety." *Id.* (quoting *Wilson*, 501 U.S. at 302–03).

Plaintiffs have not shown that they can meet either of these requirements. *First*, they have not suffered a "sufficiently serious" deprivation. *See Wilson*, 501 U.S. at 297. The active and substantial measures PCCF is taking to respond to a challenging public health crisis does not come close to satisfying the standard of deprivation Petitioners must satisfy here. Ex. A; Ex. B; Ex. C. None of the Petitioners is held in crowded units. To the contrary, the units housing Baez, Bermudez, and Gonsalves are half empty, Ex. A ¶¶ 9-11, and Lindsey's unit is at less than 20 percent capacity, *id.* ¶ 12. And, both Bermudez and Gonsalves have their own cells.[10] *Id.* ¶¶ 10-

---

[10] While Baez and Gonsalves share living quarters with a limited number of other detainees, this is also true of many unincarcerated members of the community who live with roommates or family members. *See Hines v. Youssef*, No. 13-0357, 2015 WL 164215, at *4 (E.D. Cal. Jan. 13, 2015) ("Unless there is something about a prisoner's conditions of confinement that raises the risk

11.  When Petitioners are in common areas, such as during recreation and meals, PCCF takes a variety of precautions that reasonably provide for adequate social distancing. *Id.* ¶¶ 10-11. Moreover, Petitioners' own healthcare provider attests, based on a review of their medical records and observations during detention, that none them has a medical condition that presents "a higher risk for COVID-19." *See* Decl. of Marcia Norat, attached as Exhibit E hereto.[11]

*Second*, Petitioners cannot satisfy the subjective criterion, which requires them to prove "that officials had subjective knowledge of the serious medical need and recklessly disregarded the excessive risk to inmate health or safety from that risk." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (citing *Farmer*, 511 U.S at 837). The test is subjective, meaning "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer*, 511 U.S at 837. To be sure, PCCF is acutely aware of the risk that COVID-19 poses to its detainee population and to the public at large, but it can hardly be said to be indifferent, as shown by the actions to counteract the spread of COVID-19 described above and in the multiple declarations Respondent has submitted in connection with this opposition. Ex. A; Ex. B; Ex. C; Ex. E.

While Petitioners may disagree with some of the measures taken by PCCF to protect detainees, deliberate indifference cannot be not shown simply by a difference of medical judgment. *See Scott v. Benson*, 742 F.3d 335, 340 (8th Cir. 2014) (holding that a "mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation"). Because that is all Petitioners offer—a difference of medical

---

of exposure substantially above the risk experienced by the surrounding communities, it cannot be reasoned that the prisoner is involuntarily exposed to a risk the society would not tolerate.").

[11] Ms. Norat is PCCF's Health Services Administrator. Ex. E. Because her declaration contains medical information about Petitioners, it has been submitted under seal.

judgment from purported experts who have never been to PCCF, or at least not recently, and who rely on hearsay declarations provided by Petitioners' lawyers in their criminals cases—Petitioners' claim under the Eighth Amendment fails and, at a minimum, is unlikely to succeed on the merits.

### 3.   Respondent Lacks Authority To Release Pretrial Detainees Subject To An Order Of Detention From Another Session Of This Court.

In addition, Petitioners have not shown how Respondent is empowered to provide the primary relief they seek:  their release from detention.  Doc. # 1 at 39 (section B.1-2 of the prayer for relief).  Although Respondent is the immediate custodian for Petitioners, they are not subject to detention by any authority of Respondent.  Rather, Petitioners are subject to detention by order of the federal judges assigned in each of their pending criminal cases.  *See* 18 U.S.C. § 3142. Petitioners cite no authority for the extraordinary proposition that Respondent may reduce its detainee population when those detainees are subject to valid, case-specific orders of detention from other federal judges in this district (or have requested detention, like Lindsey, resulting in an order of detention).  *See* Doc. # 1 at 39 (section B.1 of the prayer for relief).  Nor do Petitioners cite any authority for the equally extraordinary proposition that a court-appointed expert may usurp that judicial function in the guise of "recommendations to the Court regarding how many and which class members to order released."  *Id.* at 39 (section B.2 of the prayer for relief).

As discussed above (*supra* Part II), the bail process is the only appropriate legal avenue through which Petitioners may seek release due to the threat to health and safety posed by COVID-19.  Because Petitioners may seek release in their criminal cases, because Respondent is unable to release them on his own authority, and because a court-appointed expert may not usurp that judicial function, the Court should deny Petitioners' motion.

