UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANTHONY BAEZ et al., | ) |
| | ) |
| Petitioners, | ) |
| | ) |
| v. | ) Civil No. 20-10753-LTS |
| | ) |
| ANTONE MONIZ, | ) |
| | ) |
| Respondent. | ) |

ORDER ON MOTIONS TO DISMISS (DOC. NOS. 21, 39)
AND APPLICATION FOR INJUNCTIVE RELIEF (DOC. NO. 9)

May 18, 2020

SOROKIN, J.

In this action, four federal pretrial detainees housed at the Plymouth County Correctional

Facility ("PCCF"), on behalf of themselves and all other federal criminal detainees at PCCF,

challenge their confinement in light of the present COVID-19 pandemic.  The "plaintiff-

petitioners" allege violations of the Fifth and Eighth Amendments, arising from the manner in

which PCCF has responded to the pandemic, in a "Class Action Petition Seeking Writ of Habeas

Corpus Under 28 U.S.C. § 2241 and Complaint for Declaratory and Injunctive Relief."  Doc. No.

1.  The petition was accompanied by an "Application for an Emergency Temporary Restraining

Order and Preliminary Injunctive Relief."  Doc. No. 9.[1]  The respondent—Antone Moniz, the

Superintendent of PCCF, represented here by counsel from the United States Attorney's Office

for this District—opposes the request for injunctive relief and seeks dismissal of the petition in

---

[1] The petitioners also seek class certification, Doc. No. 6, the consideration of which the Court
has stayed, Doc. No. 16.

its entirety on various grounds.  Doc. Nos. 21, 23, 39.  The Court heard oral argument on the

motions to dismiss and the application for injunctive relief at a video hearing on April 30, 2020,

Doc. No. 50, requested additional information from Moniz, Doc. No. 52, and has received that

information as well as supplemental submissions from both parties, Doc. Nos. 53-60.

     The motions to dismiss and the application for injunctive relief are now ripe.  For the

reasons set forth below, the motions to dismiss are DENIED, as is the application for injunctive

relief.  Because Moniz, in part, challenges this Court's jurisdiction to entertain the petitioners'

claims and to award the relief sought, the Court will address the motions to dismiss first.

I.    <u>DISMISSAL</u>

     Moniz cites four reasons he believes dismissal is warranted.[2]  The Court addresses and

rejects each.

     <u>First</u>,[3] Moniz argues that the constitutional claims the petitioners allege here are properly

viewed as "challenge[s] to the conditions of their confinement," and that such challenges fall

"well outside the core of habeas corpus."  Doc. No. 40 at 2.  As even Moniz's counsel agreed at

oral argument, however, habeas relief plainly is available to a petitioner challenging the fact or

duration of his confinement and seeking release from such confinement.  <u>Wilkinson v. Dotson</u>,

544 U.S. 74, 78 (2005).  And, the First Circuit has held, habeas relief also is available under

§ 2241 to a petitioner seeking what "can fairly be described as a quantum change in the level of

---

[2] Initially, Moniz raised one further reason, arguing the petitioners lacked standing to pursue their constitutional claims because, he urged, they had not established injury in fact or redressability.  Doc. No. 21 at 2; Doc. No. 22 at 21-25.  However, after a state inmate at PCCF tested positive for COVID-19 on April 30, 2020, Moniz withdrew his standing challenge.  Doc. No. 49 at 2.

[3] Moniz filed two motions to dismiss.  Doc. Nos. 21, 39.  Because the analysis of the challenges levied in his first such motion to dismiss is impacted by the resolution of the jurisdictional argument advanced in his second motion, the Court begins by addressing the latter-filed challenge to its habeas jurisdiction.

[his] custody." Gonzalez-Fuentes v. Molina, 607 F.3d 864, 873 (1st Cir. 2010).  Cases such as this one which present hybrid challenges aimed both at the conditions of confinement and at the ultimate fact or level of confinement are difficult to classify, as they are neither traditional or "core" habeas claims nor straightforward conditions cases arising under 42 U.S.C. § 1983. However, neither the Supreme Court nor the First Circuit has categorically foreclosed petitioners like those before this Court from invoking federal habeas jurisdiction; indeed, both Courts have expressly declined to do so.  E.g., Preiser v. Rodriguez, 411 U.S. 475, 499-500 (1973) ("This is not to say that habeas corpus may not also be available to challenge [unconstitutional] prison conditions."); United States v. DeLeon, 444 F.3d 41, 59 (1st Cir. 2006) ("If the conditions of incarceration raise Eighth Amendment concerns, habeas corpus is available.").