### B.  Petitioners Have Not Shown That They Are Likely To
###     Suffer Irreparable Harm In The Absence of Injunctive Relief.

Independently, Petitioners have not shown that they are likely to suffer immediate and irreparable harm in the absence of injunctive relief.  To the contrary, Petitioners' alleged harm— that their detention increases the risk of harm from COVID-19—is speculative based on the site-specific circumstances at PCCF.  There is not currently, and has never been, a case of COVID-19 in the inmate and detainee population at PCCF.  Ex. A ¶ 7; Ex. B. ¶ 24 Ex. C ¶ 11.  Although there has been one case of COVID-19 of a PCCF staff member, it has been 33 days since that individual was last at PCCF.  Ex. A ¶ 7; Ex. B. ¶ 24.  To put that into perspective, 33 days is more than six times the median incubation period (about five days) and more than double the CDC's recommended quarantine period (14 days).  Indeed, the fact that a staff member tested positive for COVID-19 in mid-March, and yet there are zero cases of COVID-19 in the inmate and detention population as of April 20, indicates that PCCF's efforts *are working*.  That fatally undermines Petitioners' claim that the efforts to prevent exposure to COVID-19 at PCCF are insufficient to the point where they require the highly extraordinary remedies they seek, including judicial monitoring and release of detainees.

Nor have Petitioners shown that their alleged injury—that they are subject to a heightened risk of death from COVID-19—will be redressed by ordering their release.  To the contrary, Petitioners' desired relief—release from detention—will not ameliorate their claimed heightened risk of injury or death resulting from COVID-19, nor can release prevent them from contracting COVID-19.  Petitioners offer no proof—nor is Respondent aware of any—that their release from PCCF, a facility without a single case of COVID-19 in the inmate and detainee population, into Massachusetts, which has declared a state of emergency based on the COVID-19 crisis, or anywhere else, will reduce their risk of injury or death. *See generally* Doc. # 1.  Although infection

rates in Plymouth County are relatively low (less than half of one percent of the population), that rate is higher than zero—the current infection rate among inmates and detainees at PCCF.

Moreover, it cannot be overlooked that PCCF provides medical care at no cost to detainees, including Petitioners.  By reason of their detention, Petitioners have greater access to robust medical care than many in the general public.  Ordering their release from PCCF would leave Petitioners without their present access to health care and could put them at greater risk of serious complications in the event that they contracts COVID-19.  As Dr. Baker attests generally in his declaration:

> While it is clear that a prison setting poses particular challenges from an infectious disease stand-point, the risk of infection is tempered by the degree of control we have over access to the facility.  We are screening incoming detainees/inmates carefully and taking steps to isolate them as necessary.  We have a highly educated and trained staff that is acutely aware of the risks posed by the pandemic.  We are also providing a level of medical care to the detainees/inmates that they are unlikely to receive outside of PCCF.

Ex. B ¶ 21.

Because Petitioners have not shown that they are likely to suffer immediate and irreparable harm, the Court should deny Plaintiff's motion.

### C.   Petitioners Have Not Shown That The Balance Of Equities Tip In Their Favor Or That An Injunction Is In The Public Interest.

The final two factors, which "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009), also tilt strongly against injunctive relief.  Here again, Petitioners have not met their burden.  Petitioners ask this Court to order Respondent to release an unspecified but presumably substantial number of pretrial detainees so that the remaining detainees will not have to share living space and can more easily practice social distancing.  But Petitioners do not provide any information regarding viable housing options outside of PCCF, either for themselves or members of the putative class, or whether they or members of the putative class, if

asked to leave PCCF, would be deprived of access to food, means of personal hygiene, and medical care.[12]   Not only would that put them at risk of becoming infected with COVID-19, but it would also put others in the community at risk, thereby undermining the substantial public efforts to suppress the spread of the COVID-19.   Because Petitioners have not shown that these remaining factors support the extraordinary injunction they seek, the Court should deny Plaintiff's motion.

## **CONCLUSION**

For all of the foregoing reasons, Respondent respectfully requests that the Court deny Petitioner's motion.

Respectfully submitted,

ANTONE MONIZ
Superintendent of the Plymouth
County Correctional Facility

By his attorneys,

ANDREW E. LELLING,
United States Attorney

By:   /s/ Jason C. Weida
Jason C. Weida
Assistant U.S. Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, Massachusetts  02210
(617) 748-3180

Dated:  April 21, 2020                          Jason.Weida@usdoj.gov

---

[12] The CDC emphasizes that people who are homeless are particularly vulnerable to COVID-19.   *See*   https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/index.html (last visited Apr. 20, 2020).