The petitioners have specifically alleged: "Under the current conditions at PCCF, Respondents have not and cannot protect Petitioners and the class from this risk of serious harm. In these circumstances, release is the only means of protecting Petitioners and the class they seek to represent from unconstitutional treatment."  Doc. No. 1 ¶ 131 (emphasis added).  In light of this assertion, against the legal landscape outlined above, and in the extraordinary circumstances presented by the COVID-19 pandemic, the Court finds that the petitioners' claims sound in habeas, and this Court has jurisdiction to consider them under § 2241.  See Doc. No. 52 at 1 (concluding "that this action sounds, at least in part, in habeas"); see also Money v. Pritzker, --- F.3d ----, 2020 WL 1820660, at *8-9 (N.D. Ill. Apr. 10, 2020) (discussing the difficulty in categorizing claims arising at "the intersection of habeas and civil rights" law, noting "the statues and case law [in that area] weave a thick and tangled web," and addressing the constitutional claims presented under both rubrics); cf. Savino v. Souza, No. 20-cv-10617, ECF No. 175 (D. Mass. May 12, 2020) (reasoning that even if habeas relief were unavailable, "a cause of action

for equitable relief relating to [the petitioners'] conditions of confinement is available wholly apart from habeas" where petitioners had filed action styled similarly to this one).  Thus, Moniz's second motion to dismiss (Doc. No. 39), pressing only this challenge, is DENIED.

Second, construing this action as one properly viewed through the lens of § 1983, Moniz urges that this Court lacks jurisdiction to enter an order that would have the effect of releasing any member(s) of the proposed class, citing a provision in the Prisoner Litigation Reform Act ("PLRA") barring single district judges from entering such an order.  Doc. No. 22 at 15-21 (citing 18 U.S.C. § 3626(a)(3)(B)).  That prohibition, however, by its terms applies only in a "civil action in Federal court with respect to prison conditions."  § 3626(a)(3)(B).  By definition, "habeas corpus proceedings challenging the fact or duration of confinement in prison" are excluded from the prohibition's reach.  § 3626(g)(2).  As explained above, the Court has concluded that this action arises under § 2241 and is properly viewed, at least in part, as a challenge to the fact or duration of the petitioners' confinement.  This conclusion renders the PLRA's provisions governing "prisoner release orders" inapplicable.  In this case, as the petitioners have presented it, § 3626(a)(3)(B) does not limit this Court's jurisdiction, which arises under § 2241.

Third, Moniz argues that the Court must dismiss this action because the petitioners have not exhausted their administrative remedies by filing prison grievances challenging the conditions described in their petition.  Once again, this is an argument arising from a provision of the PLRA.  See Doc. No. 22 at 25-28 (discussing the "PLRA's mandatory exhaustion requirement" in 42 U.S.C. § 1997e(a) and the limited exceptions thereto).  That provision, like the one governing "prisoner release orders," does not apply here, where the action is appropriately construed as one arising under § 2241.  As such, even assuming PCCF's grievance

procedures are "available" to this proposed class of petitioners and would reach the constitutional claims they press here,[4] the petitioners' failure to satisfy the PLRA's exhaustion requirement is not grounds for dismissal of this habeas action.[5]

Finally, Moniz argues dismissal is required because he "lacks the authority to provide the primary relief [the petitioners] seek in this lawsuit: their release from detention." Doc. No. 22 at 28-30. This is not a basis for dismissal. As the petitioners' immediate custodian, Moniz is the appropriate respondent in an action brought under § 2241. Rumsfeld v. Padilla, 542 U.S. 426, 439 (2004). Moniz has cited no authority suggesting that, where § 2241 provides this Court with jurisdiction to entertain a constitutional challenge to the fact or duration of a petitioner's confinement, this Court's ability to order a remedy to any established constitutional violation is nevertheless limited. Here, the alleged violations and the request for release relate to the conditions of confinement at PCCF, and the petitioners seek either release in general, or release to a different facility or a different form of custody (i.e., "enlargement"), for some class

---

[4] Because this case arises under § 2241, the Court not resolve whether any administrative remedies truly are "available" to the petitioners and the specific challenges articulated in this case for purposes of § 1997e(a). See Doc. No. 22-1 at 8-9 (providing that grievances at PCCF may be filed only by individuals, not by groups or classes of detainees, and that any grievance form complaining about more than one condition or incident will not be accepted).

[5] Though federal courts generally apply a "providential exhaustion requirement" to habeas claims brought under § 2241, this Court will not do so here. See Monahan v. Winn, 276 F. Supp. 2d 196, 204 (D. Mass. 2003) (finding PLRA exhaustion requirement did not apply to habeas action challenging Bureau of Prisons rule impacting execution of criminal sentences and declining to otherwise require exhaustion where it would be futile). This case arises from extraordinary circumstances and unprecedented public health risks, both in general and in the specific context of a prison setting. In addition, requiring each of the more than 160 federal detainees at PCCF to file a separate grievance for each condition at issue here (i.e., one challenging access to masks, one challenging access to soap, one challenging access to hand sanitizer, one challenging seating at meal times, one challenging cleaning of phones, one challenging lack of information about how to use masks, one challenging a particular guard's failure to wear a mask at a particular time, one challenging proximity of bunks, and so on—multiplied by the number of proposed class members) would be so impractical as to render it futile.

members.  Moniz has identified no barrier to this Court awarding such relief, should the

petitioners prevail in this action.  Whether another party should enter this action in order to

ensure any future order granting relief is effectuated (e.g., the Attorney General,[6] to whose legal

custody the class members are committed), and to what extent any relief should be tailored to

avoid conflict with orders of detention issued by other District Judges (e.g., ordering transfer to a

different facility instead of release on bail), are questions properly considered when considering

the merits and tailoring relief on a complete factual record.  They are not issues justifying

dismissal.

In sum, none of the grounds Moniz cites in either of his motions provide a basis for

wholesale dismissal of the petition at this stage.  Accordingly, Moniz's motions to dismiss (Doc.

Nos. 21 and 39) are DENIED.

II.     INJUNCTIVE RELIEF

Having resolve the dismissal motions and found that § 2241 permits it to exercise

jurisdiction in this matter, the Court turns next to the petitioners' application for emergency

injunctive relief.  A summary of the evidence adduced by both parties and pertinent to the

familiar factors guiding consideration of the petitioners' application is necessary.

A.      Relevant Facts

At the time this action was filed, no detainee at PCCF had tested positive for COVID-19.

One staff member had tested positive in March, three days after that person's last shift at PCCF.

Doc. No. 23-2 ¶ 25.  Contact tracing was done by PCCF, confirming the person had not had

close contact with any detainees during the relevant time period.  Doc. No. 23-1 ¶ 8.  Other staff

---

[6] Notably, the Attorney General is present in the form of lawyers from the United States
Attorney's Office representing Moniz, although he is a county official.  In response to an inquiry
from the Court, those lawyers stated they perceived no conflict in the representation.

members who did have close contact with the person were required to stay home and self-quarantine for fourteen days.  Id.

The petition and the application for injunctive relief are supported by affidavits from two doctors specializing in infectious disease, one doctor who has worked in New York prisons, and five lawyers who represent current federal detainees at PCCF.  Doc. Nos. 1-3, 1-4, 1-5, 1-8, 1-9, 1-10, 1-11, 1-12.  The doctors speak generally about COVID-19 and more specifically about the risks it presents in a prison setting.  None purport to have direct personal knowledge about PCCF and its current practices or responses to the pandemic.  The lawyers describe telephone conversations they had with their clients in early and mid-April, including the four named petitioners and proposed class representatives, about the conditions they were experiencing at PCCF at the time of those conversations.  According to the lawyers' affidavits, some of their clients claimed not to have received face masks, some shared cells with multiple other detainees, some claimed not to have access to sufficient hygienic and cleaning supplies, and all described PCCF's failure to enforce social distancing by staff and detainees.

In seeking dismissal and opposing the application for injunctive relief, Moniz submitted declarations of Plymouth County Sheriff Joseph McDonald, Jr.; PCCF's medical director, Dr. Lawrence Baker; the Assistant Director of the United States Marshals Service's Prisoner Operations Division, John P. Sheehan; and PCCF's Health Services Administrator, nurse Marcia Norat.  Doc. Nos. 22-1, 22-2, 22-3, 22-7.  The declarations describe steps taken at PCCF in response to the COVID-19 pandemic, from the time Massachusetts declared a state of emergency on March 10, 2020 through the time the declarations were submitted on April 21, 2020. Measures taken included enhanced intake procedures to screen for exposure to the virus; a quarantine unit to monitor new detainees for fourteen days; suspension of in-person visits and

off-site work details; exclusion of non-essential staff and volunteers; reduction of movement within PCCF and travel beyond the facility; changes to meal and recreation schedules to limit the number of detainees eating or using recreation space at a given time; daily temperature screenings for staff upon arrival; installation of hand sanitizer dispensers in housing units; cleaning of housing units multiple times each day; and distribution of surgical masks to detainees and staff.  Doc. No. 22-1 ¶¶ 6, 13-14.

After reviewing both parties' initial filings, the Court required Moniz to supplement his submissions with more information, which he supplied via new declarations by Sheriff McDonald and nurse Norat on April 24, 2020.  Doc. No. 31.  Those declarations described the criteria for and status of COVID-19 testing at PCCF as of that date, noted one named petitioner was housed in a dorm where the beds had been moved six feet apart, described another named petitioner's cell arrangements and confirmed that the heads of the three occupied beds in his cell were more than six feet apart, listed three dates on which each detainee and each staff member received a face mask, described signs posted and other communications regarding social distancing, and provided photographs and diagrams confirming the referenced bed measurements and poster placement.  Doc. No. 31-1, 31-4, 31-5, 31-6, 31-7.

Just before the scheduled hearing on the pending motions, Moniz notified the Court that two additional staff members and one state inmate at PCCF had just tested positive for COVID-19.  Doc. Nos. 48, 49.  One staff member worked in PCCF's booking unit, and the other transported immigration detainees among other facilities.  Doc. No. 48.  PCCF traced each staff member's contact with other employees and detainees, then placed one state inmate in quarantine and required all identified employees to self-quarantine at home based on such contact.  Id.  The state inmate tested positive within a week of his arrival at PCCF and had been housed only in the

booking unit and the intake quarantine unit.  Doc. No. 49.  He reported having had contact just before his arrest with individuals he later learned had tested positive for COVID-19.  Id.  He was tested upon reporting symptoms, was kept in isolation while the results were pending, and then was assigned to a negative pressure room when the positive result was reported.  Id.

After the motion hearing, the Court ordered Moniz to respond to a list of additional questions about conditions at PCCF.  Doc. No. 52.  He did so on May 6, 2020, with a third set of declarations by Sheriff McDonald and nurse Norat.  Doc. No. 54.  Sheriff McDonald provided detailed information about the capacity, population, and sleeping arrangements in each unit housing any of the 164 federal detainees held at PCCF as of May 6th.  Doc. No. 54-1 at 1.  Like PCCF as a whole, each housing unit is significantly under capacity.  Id.  For each unit, Sheriff McDonald also described available seating arrangements at meal times and the areas accessible during recreation times.  Id. at 1-3.  He identified four dates in April on which each detainee and each staff member received a face mask, another date on which masks were distributed to managers of certain inmate work assignments, and three dates on which directives regarding the use of face masks were given to staff and/or detainees.  Id. at 3.  As of April 24, 2020, PCCF employees were "direct[ed] . . . to keep their masks on whenever they are within six feet of another person."  Id.  According to Sheriff McDonald, PCCF had more than 10,000 extra masks available "to provide to staff and inmates for replacement" as needed and placed weekly orders for more.  Id. at 3-4.  The Sheriff also described cleaning procedures and the products used, cleaning and hygiene supplies available to detainees, and the nature of grievances PCCF had received that related to COVID-19.  Id. at 4-6.

In her declaration, nurse Norat described the 107 test kids PCCF possessed, sixty-five of which she explained did not comply with state testing guidelines, and said PCCF can request and

receive "up to 20 [additional] kits a day for a limited . . . purpose[] of outbreak management."
Doc. No. 54-2 at 1.  She also described 107 sick call requests between March 10 and May 4,
2020, which resulted in nurses issuing cold or cough medication, and forty-eight more requests
which nurses referred to medical providers for assessments and treatment.  Id. at 1-2.  According
to nurse Norat, all COVID-19 "testing determinations were based on an objective assessment of
the presence or absence of accompanying symptoms and the medical provider's clinical
judgment."  Id.

On May 7, 2020, the petitioners supplemented their previous submissions with a new set
of affidavits of lawyers representing the four named petitioners and two other members of the
proposed class, again relaying information about conditions at PCCF the lawyers learned in
conversations with their clients.  Doc. No. 56.  In particular, one named petitioner disputed
whether the bunks in his dorm had been moved six feet apart; others said there had been "no
change" to meal times, and that meals were distributed by inmate workers who did not wear
masks.  Several said that detainees continued to sit close together at tables while eating after
standing close together in line to collect their meals, and that PCCF was not encouraging or
enforcing social distancing during meals and at recreation time.  Some detainees said they had
received fewer than four face masks, several described having received little to no information
about how to use the face masks, and most asserted that PCCF staff did not consistently wear
face masks while on duty.  In addition, several detainees noted that the hand sanitizer available to
them was alcohol-free (and, thus, ineffective), and some described instances in which requests
for more soap or toilet paper were refused by guards.  See id. at 2-4 (summarizing affidavits).

The day after the petitioners' submission, Moniz sought to refute the factual claims
described in the new set of lawyers' affidavits with more affidavits of his own—this time, from

four of PCCF's Assistant Deputy Superintendents ("ADS"), each of whom conveyed information based on his personal knowledge and first-hand observations while working at the facility. Doc. No. 57. For example, an ADS who conducts daily rounds in several housing units observed consistent use of face masks by staff "when they are near the inmates," described his own efforts to remind detainees he encounters about social distancing (the importance of which he described as "a well-known fact"), and said he has seen staff provide new masks to inmates upon request. Doc. No. 57-1. Another ADS described efforts to space chairs in housing unit day rooms apart from one another—and to prevent detainees from moving the chairs back together—as well as his own interactions with one named petitioner during which he reminded that petitioner and other detainees to distance themselves from one another. Doc. No. 57-2. That ADSD also said that after a disturbance in one housing unit including federal detainees, he "went cell-to-cell in the unit" on three consecutive days and "reinforced the rules of the unit, the importance of social distancing, [and] the importance of wearing masks in the dayroom." Id.

A third ADS described a memorandum he sent to all corrections officers working in the units he supervises instructing them on various policies aimed at maintaining social distancing among detainees and at face mask usage. Doc. No. 57-3. He noted his own ongoing efforts to personally remind both detainees and staff about the need for social distancing, confirmed the housing arrangements for certain proposed class members, and disputed several specific assertions made in the attorneys' affidavits submitted by the petitioners regarding conditions during meal and recreation times and usage of face masks by staff. Id. In addition, he stated that "unit workers" clean common areas in the housing units after lunch and between recreation periods, when one half of the detainees in the unit leave the area and before the other half enter it. Id. The fourth ADS "was directly involved with the distribution of masks to all inmates and

detainees" on four occasions (essentially, weekly) in April, and again on May 8, 2020.  Doc. No.

57-4.  He also verified that he had personally spaced apart the bunks, using a tape measure to

ensure six-foot separation, in one named petitioner's dorm, and also had measured the distance

from head-to-head of the beds in another named petitioner's cell.  Id.  Finally, he described

having reviewed security camera tapes to investigate claims made in one attorney's affidavit

about a detainee's observation of unmasked guards during his telephone call with the attorney,

and said that the footage showed only two officers—both wearing masks—were present during

the call.  Id.  Each of the four ADSs stated that PCCF provided alcohol-free hand sanitizer due to

security concerns arising from making an alcohol-based product available in a jail setting.

According to status reports filed by Moniz, three other Plymouth County Sheriff's Office

employees have tested positive for COVID-19: two who do not work at PCCF, and one who

tested positive more than a week after last visiting PCCF.  Doc. Nos. 53, 62.  None had close

contact with any PCCF detainee or staff.  Id.  As of May 12, 2020, a total of nineteen inmates

and detainees at PCCF had been tested for COVID-19, with one state inmate testing positive and

all other results being negative.[7]  Doc. No. 62.

B.      Legal Analysis

The Court considers petitioners' request for injunctive relief using the familiar standard,

weighing the following four factors: "(1) the [movant's] likelihood of success on the merits; (2)

---

[7] Though Moniz did not provide similar statistics for staff, the Court takes judicial notice that the most recent Special Master's Weekly Report filed in Committee for Public Counsel Services v. Chief Justice of the Trial Court, No. SJC-12926, ("Special Master's Report") reflects that as of May 10, 2020, a total of seventeen tests had been performed of corrections officers and other staff at PCCF, with five of those individuals testing positive (presumably not reflecting the most recent positive result, disclosed in Moniz's May 12, 2020 status report here).  See App'x at 12, Special Master's Report (May 11, 2020), available at https://www.mass.gov/doc/sjc-12926-special-masters-weekly-report-51120/download (last visited May 14, 2020).

the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." Charlesbank Equity Fund II v. Blinds to Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004). The First Circuit has called the first of those factors—the movant's likelihood of success on the merits—"[t]he sine qua non of this four-part inquiry." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002); see Savino, ECF No. 175 at 11-12 (noting first two factors are the most important ones, and that they interact with one another, such that a greater likelihood of success on the merits allows for a lesser showing of irreparable harm, and vice versa). Failure to establish the primary factor of likelihood of success renders "the remaining factors . . . matters of idle curiosity." New Comm Wireless Servs., 287 F.3d at 9.

The petitioners' claims arise under the Fifth Amendment's Due Process Clause (for those federal detainees who are awaiting trial) and the Eighth Amendment's prohibition on cruel and unusual punishment (for those federal detainees who have been convicted but are awaiting sentencing, and those who have been sentenced but are awaiting transfer to a federal facility). Though the petitioners urge that the two Amendments require different legal standards, with pretrial detainees facing a less daunting test under the Fifth Amendment than the "deliberate indifference" showing required by the Eighth Amendment, the First Circuit has not endorsed such a view, so this Court may not do so either. As other sessions of this Court have explained, binding First Circuit precedent describes the two standards as "not all that far apart," with both leaving "ample room for professional judgment, constraints presented by the institutional setting, and the need to give latitude to administrators who have to make difficult trade-offs as to risks and resources." Battista v. Clarke, 645 F.3d 449, 453 (1st Cir. 2011); see Savino, ECF No. 175

at 20-23 & n.16 (assessing Fifth Amendment claim of immigration detainees under "deliberate indifference" standard and discussing state of First Circuit decisions in this area); Couchon v. Cousins, No. 17-cv-10965, 2018 WL 4189694, at *6 (D. Mass. Aug. 31, 2018) (finding First Circuit precedent did not permit District Court to apply standard other than "deliberate indifference" to Fifth Amendment claim involving challenge to conditions of confinement).

Accordingly, all members of the proposed class, regardless which Amendment forms the basis for their habeas challenge to PCCF's response to the COVID-19 pandemic, must establish that Moniz has acted "with deliberate indifference to a substantial risk of serious harm to health." Coscia v. Town of Pembroke, 659 F.3d 37, 39 (1st Cir. 2011); accord Farmer v. Brennan, 511 U.S. 825, 835 (1994). This standard has a subjective component; to satisfy it, the petitioners "must provide evidence that the [respondent] had actual knowledge of impending harm, easily preventable, and yet failed to take the steps that would have easily prevented that harm." Zingg v. Groblewski, 907 F.3d 630, 635 (1st Cir. 2018) (quotation marks and citation omitted). The requisite mental state is said to be "characterized by obduracy and wontonness, not inadvertence or error in good faith," and "has been likened to . . . criminal recklessness." Leite v. Bergeron, 911 F.3d 47, 52-53 (1st Cir. 2018) (quotation marks omitted); accord Whitley v. Albers, 475 U.S. 312, 319 (1986); Giroux v. Somerset Cty., 178 F.3d 28, 32 (1st Cir. 1999).[8]

There is, and can be, no meaningful dispute that COVID-19 presents a substantial risk of serious harm to health, to the proposed class of petitioners in this case as well as to members of

---

[8] The Court's conclusion would not change even if it were inclined to, and could, adopt the less stringent standard urged by the petitioners, as the present record does not establish that the petitioners are likely to succeed in showing that Moniz's response to COVID-19 at PCCF has been objectively unreasonable. See Doc. No. 10 at 30-31 (listing cases from other jurisdictions applying an objective reasonableness standard to Fifth Amendment conditions-of-confinement claims).

society at large.  The petitioners here, however, have not established that they are likely to

succeed in showing that Moniz has been obdurate, wonton, or reckless with respect to that risk,

or has otherwise failed to take reasonable steps aimed at preventing or mitigating the risk that

COVID-19 presents to those detained at PCCF.  The Court reaches this conclusion having

carefully considered all submissions and arguments by both parties, and especially considering

three broad types of risk COVID-19 creates in a congregate setting like a prison:  the danger that

the virus will be brought into the setting; the risk that the virus will spread within the setting once

there, and the need to monitor whether and to what extent the virus may be present in the setting.

First, according to the declarations submitted by Moniz, PCCF has adopted many

measures and policies aimed at keeping COVID-19 from entering the facility.  All detainees and

inmates entering the facility are screened for symptoms, then held in individual cells in an intake

quarantine unit for fourteen days.  This applies both to detainees or inmates new to PCCF as well

as to inmates or detainees returning to PCCF from any outside activity such as a court hearing or

hospital examination.  Doc. No. 22-1 at 3.  Staff are encouraged to stay home if they are sick,

temperatures are checked upon their arrival, and they have face masks they are required to wear

while working if they are within six feet of others.  Only essential people are permitted to enter

PCCF, with all family and face-to-face legal visits suspended, as are programming run by outside

volunteers and work details requiring detainees to leave the facility.  Travel outside the facility

has been limited, with most (if not all) court appearances occurring by video.  Most of these facts

are undisputed by the petitioners.[9]  On this record, the petitioners have not met their burden of

---

[9] The only contrary evidence the petitioners have offered is the claim repeated in several of the
attorneys' affidavits that detainees have observed many employees not wearing masks.  The
petitioners have offered nothing contradicting the description of the intake and quarantine
procedure, staff temperature checks, the elimination of visits and work by nonessential outsiders,
and the severe reduction in travel by detainees outside PCCF.

establishing that they are likely to succeed in showing that Moniz has been deliberately indifferent to the risk that COVID-19 will infiltrate PCCF.

Second, according to the declarations submitted by Moniz, PCCF has similarly undertaken meaningful actions aimed at controlling and mitigating against the spread of COVID-19 within the facility.  When a new inmate demonstrated symptoms, he was promptly tested and placed in isolation; upon learning the results of the test were positive, he was placed in a negative pressure cell.  When staff members tested positive, efforts were made to identify those who had close contact with them—including, on multiple occasions, reviewing security camera footage to trace the person's contacts—and steps were taken to quarantine the relevant people.

Face masks have been distributed to all detainees and staff on multiple occasions, with policies adopted requiring their use when detainees leave their housing units and when staff has close contact with detainees.  The overall population of PCCF has been steadily declining since the beginning of April, and the proposed class has diminished in size as well.[10]  All housing units that include federal detainees are substantially under their capacity, and ninety-four proposed class members were housed in their own cells as of May 6, 2020.  Doc. No. 54-1 at 1.  The remaining seventy federal detainees are in shared cells or dorm units, but Moniz has offered

---

[10] According to the Special Master's Report, the population of PCCF was close to 800 at the beginning of April, and was 651 as of May 10, 2020.  PCCF was designed to hold 1,250 inmates.  Doc. No. 22-1 ¶ 7.  According to uncontradicted information submitted by Moniz, there were 170 federal detainees at PCCF as of April 19, 2020, and 164 as of May 6, 2020.  Doc. No. 22-3 ¶ 11; Doc. No. 54-1 at 1.  The most recent set of affidavits Moniz submitted demonstrate that in just two days, between May 6 and May 8, 2020, the occupancy of the two large housing units at PCCF to which federal detainees are assigned (H1 and H3) decreased still further (from 65 to 62, and from 67 to 66, respectively).  Compare Doc. No. 54-1 at 1 (65 men in unit H1 and 67 men in unit H3, both of which have a capacity of 139, on May 6th), with Doc. No. 57-2 ¶ 4 (66 men in H3 on May 8th), and Doc. No. 57-3 ¶ 4 (62 men in H1 on May 8th).

diagrams and photographs demonstrating his efforts to ensure that all beds in such units have at least six feet of space between their heads.

A majority of the proposed class are in housing units where the detainees are split into two groups (roughly in half) for meal and recreation times, reducing the number of detainees using common spaces at any one time and providing more space in which detainees may spread out to eat and recreate. The recent affidavits of Moniz's assistant deputies describe several of them making individual and direct efforts to remind detainees of the importance of social distancing and to encourage their compliance. In addition, at least one ADS specifically described cleaning procedures aimed at disinfecting the common areas after one group has used them and before another enters. Doc. No. 57-3 ¶ 11. Sheriff McDonald and his deputies have also described more general cleaning procedures that have been amplified in response to the pandemic, as well as the ways in which they make cleaning supplies available to detainees. In addition, overall movement within the facility has been minimized, apparently resulting in the detainees spending most of their time in their assigned housing units with the same group of men.

Though the petitioners dispute the particulars related to some of these areas,[11] on the present record, they have not met their burden of establishing that they are likely to succeed in

---

[11] For example, the lawyers' affidavits submitted by the petitioners include varying statements about the number of masks they have received (though all concede having received at least one), claims by some named petitioners that their beds are not six feet from others (though Moniz's documentation to the contrary is powerful evidence), and describe as many as thirty-five men eating meals together (though the large units, where there are enough detainees to make it possible for half of the group to total in the thirties, have enough tables and day room chairs to allow that number of men to spread out during meals, if they wished to do so). The petitioners have not sought to refute the overall capacity and population of each relevant housing unit or the manner in which PCCF responded when an inmate and several staff members tested positive for the virus, nor have they specifically disputed many of the cleaning practices described in Moniz's submissions.

showing that Moniz has been deliberately indifferent to the undeniable risk that COVID-19 could spread quickly and devastatingly within PCCF.

     <u>Third</u>, according to the declarations submitted by Moniz, PCCF takes a number of steps aimed at identifying detainees and staff who might be infected with COVID-19.  Besides performing temperature checks on staff when they arrive each day, Moniz has offered declarations stating that PCCF's medical staff received training on how to detect and treat COVID-19, adopted testing criteria based on state and federal guidelines, and took steps to identify and monitor detainees with known risk factors making them especially vulnerable to the virus.  Doc. Nos. 22-2, 22-7, 31-5.  As of May 6, 2020, seventeen PCCF detainees and inmates had been tested for the virus.[12]  Doc. No. 54.  Consistent with Dr. Baker's earlier declaration and federal guidance, nurse Norat described PCCF's decisions about whether and when to test as guided by the "clinical presentation" of the individual and "the medical provider's clinical judgment," considering symptoms, their reported onset, and an objective assessment of the detainee's condition.  Doc. No. 54-2.  The petitioners have offered no evidence—medical or otherwise—contradicting Moniz's submissions as to these points or calling into question the reasonableness of the described approach.[13]  On this record, the petitioners have not met their

---

[12] This number remained the same as of May 10, 2020, according to the most recent Special Master's Report.

[13] The parties have not discussed it, but the Court takes judicial notice of the fact that there presently is litigation pending before the Supreme Judicial Court ("SJC") challenging conditions in facilities run by the Massachusetts Department of Corrections ("DOC").  <u>Foster v. Mici</u>, No. SJC-12935.  Following a recent oral argument, the DOC submitted a letter responding to a series of questions posed by the SJC about matters at issue in that case.  Supp. Citation of the Dep't of Corr. (May 13, 2020), <u>available at</u> https://www.mass.gov/doc/sjc-12935-supplemental-citation-of-the-department-of-correction (last visited May 15, 2020).  On pages 7 and 8 of its May 13, 2020 letter, the DOC described its approach to COVID-19 testing in its facilities and how that approach has evolved since the state of emergency began in Massachusetts.  Initially, its approach was the same as that employed by PCCF now: "consistent with CDC and DPH guidelines, testing was done per the protocol and medical judgment of the medical vendor at

burden of establishing that they are likely to succeed in showing that Moniz has been deliberately indifferent to the risk that would arise from a failure to identify PCCF detainees and staff carrying the virus.

In sum, the petitioners have not established a likelihood of success on the merits of their constitutional claims.  This is so whether the three risk areas the Court has discussed are considered separately or cumulatively.  In light of this conclusion, the Court need not proceed to the remaining prongs of the preliminary junction analysis.  The Court notes that in reaching this conclusion, the Court has not found—and does not believe—that a petitioner must be on the precipice of serious illness or death in order to establish standing, substantial risk of serious harm to health, a likelihood of irreparable harm, or a likelihood of success on the merits.

III.    <u>CONCLUSION</u>

For the foregoing reasons, the respondent's motions to dismiss (Doc. Nos. 21 and 39) and the petitioners' application for emergency injunctive relief (Doc. No. 9) are DENIED.

---

each facility and included inmates who were symptomatic, or non-symptomatic but a 'close contact' of anyone who tested positive."  By late April, though, perhaps in response to one or more outbreaks at DOC facilities, DOC gained access to "[l]arge-scale mobile testing," and began offering "institution-wide testing" at facilities beginning on April 22, 2020.  In the letter, DOC described its ongoing plan to offer such testing to every inmate and staff member at every DOC facility by May 31, 2020.  The DOC also affirmed that "there is no shortage of tests available to" it.

The petitioners in this case have not suggested the Constitution requires institution-wide testing, nor have they asked for it.  The Court highlights DOC's approach to testing because it appears eminently sensible, and it shows that DOC's response to this virus—like PCCF's, in many ways—is something that necessarily is constantly evolving as more information and more resources become available.  It also evidences a recognition that aggressive measures aimed at minimizing and preventing outbreaks are preferable to reactionary efforts to manage an outbreak after it has occurred.  DOC may have learned that lesson the hard way.  PCCF and other county facilities, most of which have testing rates similar to PCCF per the Special Master's Report, would be wise to benefit from DOC's experience as well as, if possible, gain access to either DOC's testing resources or those available to the Attorney General.

One further point bears mention.  The law is clear and unequivocal in certain respects.

"Prison officials must provide humane conditions of confinement, including adequate medical

care."  Leite, 911 F.3d at 52 (quotation marks omitted); accord Farmer, 511 U.S. at 832.  Each

member of the putative class is in the legal custody of the Attorney General of the United States,

who bears ultimate responsibility for their health and safety.  18 U.S.C. § 3142(i)(2).  Court

rulings requiring a showing of deliberate indifference to prevail on a constitutional claim, and

procedural requirements such as exhaustion of administrative remedies before filing a section

1983 conditions claim, in no way dilute the legal and moral obligations borne by the Attorney

General, PCCF, and other officials personally responsible for the health and safety of persons

who are imprisoned in their custody.  Rather, such rulings and requirements are jurisdictional

means of allocating responsibility and oversight for the safety of persons in confinement and the

operation of prisons.

On the record developed to date, the petitioners have not demonstrated they are likely to

succeed on the merits of their claims.  Nonetheless, the obligation the law imposes on Moniz

remains unabated.  His submissions reflect that he has adopted many reasonable policies and

practices to protect the individuals working and imprisoned at PCCF.  Less clear is whether and

to what extent he is ensuring that such policies and practices are effectively and consistently

implemented by those working for him.  Moreover, nothing in the Court's ruling endorses

PCCF's apparent failure to provide clear, detailed, institution-wide education about the risks of

COVID-19 generally, the proper use of face masks, and the importance of social distancing.

While posting signs and instructing staff to give direction during personal interactions with

detainees is commendable, straightforward communication and regular access to accurate

information are powerful antidotes to the anxiety and rumor likely to occur among people confined to a prison in the face of a fast-spreading virus.

*      *      *

The Court anticipates resolving this petition expeditiously.  No later than May 27, 2020, the parties shall file a joint status report stating their joint or separate positions regarding how, and on what schedule, this matter should proceed.  In addition, Moniz shall file a status report, by the same date, explaining whether and how PCCF is expanding its testing in line with the institution-wide testing occurring in DOC facilities, and if not, why not.

SO ORDERED.

 /s/ Leo T. Sorokin
United States District Judge